IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT P. KEMPSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-252 KAJ |
| | ) | |
| TOLL BROS., INC., a corporation of | ) | |
| the Commonwealth of Pennsylvania, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TOLL BROS., INC., a corporation of | ) | |
| the Commonwealth of Pennsylvania, | ) | |
| | ) | |
| Third Party Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE HEATING AND AIR | ) | |
| CONDITIONING SERVICES, INC., a corporation | ) | |
| of the State of Delaware, and | ) | |
| JD FRAMING CONTRACTORS, INC., a | ) | |
| corporation of the State of New Jersey, | ) | |
| | ) | |
| Third Party Defendants | ) | |

## THIRD PARTY COMPLAINT

COMES NOW, Defendant/Third-Party Plaintiff, by and through its undersigned

attorneys and pursuant to Fed. R. Civ. P. 4 and 14, files this Third Party Complaint against

Delaware Heating and Air Conditioning Services, Inc., and JD Framing Contractors, Inc.,

alleging as follows:

1

The Parties

1.    Plaintiff Robert P. Kempski ("Kempski") is an adult resident of the State of
Delaware and resides at 818 Woodlawn Avenue, Apartment C3, Wilmington, Delaware.

2.    Defendant/Third Party Plaintiff Toll Bros., Inc. ("TBI") is a Pennsylvania
corporation with its principal place of business in Horsham, Pennsylvania.

3.    Third Party Defendant Delaware Heating and Air Conditioning Services, Inc.
("DHAC") is a Delaware corporation that may be served through its registered agent Corporate
Agents, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware.  DHAC lawfully
conducts business in the State of Delaware.

4.    Third Party Defendant JD Framing Contractors, Inc. ("JD Framing") is a New
Jersey corporation that may be served at its principal place of business located at 200 Delores
Drive, Cinnaminson, New Jersey.  JD Framing lawfully conducts business in the State of
Delaware.

Venue and Jurisdiction

5.    Venue is proper in this Court as the incident giving rise to this lawsuit took place
in Wilmington, Delaware, which is located in this judicial district.

6.    Jurisdiction over the initial Complaint is proper under 28 U.S.C. § 1441(a).  This
Court has supplemental jurisdiction over this Third Party Complaint under 28 U.S.C. § 1367(a).

The Contracts

7.    TBI lawfully conducts business in Delaware.

8.    One of TBI's business projects was developing a subdivision in Wilmington,
Delaware (the "Development").

9.      DHAC entered into a contract with TBI (the "DHAC Contract") to perform work on the Development as a contractor.  (Relevant portions of DHAC Contract attached hereto as Exhibit A).

10.     The DHAC Contract required DHAC to defend and indemnify TBI for any claims related to DHAC's work.

11.     The DHAC Contract required DHAC to procure liability insurance designating TBI as a named insured and beneficiary of the policy, to cover TBI for any claims associated with work performed under the DHAC Contract.

12.     In compliance with the DHAC Contract, DHAC procured liability insurance with Penn National Insurance Company (the "Penn National Policy").

13.     JD Framing entered into a contract with TBI (the "JD Framing Contract") to perform work on the Development as a contractor.  (Relevant portions of JD Framing Contract attached hereto as Exhibit B).

14.     The JD Framing Contract required JD Framing to defend and indemnify TBI for any claims related to JD Framing's work.

15.     The JD Framing Contract required JD Framing to procure liability insurance designating TBI as a named insured and beneficiary of the policy, to cover TBI for any claims associated with work performed under the JD Framing Contract.

16.     Pursuant to the JD Framing Contract, JD Framing submitted an insurance certificate to TBI evidencing coverage from Sirius America Insurance Company.

The Alleged Accident

17.     Upon information and belief, Kempski was an employee of DHAC at all relevant times.

18.     Kempski allegedly fell from a floorboard while working in a certain house (the "House") in the Development (the "Alleged Accident").

19.     Kempski has filed a Complaint (Exhibit C) that seeks to hold TBI liable for the Alleged Accident on theories of negligence and premises liability.

20.     Kempski has sought damages and compensation for the injuries sustained in the Alleged Accident from TBI.

21.     TBI has filed an Answer to the Complaint denying liability to Kempski in any manner.

The Dispute

22.     TBI did not control the House at the time of the Alleged Accident.  Instead, the House was controlled by whatever contractor was in charge of it at the time.

23.     DHAC was the contractor in charge of HVAC work in the House.

24.     TBI had no duty to control DHAC's worksite or employees.  Instead, DHAC, as an independent contractor, was solely responsible for the work of its employees, including their safety.

25.     The DHAC Contract required DHAC to procure insurance listing TBI as a named additional insured for losses related to work under the DHAC Contract.

26.     The DHAC Contract requires DHAC to defend and indemnify TBI.

27.     The House was in "frame" condition at the time of the Alleged Accident.

28.     JD Framing was the contractor in charge of framing the House.

29.     TBI had no duty to control JD Framing's worksite or employees.  Instead, JD Framing, as an independent contractor, was solely responsible for the work of its employees, including liability to third parties for claims related to that work.

4

30.     The JD Framing Contract required JD Framing to procure insurance listing TBI as a named additional insured for losses related to work under the JD Framing Contract.

31.     The JD Framing Contract requires JD Framing to defend and indemnify TBI.

<u>Count I – Negligence (Indemnification/Contribution)</u>

<u>Against DHAC</u>

32.     TBI incorporates by reference all preceding allegations of this Third Party Complaint.

33.     TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

34.     DHAC, and not TBI, was responsible for the work and safety of its employees, including Kempski.

35.     TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, DHAC was negligent by, *inter alia*:

      a.     Failing to properly supervise its employees;

      b.     Failing to properly train its employees;

      c.     Failing to properly inspect the work area of its employees;

      d.     Failing to properly secure the allegedly loose floor board;

      e.     Failing to implement proper safety procedures for work of the type at issue;

      f.     Failing to observe its employees performing work in an unsafe manner;

      g.     Failing to adequately warn its employees of the dangers associated with their work;

      h.     Failing to use proper materials;

      i.     Failing to comply with applicable statutes, regulations, and ordinances regarding worker safety;

      j.     Failing to use due care to prevent foreseeable injury to its employees.

36.     TBI is entitled to indemnification and/or contribution from DHAC to whatever extent DHAC is found to have proximately caused Kempski's alleged injuries.

<u>Count II – Negligence (Indemnification/Contribution)</u>

<u>Against JD Framing</u>

37.     TBI incorporates by reference all preceding allegations of this Third Party Complaint.

38.     TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

39.     JD Framing, and not TBI, was responsible for the work of its employees, including liability to third parties for claims related to that work.

40.     JD Framing, and not TBI, was responsible for passing the House to the next contractor in a safe condition after JD Framing finished its work.

41.     TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, JD Framing was negligent by, *inter alia*:

      a.     Failing to pass the House to the next subcontractor in a reasonably safe condition;

      b.     Failing to properly supervise its employees;

      c.     Failing to properly train its employees;

d.      Failing to properly inspect the work of its employees;

e.      Failing to properly secure the allegedly loose floor board;

f.      Failing to implement proper safety procedures for work of the type at issue;

g.      Failing to observe its employees performing work in an unsafe manner;

h.      Failing to use proper materials;

i.      Failing to warn of a dangerous condition when it had a duty to do so;

j.      Failing to comply with applicable statutes, regulations, and ordinances regarding worker safety;

k.      Failing to use due care to prevent foreseeable injury to third parties from the work of its employees.

42.     TBI is entitled to indemnification and/or contribution from JD Framing to whatever extent JD Framing is found to have proximately caused Kempski's alleged injuries.

<u>Count III – Premises Liability (Indemnification/Contribution)</u>

<u>Against DHAC</u>

43.     TBI incorporates by reference all preceding allegations of this Third Party Complaint.

44.     TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

45.     DHAC, and not TBI, was responsible for maintaining a reasonably safe work area for its employees.

46.    DHAC, and not TBI, controlled the worksite of its employees – the premises at issue.

47.    TBI is entitled to indemnification and/or contribution to whatever extent DHAC's failure to maintain the premises is found to have proximately caused Kempski's injuries.

<u>Count IV – Premises Liability (Indemnification/Contribution)</u>

<u>Against JD Framing</u>

48.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

49.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

50.    JD Framing, and not TBI, was responsible for maintaining its work area in a reasonably safe condition.

51.    JD Framing, and not TBI, was responsible for passing the House to the next subcontractor in a reasonably safe condition at the completion of JD Framing's work.

52.    JD Framing, and not TBI, controlled the premises at issue because it was still working on the House or had so recently passed the premises to the next subcontractor, DHAC, that it remained responsible for any dangerous condition that it had created.

53.    TBI is entitled to indemnity and/or contribution to whatever extent JD Framing's failure to maintain the premises is found to have proximately caused Kempski's injuries.

Count V – Breach of Contract

Against DHAC

54.    TBI incorporates by reference all preceding allegations of this Third Party

Complaint.

55.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed

on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for

breach of contract.

56.    Article 3 of the DHAC Contract states,

> INDEMNIFICATION: The Contractor [DHAC] shall indemnify, defend
> and hold harmless [TBI] and all of its agents and employees from and
> against all claims, damages, losses and expenses including attorneys' fees
> in any way arising out of or resulting from the performance, existence or
> condition of the Work under the Contract Documents, whether or not such
> claim, damage, loss or expense is based in whole or in part upon any
> negligent act or omission of [TBI] or [TBI]'s participation in the Work or
> upon any statutory duty or obligation.  [DHAC] expressly acknowledges
> that the parties are contractually allocating these risks to [DHAC] and
> [DHAC] has procured and shall maintain for the term of this Agreement
> the insurance polices … for the purpose of providing a financial means to
> support this indemnification provision.  In addition, in any and all claims
> against [TBI] or any of its agents or employees by any employee of
> [DHAC] or anyone for whose acts [DHAC] may be liable, the
> indemnification obligation under this paragraph shall not be limited in any
> way by any limitations on the amount or type of damages, compensation
> or benefits payable by or for [DHAC] under workers' compensation acts,
> disability benefit acts or other employee benefit acts. . . . [DHAC], at its
> own cost and expense, shall indemnify and defend [TBI] against such
> action, suit or proceeding and take such steps as are necessary to prevent
> the entry of judgment or award against [TBI] and to satisfy such judgment
> or award if entered.

57.    Article 4 of the DHAC Contract required DHAC to procure insurance for its work

on the Development that "shall name Toll Brothers, Inc., its subsidiaries and affiliates as

'Additional Insured' parties for work performed by [DHAC] . . . ."

58.    Article 6 of the DHAC Contract states,

9

ADDITIONAL OBLIGATIONS OF CONTRACTOR: [DHAC] shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to [TBI] to supervise the performance of the Work, . . . (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by [TBI] or promulgated by any governmental body or agent with jurisdiction over the Work . . . .

59.     Article 8 of the DHAC Contract states,

OTHER ITEMS: [DHAC] represents that prior to submitting its proposal, [DHAC] carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work.

60.     Article 12 of the DHAC Contract states,

SAFETY PRECAUTIONS/EEO COMPLIANCE: [DHAC] has agreed to comply with and has full knowledge of the latest revised Occupation Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects.  All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project.

61.     The DHAC Contract contractually allocates the duty of providing a safe workplace for DHAC employees to DHAC.

62.     The DHAC Contract creates an absolute duty for DHAC to defend and indemnify TBI for the claims Kempski has made against TBI.

63.     DHAC has breached the DHAC Contract by failing to defend and indemnify TBI from Kempski's suit.

10

64.    TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, then DHAC has breached the DHAC Contract by negligently causing Kempski's alleged injuries.

65.    TBI has been damaged by the aforesaid breaches in an amount to be determined at trial.

Count VI – Breach of Contract

Against JD Framing

66.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

67.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for breach of contract.

68.    Article 3 of the JD Framing Contract states,

> INDEMNIFICATION: [JD Framing] shall indemnify, defend and hold harmless [TBI] and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of [TBI] or [TBI]'s participation in the Work or upon any statutory duty or obligation.  [JD Framing] expressly acknowledges that the parties are contractually allocating these risks to [JD Framing] and [JD Framing] has procured and shall maintain for the term of this Agreement the insurance polices ... for the purpose of providing a financial means to support this indemnification provision.  In addition, in any and all claims against [TBI] or any of its agents or employees by any employee of [JD Framing] or anyone for whose acts [JD Framing] may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for [JD Framing] under workers' compensation acts, disability benefit acts or other employee benefit acts. . . . [JD Framing], at its own cost and expense, shall indemnify and defend [TBI] against such action, suit or proceeding and take such steps as are necessary

to prevent the entry of judgment or award against [TBI] and to satisfy such judgment or award if entered.

69.    Article 4 of the JD Framing Contract required JD Framing to procure insurance for its work on the Development that "shall name Toll Brothers, Inc., its subsidiaries and affiliates as 'Additional Insured' parties for work performed by [JD Framing] . . . . "

70.    Article 6 of the JD Framing Contract states,

ADDITIONAL OBLIGATIONS OF CONTRACTOR: [JD Framing] shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to [TBI] to supervise the performance of the Work, . . . (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by [TBI] or promulgated by any governmental body or agent with jurisdiction over the Work . . . .

71.    Article 8 of the JD Framing Contract states,

OTHER ITEMS: [JD Framing] represents that prior to submitting its proposal, [JD Framing] carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work.

72.    Article 12 of the JD Framing Contract states,

SAFETY PRECAUTIONS/EEO COMPLIANCE: [JD Framing] has agreed to comply with and has full knowledge of the latest revised Occupation Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects.  All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project.

73.    The JD Framing Contract allocates the duty of maintaining a safe workplace, and passing a safe workplace to the next subcontractor, to JD Framing.

74.    The JD Framing Contract creates an absolute duty for JD Framing to defend and indemnify TBI for the claims Kempski has made against TBI.

75.    The JD Framing Contract creates an absolute duty for JD Framing to procure insurance naming TBI as an additional insured and beneficiary for losses of the type alleged by Kempski.

76.    JD Framing has breached the JD Framing Contract by failing to defend and indemnify TBI from Kempski's suit.

77.    TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, JD Framing has breached the JD Framing Contract by conducting its work in such a manner as to cause Kempski's alleged injuries.

78.    JD Framing has breached the JD Framing Contract by failing to ensure that TBI was named an additional insured on its insurance policy.

79.    TBI has been damaged by the aforesaid breaches in an amount to be determined at trial.

<u>Count VII – Declaratory Judgment</u>

<u>Against DHAC</u>

80.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

81.    TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for declaratory judgment.

82.    Pursuant to the DHAC Contract, DHAC must defend and indemnify TBI both for its costs of defending this matter and for any judgment that might be entered.

83.     DHAC has refused to honor its contractual obligation to defend and indemnify TBI.

84.     By reason of the foregoing, an actual and justiciable controversy exists between DHAC and TBI regarding their rights and obligations under the DHAC Contract, and a judicial declaration is necessary to establish TBI's rights and DHAC's duties under the DHAC Contract.

Count VII – Declaratory Judgment

Against JD Framing

85.     TBI incorporates by reference all preceding allegations of this Third Party Complaint.

86.     TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for declaratory judgment.

87.     Pursuant to the JD Framing Contract, JD Framing must defend and indemnify TBI both for its costs of defending this matter and for any judgment that might be entered.

88.     JD Framing has refused to honor its contractual obligation to defend and indemnify TBI.

89.     By reason of the foregoing, an actual and justiciable controversy exists between JD Framing and TBI regarding their rights and obligations under the JD Framing Contract, and a judicial declaration is necessary to establish TBI's rights and JD Framing's duties under the JD Framing Contract.

WHEREFORE, Defendant/Third-Party Plaintiff TBI demands judgment against Third Party Defendants DHAC and JD Framing for a declaration of Third-Party Defendants' duties under the relevant contracts, indemnification, contribution, and breach of contract damages,

including reasonable attorneys fees and all defense costs as specified in the relevant contracts,

plus pre- and post-judgment interest and any other relief the Court deems just and proper.

**McCARTER & ENGLISH, LLP**

/s/ Michael P. Kelly

By:_____

Michael P. Kelly (DE Bar ID #2295)
Andrew S. Dupre (DE Bar ID #4621)
919 N. Market Street, St. 1800
Wilmington, DE 19801
(302) 984-6300

Attorneys for Defendant

Dated: May 9, 2006

# EXHIBIT A

3103 Philmont Avenue
Huntingdon Valley, PA 19006

Contract No:
Community: __Brandywine Hunt__

## CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:

CONTRACTOR _Delaware Heat and Air_
ADDRESS: _713 Millcreek Lane  Bear DE  19701_
PHONE: _302-738-4669_      CONTACT: _Frank Bartuski_
FACSIMILE: _302-738-4680_      E-MAIL:

Contractor, representing that it is skillful and experienced in the craft _HVAC_
and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:

Reference Exhibit "A", page(s) 1 through __5__, Toll architectural plans, construction detail documents and detail documents for specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ _varies_.
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through __3~5__ for "Payment Schedule." _1~5_ )
Reference Exhibit "C", page(s) 1 through __1__ for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and contained herein.

**It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.**

ARBITRATION: Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization selected by Seller. In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless and until Contractor has first given Toll specific written notice of each claim (at 3103 Philmont Avenue, Huntingdon Valley, PA 19006, Attn: Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: _51 0362156_

CONTRACTOR:                                      TOLL BROS., INC.
By: _DELAWARE HEATING AND CONDITIONING_          By: _[signature]_
Print Name: _FRANK J BARTUSKI          SERVICES INC_  Print Name: _Kevin Grubb_
Title: _PRESIDENT_                                Title: _Project Manager_
Date: _8/18/04_                                  Date: _8/23/04_

Senior Manager Initials: _[signature]_  _8/25/04_

☐ Check if secondary contract so budget will not be loaded - For File Only.

Page Two

Article 1. TIME OF PERFORMANCE: Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's construction schedule. Contractor shall begin the Work when directed by Toll and shall perform and complete it during normal business hours unless directed otherwise by Toll. If Contractor shall be delayed in whatever construction the Work by the act or omission of Toll, by damage caused by fire or other casualty for which Contractor is not responsible, or by strikes or lockouts, then the time for completion of the Work shall be extended for such period of time as the time lost by reason of the aforesaid causes. Such an extension of time shall be the Contractor's sole and exclusive remedy for such delay. In no event shall Toll be liable for any costs, expenses or damages incurred or suffered by Contractor as a result of delays in the performance of the Work or the Project, whether caused by Toll, caused in part or in whole by other contractors' negligence, if Contractor fails to keep abreast with the general progress of the Work, Contractor shall, if requested by Toll, cause its work force to perform overtime work, the cost of which shall be borne entirely by Contractor. Contractor agrees that Toll may, by two working days written notice mailed to Contractor at Contractor's last known address or place of business, or notice delivered at such place, at its option terminate all of Contractor's foremen in charge of the Work, at any time and take possession of the Work, materials, tools, appliances and equipment needed to complete said otherwise, and enter as make such payments as Toll deems reasonable for the discharge in whole or in part of the claims, liens or claims for liens, of any person in privity with Contractor on account of this Agreement, and Contractor agrees that the aggregate sum of all monies and of the completion of the Work, and the amount paid for the discharge or payment on account of claims, liens or other liens, and the expense thereof, shall be deducted from the amount due or to become due to Contractor, and if more than that amount due, then Contractor shall be liable to Toll for the difference, and Toll may hold, sell or otherwise realize upon any material, machinery, tools or other equipment upon the premises on account of such difference in case Contractor shall fail or refuse to pay the same as without prejudice to any other remedy Toll may have.

Article 2. CHANGES IN THE WORK: Toll may at any time, without notice to Contractor's surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work. Contractor shall not alter, add to or claim from the Work except upon receipt of such orders. The amount to be allowed or deducted from the contract price for such alterations, additions or deletions shall be agreed upon by Toll and Contractor and, in the event they are unable to agree, shall be calculated in Contractor's actual out-of-pocket cost or savings for such alterations or additions, plus 15% for overhead and profit; and for deletions shall be equivalent to Contractor's actual out-of-pocket cost or savings for such deletion, plus 7½% for overhead.

Article 3. INDEMNIFICATION: The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of Toll or Toll's participation in the Work or upon any statutory duty or obligation. Contractor expressly acknowledges that the parties are purposely allocating those risks to Contractor and Contractor has procured and shall maintain for the term of this Agreement, the insurance policies hereinafter set forth in Article 4 below for the purpose of providing a financial means to support this indemnification provision. In whose sole Contractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for its Contractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

In the event that any claim of demand arising out of or relating to the performance of the Work is asserted against Toll by any action, suit, or other proceeding, Toll shall within thirty (30) days of notice thereof, give notice thereof to Contractor. Upon receipt of such notice, Contractor, at its own cost and expense, shall indemnify and defend Toll against such action, suit or proceeding and take such steps as are necessary to prevent the entry of judgment or award against Toll and to satisfy such judgment or award if entered. Notwithstanding the foregoing, Toll shall be permitted to be represented by its own counsel should Toll so desire.

Article 4. INSURANCE: Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of Insurance from a company or companies with an A.M. Best rating of not less than B; VI.

A. General Liability -
   Types  Occurrence Basis
   Limits
   Per occurrence                    $1,000,000
   General Aggregate                 $2,000,000
   Product/Completed
   Operations Aggregate              $1,000,000
   Special Provision:
      Additional Insured Endorsement
      (Endorsement CG 20 10 11/85 or its equivalent)

B. Vehicle Liability -
   Limits
      Bodily Injury/Property
      Damage per occurrence          $1,000,000
   Special Provisions:
      Coverage shall include owned, hired and non-owned vehicles. The insurance policies in Article 4A and 4B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties for work performed by Contractor under the Construction Agreement and shall provide that the policy may not be canceled or terminated without at least thirty (30) days prior written notice to Toll. Before beginning the Work, Contractor shall furnish Toll with an Endorsement to Insurance Policy, on Endorsement Form CG-20-10 11/85 or its equivalent, naming Toll as an "Additional Insured" party.

C. Workers' Compensation -
   Limits                            Statutory

D. Employer's Liability -
   Limits
      Each Accident                  $100,000
      Disease - Policy Limit         $500,000
      Disease - each employee        $100,000

Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage specified above is in effect.

Article 5. MECHANIC'S AND/OR MATERIALMEN'S LIENS AND CLAIMS TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANIC'S AND/OR MATERIALMEN'S LIEN OR MECHANIC'S AND/OR MATERIALMEN'S NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDINGS THEREON OR THE GROUND APPURTENANT THERETO. Contractor agrees that if any mechanics lien or claim is filed against the Project, the buildings thereon, or the ground appurtenant thereto, for or on account of any work done or materials furnished in the Project by Contractor, its agents or subcontractors, Contractor shall take immediate steps to satisfy and remove from the record such mechanics and/or materialmen's lien or claim at Contractor's sole expense. In the event that the mechanics and/or materialmen's lien or claim is not satisfied or removed from the record within thirty-eight (48) hours after notice thereof is Contractor, Toll shall have the right to pay all sums necessary to secure the satisfaction or removal of such lien or claim and to deduct such sums from the amount then due or to become due Contractor. Contractor will reimburse Toll for all costs, damages and attorneys' fees resulting from the improper filing of mechanics and/or materialmen's liens and claims.

Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR: Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and all supplies of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to Toll to supervise the performance of the Work, which foreman or superintendent shall not be replaced without written permission of Toll, (c) dismiss any employee whom Toll deems incompetent, insubordinate or otherwise objectionable, (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by Toll or promulgated by any governmental body or agent with jurisdiction over the Work, (f) cooperate fully with Toll and other contractors at the project site and carefully fit the Work to the work provided by

Article 7. DEFAULT: In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent, or should Contractor refuse or neglect to supply a sufficiency of properly skilled or other workmen or any necessary of materials, tools and equipment, to prosecute vigorously the performance of the Work, or fail to make prompt payment for labor, services, materials, tools or equipment used in connection with the performance of the Work, or otherwise be in default in the performance of any of its obligations hereunder, Toll, two equipment or otherwise to cause Contractor's default hereunder and deduct the cost thereof from any payments due or to become due Contractor, and/or (2) terminate this Agreement and take possession of all materials, tools and equipment on the project for the purpose of completing the Work. In the case of such a termination, Contractor shall not be entitled to receive any further payments from Toll until the Work shall be wholly finished and accepted by Toll, at which time, if the unpaid balance of the amounts to be paid Contractor shall exceed the expense incurred by Toll in finishing the Work, such excess shall be paid to Contractor, but, if such expense shall exceed the unpaid balance, Contractor shall pay the difference to Toll plus damages, including attorneys' fees. The remedies provided for herein are not exclusive, and Toll may elect any other remedies available under the law and this Agreement, jointly or severally.

Article 8. OTHER ITEMS: Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relating to the Work; and satisfied itself regarding the full understanding of the difficulties which might be encountered in performing the Work. Toll shall not be responsible for any loss of change to the Work to be performed and furnished by Contractor, nor shall Toll be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, hired or used by Contractor or anyone employed by Contractor in the performance of the Work, however caused. It is advised that Contractor insure the Work against such casualty.

Article 9. MISCELLANEOUS: Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll. Contractor's acceptance of final payment hereunder shall constitute a complete release of any and all existing or future claims or demands by Contractor against Toll arising out of or relating to this Agreement or the performance of the Work, including without limiting the generality of the foregoing, claims or demands based in whole or in part upon Toll's negligence.
It is expressly understood and agreed that the performance of the Work is dependent upon Toll's performance of other work at the Project. Should Toll, for any reason in its sole discretion, decide not to proceed with other work at the Project and actually discontinue this Agreement shall become null and void and this Subparagraph shall not entitle Contractor to payment on a pro-rata basis for work actually completed.
Toll and Contractor and their heirs, executors, administrators, successors and assigns, shall be bound by and severally fully perform the covenants contained herein.

Article 10. LIMITATION OF LIABILITY: Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damage arising from the breach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement (to be prorated if the Work is not yet completed). Contractor shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum.

Article 11. OPTION POLICY: Contractor agrees toll is toll option, install extras or to do work of any kind or description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home. Options or extras which Toll refuses to sell may be sold and installed within the aforesaid 120 day period if Toll authorizes same in writing prior to any proposal to the buyer or homeowner. Pending final electrical calculations may perform non-warranty emergency work without prior written consent of Toll. Any work performed pursuant to this Article must be performed so as not to interfere with Contractor's production responsibilities.

Article 12. SAFETY PRECAUTIONS/OSHA COMPLIANCE: Contractor has agreed to comply with and has full knowledge of the latest revised Occupational Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects, all applicable provisions of the latest approved OSHA requirements and any and all amendments shall be observed in this project. Contractor agrees that it will provide a "competent person," as that term is defined under 29 C.F.R. 1926.20(b)(2), to provide for frequent and regular inspections of the job site, materials and equipment as part of Contractor's accident prevention program. If Contractor fails to provide such competent person, and/or such competent person fails to perform frequent and regular inspections, Toll may take any action to remedy the situation, including the remedies provided in Article 11 herein. In addition, Contractor shall comply with all other applicable laws, ordinances, codes, rules and regulations, including, without limitation, all applicable laws, rules and regulations relating to equal employment opportunity. Contractor agrees that it will not take any adverse employment action against its employees on the basis of race, color, religion, national origin, age, disability, or other protected category established by applicable law.

Article 13. NON-EXCLUSIVE TERMINATION: Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor at any time for any reason whatsoever. In addition, Contractor agrees that Toll shall have the right to terminate this Agreement, with or without cause, upon thirty-eight (48) hours notice thereof to Contractor. In the event of such termination, Toll shall pay Contractor a pro-rata portion of the contract amount as set forth herein based upon the percentage of the Work completed up to the date of termination, as much further liability to Contractor. If Toll terminates in its discretion. Upon such payment, this Agreement shall be terminated and Toll shall have no further liability to Contractor.

Article 14. SEVERABILITY: To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

Article 15. GOVERNING LAWS: This Agreement shall be governed by the laws of Pennsylvania.

Contract No.: _____    Contractor: _____    Dated: 8/16/04

Community: Brandywine Hunt    Toll: _____    Dated: 8/22/04

# EXHIBIT B

250 Gibraltar Road
Horsham, PA 19044

*33545*

Contract No:
Community: **Brandywine Hunt**

## CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:   *162883*

| | |
|---|---|
| CONTRACTOR | **JD Framing Contractors Inc.** |
| ADDRESS: | **200 Delores Drive Cinnaminson, NJ 08077** |
| PHONE: | **(856) 786-8300** |
| FACSIMILIE: | **(856) 786- 7666** |

CONTACT:   John Sousa
E-MAIL:

Contractor, representing that it is skillful and experienced in the craft **Rough Carpentry**
and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:

Reference Exhibit "A", page(s) 1 through **9**, Toll architectural plans, construction detail documents and detail documents for specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ *Varies*
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through **4**, for "Payment Schedule."
Reference Exhibit "C", page(s) 1 through **1** for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and contained herein.

**It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.**

ARBITRATION: Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization selected by Seller. In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless and until Contractor has first given Toll specific written notice of each claim (at 250 Gibraltar Rd., Horsham, PA 19044, Attn: Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

RECEIVED
APR 19 2005
CONTRACT LOADING

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: **59 - 3784129**

| | | | |
|---|---|---|---|
| CONTRACTOR: | | TOLL BROS., INC.: | |
| By: | *Jose A. DeSousa* | By: | *Kevin H. Grubb* |
| Print Name: | *JOSE A. DE SOUSA* | Print Name: | **Kevin H. Grubb** |
| Title: | *V. President* | Title: | **Project Manager** |
| Date: | *4/18/05* | Date: | **4/14/05** |
| | | Senior Manager Initials: | *4/19/05* |

☐ Check if secondary contract so budget will not be loaded - For File Only.

No. 0080   P. 7

**Article 1. TIME OF PERFORMANCE:** Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's construction schedule. Contractor shall begin the Work when directed by Toll and shall perform and complete it during normal business hours unless directed otherwise by Toll, if Contractor shall be delayed in beginning, prosecuting or completing the Work by the act or omission of Toll, by damage caused by fire or other casualty for which Contractor is not responsible, or by strikes or lockouts, then the time for completion of the Work shall be extended for such period of time as the time lost by reason of the aforesaid causes. Such an extension of time shall be Contractor's sole and exclusive remedy for such delay. In no event shall Toll be liable for any costs, expenses or damages incurred or suffered by Contractor as a result of delays in the performance of the Work. If the Project, whether or not such delays result in whole or in part from Toll's or other contractors' negligence. If Contractor fails to keep abreast with the general progress of the Work, Contractor shall, if requested by Toll, cause its work force to perform overtime work, the cost of which shall be borne without any time and late possession of the Work, materials, tools, appliances and equipment needed to complete the Work, and make such payments as Toll deems necessary for the discharge in whole or in part of the claims, liens or other factors, and any person in privity with Contractor on account of this Agreement; and Contractor agrees that the expense of such notice and of the completion of the Work, and the amount paid for the discharge or payment on account of claims, liens, or claims for liens, and the expense thereof, shall be deducted from the amount due or to become due to Contractor, and if more than the amount due, then Contractor shall be liable to Toll for the difference, and Toll may hold, set or otherwise retain upon any material, machinery, tools or other equipment upon the premises on account of such difference in case Contractor shall fail or refuse to pay the same; all without prejudice to any other remedy Toll may have.

**Article 2. CHANGES IN THE WORK:** Toll may at any time, without notice to Contractor's surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work. Contractor shall not alter, add to or delete from the Work except upon receipt of such orders. The amount to be allowed or deducted from the contract price for such alterations, additions or deletions shall be agreed upon by Toll and Contractor and, in the event they are unable to agree, shall be equivalent to Contractor's actual out-of-pocket cost or savings for such alterations or additions, plus 15% for overhead and profit and for deletions shall be equivalent to Contractor's actual out-of-pocket cost of savings for such deletion, plus 7½% for overhead.

**Article 3. INDEMNIFICATIONS:** The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of Toll or Toll's participation in the Work or upon any statutory duty or obligation. Contractor expressly acknowledges that the parties are contractually allocating these risks to Contractor and Contractor has procured and shall maintain for the term of this Agreement the insurance provision in addition, in any and all claims against Toll or any of its agents or employees by any employee of the Contractor or anyone for whose acts Contractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

In the event that any claim or demand arising out of or relating to the performance of the Work is asserted against Toll in any action, suit, or other proceeding, Toll shall within thirty (30) days of notice thereof, give notice thereof to Contractor. Upon receipt of such notice, Contractor, at its own cost and expense, shall indemnify and defend Toll against such action, suit or proceeding and take such steps as are necessary to prevent the entry of judgment or award against Toll and to satisfy such judgment or award if entered. Notwithstanding the foregoing, Toll shall be permitted to be represented by its own counsel should Toll so desire.

**Article 4. INSURANCE:** Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of insurance in a company or companies with an A.M. Best rating of not less than B, VI:

A. General Liability –
   Type: Occurrence Basis
   Limits:
   Per occurrence ........................................................ $1,000,000
   General Aggregate ................................................... $2,000,000
   Products/Completed
   Operations Aggregate ............................................. $1,000,000
   Special Provision:
     Additional Insured Endorsement
     (Endorsement CG 20 10 11/85 or its equivalent)

B. Vehicle Liability –
   Limits:
   Bodily Injury/Property
   Damage per occurrence .......................................... $1,000,000
   Special Provision:
     Coverage shall include owned, hired and non-owned vehicles. The insurance policies in Article 4A and 4B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties for work performed by Contractor under the Construction Agreement and shall provide that the policy may not be cancelled or terminated without at least thirty (30) days prior written notice to Toll. Before beginning the Work, Contractor shall furnish Toll with an Endorsement to Insurance Policy, on Endorsement Form CG-20-10 11/85 or its equivalent, naming Toll as an "Additional Insured" party.

C. Workers' Compensation –
   Limits: ..................................................................... Statutory

D. Employer's Liability –
   Limits:
   Each Accident ......................................................... $100,000
   Disease - Policy Limit ............................................. $500,000
   Disease - each employee ......................................... $100,000

Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage specified above is in effect.

**Article 5. MECHANICS AND/OR MATERIALMEN'S LIENS AND CLAIMS: TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANICS AND/OR MATERIALMEN'S LIEN OR MECHANICS AND/OR MATERIALMEN'S NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDINGS THEREON OR THE GROUND APPURTENANT THERETO.** In the event that any mechanics lien or claim is filed against the Project, the buildings thereon, or the ground appurtenant thereto, for or on account of any work done or materials furnished to the Project by Contractor, its suppliers or subcontractors, Contractor shall take immediate steps to satisfy and remove from the record such mechanics and/or materialmen's lien or claim at Contractor's sole expense. In the event that the mechanics and/or materialmen's lien or claim is not satisfied or removed from the record within forty-eight (48) hours after notice thereof to Contractor, Toll shall have the right to pay all sums necessary to secure the satisfaction or removal of such lien or claim and to deduct such sums from the amount then due or to become due Contractor. Contractor will reimburse Toll for all costs, damages and attorneys' fees resulting from the improper filing of mechanics and/or materialmen's liens and claims.

**Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR:** Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work; (b) provide a foreman or superintendent satisfactory to Toll to supervise the performance of the Work, which foreman or superintendent shall not be replaced without written permission of Toll; (c) dismiss any employee whom Toll deems incompetent, insubordinate or otherwise objectionable; (d) comply with all ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work; (e) abide by all safety rules and regulations established by Toll or as promulgated by any governmental body or agent with jurisdiction over the Work, (f) cooperate fully with Toll and other contractors at the project site and carefully do the Work in the way provided by

others; (g) permit and provide sufficient safe and proper facilities for inspection or testing by Toll or its representative of the Work, such testing or inspection to be made at a reasonable time and place and not to be construed as a waiver of any of Toll's rights to reject defective materials or equipment supplied and work performed by Contractor in connection with the Work, such testing or inspection to occur at the Project site, the place of manufacture of materials, or at any other industry convenient place, with the cost of such inspection or testing to be borne by Contractor and/or manufacturer, (h) employ in connection with performance of the Work only workmen of such labor affiliations as are satisfactory to Toll; (i) pay promptly all sums due for labor, services, materials, tools and equipment supplied in connection with the performance of the Work and, when required by Toll, submit to Toll satisfactory evidence of such payment, it being understood that this subparagraph shall not create any right in any third party against Toll, (j) clean up and remove from the Project site all rubbish, debris and waste resulting from the performance of the Work. Where permission is granted by Toll, all rubbish, debris and waste will be placed by Contractor in a central area designated by Toll for such purpose, (k) pay all federal, state, municipal and local taxes of whatever nature now in force or hereinafter enacted arising out of or relating to the performance of the Work including, without limitation, all sales and use taxes and all taxes required pursuant to the Federal Social Security act and state unemployment compensation laws, it being expressly understood that all such taxes are included in the contract price, (l) reimburse Toll for any loss incurred or damage suffered as a result of Contractor's delay in beginning, prosecuting or completing the Work, except for delay resulting from causes for which Contractor is entitled to extensions of time hereunder, (m) perform the Work solely with its own employees and not transfer or assign all or any portion of its performance, the Work or the sum of money payable hereunder without prior written consent of Toll, (n) repair and replace at Contractor's expense all materials, tools, equipment or work damaged or lost as a result of floods, rain, wind, storm, lightning, acts of God, theft, fire or other casualty, (o) when required by Toll, submit to Contractor's expense shop drawings, samples, brochures, manuals and photographs of work or materials to be furnished by Contractor in connection with the performance of the Work, (p) warrant that all material not covered by manufacturer's guarantees against defects in workmanship shall be guaranteed for a period of not less than one year or as required in the latest revised warranty issued to Toll's homebuyers of which Contractor acknowledges receipt and full understanding, whichever is greater. Defective work and materials shall be replaced at Contractor's expense. No substitution of materials permitted without written authority of Toll, (q) unless otherwise specified, supply only all new materials and comply with the hereinbefore referred plans and specifications. All materials and workmanship furnished are subject to inspection and test by the Architect, if any, and Toll at any and all times during manufacture or construction, (r) within twenty-four (24) hours after receiving written notice from Toll, remove from the Project site all work or material determined by Toll to be defective, unsuitable or not as specified and make good all work damaged or destroyed as a result thereof.

**Article 7. DEFAULT:** In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent, or should Contractor refuse or neglect to supply a sufficiency of properly skilled or other workmen or any adequacy of materials, tools and equipment, to prosecute vigorously the continuance of the Work, or fail to make prompt payment for labor, services, materials, tools or equipment supplied in connection with the performance of the Work, or otherwise be in default in the performance of any of its obligations hereunder, Toll, ten days after written notice is Contractor, shall have the right to (1) provide and pay for such labor, services, materials, tools and working days after written notice is Contractor, shall have the right to (1) provide and pay for such labor, services, materials, tools and equipment or otherwise cure Contractor's default hereunder and deduct the cost thereof from any payments due or to become due Contractor; and/or (2) terminate this Agreement and take possession of all materials, tools and equipment at the project for the purpose of completing the Work, in the case of such a termination, Contractor shall not be entitled to receive any further payments from Toll until the Work shall be wholly finished and accepted by Toll, at which time, if the unpaid balance of the amount to be paid Contractor shall exceed the expense incurred by Toll in finishing the Work, such excess shall be paid to Contractor; but if such expense shall exceed the unpaid balance, Contractor shall pay the difference to Toll plus damages, including attorneys' fees. The remedies provided for herein are not exclusive, and Toll may elect any other remedies available under the law and this Agreement, jointly or severally.

**Article 8. OTHER ITEMS:** Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to a full understanding of the difficulties which might be encountered in performing the Work. Toll shall not be responsible for any loss or damage to the Work to be performed and furnished by Contractor, nor shall Toll be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by Contractor or anyone employed by Contractor in the performance of the Work, however caused. It is advised that Contractor insure the Work against such casualty.

**Article 9. MISCELLANEOUS:** Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll. Contractor's acceptance of final payment hereunder shall constitute a complete release of any and all existing or future claims or demands by Contractor against Toll arising out of or relating to this Agreement or the performance of the Work, including without limiting the generality of the foregoing, claims or demands based in whole or in part upon Toll's negligence.

It is expressly understood and agreed that the performance of the Work is dependent upon Toll's performance of other work at the Project. Should Toll, for any reason in its sole discretion, decide not to proceed with other work at the Project and so notify Contractor, this Agreement shall become null and void and Contractor's compensation hereunder shall be limited solely to payment on a pro-rata basis for work actually completed.

Toll and Contractor and their heirs, executors, administrators, successors and assigns, shall be bound by and severally fully perform the covenants contained herein.

**Article 10. LIMITATION OF LIABILITY:** Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damages arising from the breach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement for the work actually completed). Contractor shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum.

**Article 11. OPTION POLICY:** Contractor agrees not to sell options, install extras or to do work of any kind of description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home. Options or extras which Toll refuses to sell may be sold and installed within the aforesaid 120 day period if Toll authorizes same in writing prior to any proposal to the buyer or homeowner. Plumbing and electrical contractors may perform non-warranty emergency work without prior written consent of Toll. Any work permitted pursuant to this Article must be performed so as not to interfere with Contractor's production responsibilities.

**Article 12. SAFETY PRECAUTIONS/EEO COMPLIANCE:** Contractor has agreed to comply with and has full knowledge of the latest revised Occupational Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects. All applicable safety requirements of the latest approved OSHA requirements and any and all amendments shall be observed in this project. Contractor agrees that it will provide a "competent person," as that term is defined under 29 C.F.R. §1926.20(b)(2), to provide for frequent and regular inspections of the job site, materials and equipment as part of Contractor's accident prevention program. If Contractor fails to provide such competent person, and/or such competent person fails to perform frequent and regular inspections, Toll may take any action to remedy the situation, including the remedies provided in Article 7 herein. In addition, Contractor shall comply with all other applicable laws, ordinances, codes, rules and regulations, including, without limitation, all applicable laws, rules and regulations relating to equal employment opportunity. Contractor agrees that it will not take any adverse employment action against its employees on the basis of race, color, religion, national origin, age, disability, or other protected category established by applicable law.

**Article 13. NON-EXCLUSIVE; TERMINATION:** Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor at any time for any reason whatsoever. In addition, Contractor agrees that Toll shall have the right to terminate this Agreement, with or without cause, upon forty-eight (48) hours notice thereof to Contractor. In the event of such termination, Toll shall pay Contractor a pro-rata portion of the contract amount as set forth herein based upon the percentage of the Work completed up to the date of termination, as such amount is determined by Toll in its discretion. Upon such payment, this Agreement shall be terminated and Toll shall have no further liability to Contractor

**Article 14. SEVERABILITY:** To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

**Article 15. GOVERNING LAWS:** This Agreement shall be governed by the laws of Pennsylvania.

| | |
|---|---|
| | *[signature]* Dated: 4/18/05 |
| | *[signature]* Dated: 4/14/05 |

Contract No.: _____   Contractor: _____

Community: _Brandywine Hunt_   Toll:

# EXHIBIT C

EFiled: Jan 13 2006 10:08 M EST
Transaction ID 10248566

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

ROBERT P. KEMPSKI,                          :

        Plaintiff,                          :          C.A. No. 06C-01-145-JEB

                      :

        v.                                  :          <u>ARBITRATION CASE</u>

                      :

TOLL BROTHERS, INC., a corporation          :          <u>JURY TRIAL DEMANDED</u>
of the State of Delaware,

                      :

        Defendants.                         :

## <u>COMPLAINT</u>

    1.    Plaintiff is a resident of the State of Delaware, residing at 818 Woodlawn Avenue, Apartment C3, Wilmington, Delaware 19806.

    2.    Defendant is a corporation of the State of Delaware. Its registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

    3.    Upon information and belief, at all times pertinent hereto, defendant was the owners, possessors, operators, franchisors, franchisees, lessors and/or lessees of the property located at Brandywine Hunt, Naamans Road, Wilmington, Delaware.

    4.    On or about August 25, 2005, at approximately 12:00 p.m., plaintiff Robert P. Kempski was lawfully working as a heating and air conditioning installer for Delaware Heating and Air Conditioning within a stick structure of a new home located at Lot 87 of the Brandywine Hundred home construction site where defendant was performing construction activities. At all times pertinent hereto, plaintiff was an employee, worker, invitee, business visitor and/or person lawfully on the premises and was otherwise lawfully on the aforementioned premises. Plaintiff was installing duct work in the attic of the home when suddenly and without warning, the floor

board on which he was standing gave way, causing him to fall from the attic to the first floor level of the home.

5.     As a direct and proximate result of the aforementioned incident, plaintiff suffered severe bodily injuries, including, but not limited to, injuries to his head, shoulders, arms, and hands. Some or all of his injuries have continued since the accident and are permanent in nature.

6.     As a further consequence of his injuries, plaintiff has incurred in the past and will continue to incur in the future, medical and medication expenses for the treatment of his injuries.

7.     As a further consequence of his injuries, plaintiff has experienced in the past and will continue to experience in the future, considerable pain, suffering, discomfort, anxiety and anguish, both mental and physical in nature.

8.     As a further consequence of his injuries, plaintiff has incurred in the past and will continue to incur in the future a loss of earnings and a permanent loss of earning capacity.

9.     Defendant, working on and in control of the premises and area in question, owed a duty to the employees, workers, invitees, business visitors and/or persons lawfully on the premises, including plaintiff, to maintain the property in a reasonable and safe condition, free of defects and hazards which would render it unsafe for persons lawfully on the premises. Defendant breached that duty.

10.     The incident and the plaintiff's resulting injuries and damages were proximately caused by the negligence of defendant in that it, through their agents, servants and/or employees:

(a)     failed to properly inspect the construction area to insure that it was safe to work in when it knew or in the exercise of reasonable care should have known that plaintiff and other workers like him intended to work in the area in question;

(b)    failed to properly secure the floor board or see that it was secured when they knew or should have known that the plaintiff and other workers like him intended to work in the area in question;

(c)    failed to employ appropriate safety techniques in setting up the work and allowing it to take place in the construction area when they knew or should have known that plaintiff and other workers like him intended to work in the area in question;

(d)    required and/or permitted its employees, agents, contractors, and/or subcontractors to work in improper, unsafe, and dangerous construction conditions when defendants knew or should have known of the likelihood that employees, workers, invitees, business visitors and/or persons lawfully on the premises would be injured by the condition of the area in question and when defendant had a right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(e)    required and/or permitted its employees, agents, contractors and/or subcontractors to fail to comply with appropriate safety regulations and procedures when defendant had the right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(f)    did not observe the failure of its employees, agents, contractors, and/or subcontractors to use proper and safe materials when defendant knew, or in the exercise of reasonable care, should have discovered and should have realized that the condition of the area in question involved an unreasonable risk of harm to the persons lawfully on the premises and should have expected that these individuals would not discover or realize the danger or would fail to protect themselves against the danger when defendant had the right to control the actions of its employees, agents, contractors and/or subcontractors;

(g)     did not observe the failure of its employees, agents, contractors and/or subcontractors to comply with appropriate safety regulations and procedures when defendant had the right to control the actions of its employees, agents, contractors and/or subcontractors;

(h)     did not prevent the failure of its employees, agents, contractors and/or subcontractors from working in improper, unsafe, and dangerous construction conditions when defendants had the right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(i)     did not prevent the failure of its employees, agents, contractors and/or subcontractors to comply with appropriate safety regulations and procedures when defendant had a right to control the actions of their employees, agents, contractors and/or subcontractors;

(j)     permitted improperly attached floor boards to remain in the home construction site on Lot 87 of Brandywine Hunt thereby creating a dangerous, defective and hazardous condition;

(k)     failed to properly and adequately notify its employees, agents, contractors and/or subcontractors that the floor boards had not been properly and adequately installed in the construction area in question;

(l)     failed to adequately warn or otherwise inform its employees, agents, contractors and/or subcontractors that the improperly installed floor boards posed a dangerous and unsafe condition, having actual or constructive knowledge thereof;

(m)     failed to exercise reasonable care to protect plaintiff, by inspection and other affirmative acts, from the danger of reasonably foreseeable injury occurring from reasonably foreseeable uses of the area in question;

(n)     carelessly performed its contractual duties by causing the improper installation of the floor boards of the Lot 87 home construction project, thereby causing a dangerous, defective, and hazardous condition within the home;

(o)     failed to properly train, supervise or hire sufficient personnel to properly inspect, maintain, construct, and/or alter, the assembly of floor boards and/or other equipment in the area in question so as to maintain the work area in a condition free of defects and reasonably safe for use by individuals, such as plaintiff;

(p)     utilized improper materials and equipment during the assembly, construction, and/or installation of floor boards and/or other equipment so as to cause or increase the risk that it would be unstable and/or break; and,

(q)     failed to use due care to provide plaintiff with a safe working environment.

11.    Defendant knew or should have known at the time of the aforementioned incident that the work which was to be done and/or performed normally and inherently involved special dangers to others including the employees of Delaware Heating and Air Conditioning one of whom was plaintiff, unless reasonable precautions were taken against such dangers. Defendant was negligent in failing to take such reasonable precautions. Its negligence was the proximate cause of plaintiff's injuries and damages

12.    The aforementioned negligence of the defendant also constituted negligence per se, said negligence constituting non-compliance on the part of the defendant with pertinent safety and construction statutes, regulations and procedures.

13.    Defendant is also responsible for plaintiff's damages under the doctrine of Res Ipsa Loquitur.

WHEREFORE, plaintiff demands judgment against defendant for his special and general damages, including pain and suffering, the costs of this action plus pre and post judgment interest and other such relief as the Court finds just.

____/s/ Joseph J. Rhoades_____

Joseph J. Rhoades, Esquire (ID No. 2064)
A. Dale Bowers, Esquire (ID No. 3932)
1225 King Street, 12 Flr.
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiff(s)

DATE: January 13, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document

was served on the 9th day of May, 2006 via e-file on the following counsel of record:

Joseph J. Rhoades, Esquire
A.  Dale Bower, Esquire
1225 King St., 12th Floor
Wilmington, DE  19801


/s/ Michael P. Kelly

_____

Michael P. Kelly (DE Bar ID #2295)