IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Robert P. Kempski,                          :
                    Plaintiff,              :
                                            :        C.A. No. 06-252 ***
            v.                              :
                                            :
Toll Bros., Inc., *et al.*,                 :
                    Defendants.             :
_____         :
                                            :
Toll Bros., Inc.,                           :
                    Third-Party Plaintiff,  :
                                            :
            v.                              :
                                            :
Delaware Heating and Air Conditioning       :
Services, Inc.,                             :
                    Third-Party Defendant.  :

**DEFENDANT/THIRD-PARTY PLAINTIFF TOLL BROS., INC.'S ANSWERING BRIEF
IN OPPOSITION TO DELAWARE HEATING AND AIR CONDITIONING SERVICES,
INC.'S MOTION FOR SUMMARY JUDGMENT**

MCCARTER & ENGLISH, LLP

/s/ Michael P. Kelly
Michael P. Kelly (#2295)
David A. White (#2641)
Matthew J. Rifino (#4749)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300

Attorneys for Defendant / Third-Party
Plaintiff, Toll Bros., Inc.

Dated:  April 28, 2008

## TABLE OF CONTENTS

Table of Citations……………………………………………………………..ii

Nature of the Proceedings……………………………………………………1

Summary of the Arguments…………………………………………………..2

Statement of Facts……………………………………………………………3

Standard of Review………………………………………………………...7

Argument…………………………………………………………………...8

      I. DHAC Possesses A Contractual Obligation to Defend and
          Indemnify Toll Against All Claims Arising from DHAC's
          Work at Brandywine Hunt………………………………………….8

      II.  DHAC's Conditional Defense and Limited Indemnity Does
          Not Constitute Full Performance Under the Terms of
          The Agreement…………………………………………………….14

Conclusion…………………………………………………………………17

ME1 7320542v.1

## <u>TABLE OF CITATIONS</u>

### FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..........................................7

*Armbruster v. Unisys Corp.*, 32 F.3d 768 (3d Cir. 1994) ....................................7

### STATE CASES

*Comrie v. Enteravs Networks, Inc.*, 837 A.2d 1 (Del. Ch. 2003) ......................................13

*Continental Casaulty Co. v. Alexis I. DuPont School District, et al.*, 317 A.2d 101 (Del. 1974) ......................................................................................11, 12, 13

*Crispo v. Crispo*, 909 A.2d 308 (Pa. Super. 2006) ............................................9

*Davis v. R.C. Peoples, Inc.*, 2003 WL 21733013 (Del. Super. July 25, 2003) ..................13

*Green v. City of Phil., et al.*, 795 A.2d 376 (Pa. 2002) ........................................8

*Handler Corp. v. State Drywall Co., Inc.*, 2007 WL 3112466 (Del. Super. Sept. 27, 2007) ..................................................................................12, 13, 17

*Integrated Projected Services v. HMS Interiors, Inc., et al.*, 931 A.2d 724 (Pa. Super. 2007) ..............................................................................8

*J.S. Alberici Construction Co., Inc. v. Mid-West Conveyor Co., Inc., et al.*, 750 A.2d 518 (Del. 2000) ....................................................................11

*John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696 (Pa. Super. 2003)..........................9

*Montgomery v. Levy*, 177 A.2d 448 (Pa. 1962) ....................................................9

*Ruzzi v. Butler Petroleum Co.*, 588 A.2d 1 (Pa. 1991) ......................................8, 9, 11, 14

*Simeone v. Simeone*, 581 A.2d 162 (Pa. 1990) ..................................................9

*Texas Instruments, Inc. v. Tandy Corp.*, 1992 WL 200604 (Del. Ch. Aug. 13, 1992) ..........................................................................................12

*West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551 (Del. Ch. Nov. 2, 2007)................................................................12

## NATURE OF THE PROCEEDINGS

Plaintiff Robert P. Kempski ("Kempski") filed a personal injury action against Toll Bros., Inc. ("Toll"), a Pennsylvania corporation, in the Superior Court of Delaware.  Toll removed the case to the District Court of Delaware.  On April 27, 2006, Toll filed its Answer to the Complaint.  Fourteen (14) days later, on May 11, 2006, Toll filed a Third-Party Complaint against JD Framing Contractors, Inc. ("JD Framing") and Delaware Heating and Air Conditioning Services, Inc. ("DHAC").  Toll sought indemnification and/or contribution from JD Framing and DHAC under the following legal theories:  (1) Negligence; (2) Premise Liability; (3) Breach of Contract; and (4) Declaratory Judgment.  JD Framing and DHAC filed their Answer to the Third-Party Complaint.  Counsel entered into a Stipulation to Amend the Complaint to Add Additional Parties and Re-Align Parties, which permitted Kempski to not only assert a direct claim against JD Framing, but also bring suit against an additional defendant, TBS Construction, Inc.  The realignment caused Toll to assert a third-party claim against DHAC alone.  On January 26, 2007, Toll and DHAC stipulated to the dismissal of Counts I (Negligence) and III (Premise Liability) of the Third-Party Complaint.  The Breach of Contract claim and request for Declaratory Judgment remain.

Each of the parties to this Action, but for TBS Construction, Inc.,[1] has filed a responsive pleading and begun to participate in written discovery.[2]  Discovery must be completed on or before August 27, 2008.  DHAC filed its Motion for Summary Judgment on March 20, 2008 ("Motion").  This is Toll's Answering Brief in Opposition to DHAC's Motion for Summary Judgment.

---

[1] The Court entered an Order for Default Judgment against TBS Construction, Inc. on September 12, 2007.
[2] DHAC's response to Toll's Second Set of Interrogatories and Request for Production of Documents was due on April 18, 2008.  DHAC's Rule 30(b)(6) Deposition is scheduled to take place on May 13, 2008.  Toll reserves the right to assert additional arguments based on the information obtained from the discovery responses and deposition.

## <u>SUMMARY OF THE ARGUMENTS</u>

I.      DHAC Possesses A Contractual Obligation To Defend And Indemnify Toll
        Against All Claims Arising From DHAC's Work At Brandywine Hunt.

II.     DHAC'S Conditional Defense And Limited Indemnity Does Not Constitute Full
        Performance Under The Terms Of The Agreement.

2

## STATEMENT OF FACTS

DHAC lacks a legal basis to prevail on summary judgment. The law affords parties considerable freedom to negotiate and contract for certain rights. Toll and DHAC utilized these freedoms and entered into a contract that outlined the terms under which DHAC would perform HVAC-type services. DHAC has failed to honor its contractual obligation to defend and indemnify Toll, a right lawfully afforded Toll under the law and contract.

In 2004, Toll initiated construction of the Brandywine Hunt Development in Wilmington, Delaware ("Brandywine Hunt"). Toll did not perform any construction-type activities, as it served as the property developer alone. Toll entered into service agreements with various contractors to perform the necessary construction at Brandywine Hunt, including JD Framing and DHAC ("Agreement"). A copy of the Agreement between Toll and DHAC is attached hereto as Exhibit A. The Agreement includes several provisions critical to the Motion:

> Article 3. INDEMNIFICATION: *[DHAC] shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents,*[3] whether or not such claim, damages, loss or expense is based in whole or in part upon any negligent act or omission of Toll or Toll's participation in the Work or upon any statutory duty or obligation. [DHAC] expressly acknowledges that the parties are contractually allocating these risks to [DHAC] and [DHAC] has procured and shall maintain for the term of this Agreement the insurance policies … for the purpose of providing a financial means to support this indemnification provision. In addition, in any and all claims against Toll or any of its agents or employees by an employee of [DHAC] or anyone for whose acts [DHAC] may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for [DHAC] under workers' compensation acts, disability benefit acts or other employer benefit acts.

> …

---

[3] The italicized portions of Article 3 above are the defense and indemnity clauses that underlie Toll's third-party breach of contract claims and request for declaratory relief.

3

*[DHAC], at its own cost and expense, shall indemnify and defend Toll against such action, suit or proceeding and take such steps as are necessary to prevent the entry of judgment or award against Toll and to satisfy such judgment or award if entered.* Notwithstanding the foregoing, Toll shall be permitted to be represented by its own counsel should Toll so desire.

…

Article 4.  INSURANCE:  Before beginning the Work, [DHAC] shall procure and shall maintain for the terms of this Agreement the following types of insurance from a company or companies with an A.M. Best rating of not less than B, vi:

A.    General Liability -
      Type:  Occurrence Basis
      Limits
            Per Occurrence                        $1,000,000
            General Aggregate                     $2,000,000
            Products/Completed
            Operations Aggregate                  $1,000,000
      Special Provision:
            Additional Insured Endorsement
B.    Vehicle Liability
      Limits
            Bodily Injury/Property
            Damage per occurrence                 $1,000,000
      Special Provisions:
            Coverage shall include owned, hired and non-owned vehicles.  The insurance polices in Article 4A and 4B above shall name Toll, its subsidiaries and affiliates as "Additional Insured" parties for work performed by [DHAC] under the Construction Agreement and shall provide that the policy may not be cancelled or terminated without at least thirty (30) days prior written notice to Toll.  Before beginning the Work, [DHAC] shall furnish Toll with an Endorsement to Insurance Policy on Endorsement Form CG-20-10 11/85 or its equivalent naming Toll as an "Additional Insured" party.

…

Article 14.  SEVERABILITY:  To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

Article 15.  GOVERNING LAWS:  This Agreement shall be governed by the laws of Pennsylvania.

4

Exh. A.  The Agreement indicates a clear distinction between (1) the duties of defense and indemnity and (2) the insurance requirement, as the parties intended the insurance coverage to serve as a financial means - *but not the sole source* - for satisfying the defense and indemnity obligations.  *See* Exh. A, Article 3 and 4.

On August 25, 2005, Kempski, a DHAC employee, was performing HVAC-type services in the attic of Lot 87 at Brandywine Hunt.  According to the Complaint, a board allegedly gave way, and he fell to the second floor landing below ("Fall").  He allegedly suffered personal injuries as a result of the Fall.  Kempski then filed a personal injury action against Toll.

Once notified of the resulting Action, Toll informed DHAC and its insurance carrier, Penn National Insurance Company ("Penn National"), of the personal injury claim and requested that DHAC defend and indemnify Toll.  A copy of the February 9, 2006 letter is attached hereto as Exhibit B.[4]  The issue of tender could not be resolved, and Toll filed a Third-Party Complaint against JD Framing and DHAC, alleging causes of action for (1) Negligence; (2) Premise Liability; (3) Breach of Contract; and (4) Declaratory Judgment.  A copy of the Third-Party Complaint is attached hereto as Exhibit C.  Toll and Penn National engaged in further discussion regarding DHAC's contractual duties of defense and indemnification.  At no point did DHAC offer to defend and indemnify Toll without limiting and/or restricting the terms under which DHAC would bear responsibility for Toll's defense.[5]  A copy of the correspondences between Penn National and McCarter & English, LLP are attached hereto as Exhibit D.[6]

---

[4] Toll's use of various correspondences does not constitute a waiver of the attorney-client privilege.
[5] DHAC has failed to provide an accurate account of the facts in its Memorandum of Law when it stated:  "[Toll] refused to accept the defense that was offered by Penn National through the insurance policy that was purchased by DHAC, however [Toll] did accept indemnification under the Penn National insurance policy."  *See* MEMORANDUM IN SUPPORT OF THIRD-PARTY DEFENDANT , DELAWARE HEATING AND AIR CONDITIONING SERVICES, INC., MOTION FOR SUMMARY JUDGMENT, at *4.  This statement ignores the fact that neither DHAC nor Penn National made an unconditional offer of defense and indemnity.
[6] Toll has attached the following letters dated on June 28, 2006; August 1, 2006; August 2, 2006 (two (2) letters); October 4, 2006; October 13, 2006; November 2, 2006; and November 8, 2006.

Toll, through its attorneys, expressed concern at the prospect of incurring liability as a result of the extraneous limitations DHAC and Penn National sought to attach to its offer of defense and indemnity. *See* Exhibit D, June 28, 2006. Penn National first insisted that Toll dismiss its third-party claims against DHAC - an action that prejudiced Toll's defense. *Id.* Ignoring the parties' conflicting interests in this litigation, Penn National then conditioned its offer upon Toll accepting legal representation from DHAC's attorneys. *See* Exh. D, August 2, 2006. The Motion, at issue, illustrates the clear conflict between Toll and DHAC that underlies Toll's request for separate counsel, a right afforded Toll under the Agreement. *See id.* Finally, Penn National has wrongfully tried to limit the extent to which DHAC will defend and indemnify Toll, including its refusal to pay those defense costs associated with prosecuting Toll's third-party claims. *See* Exhibit D, November 8, 2006. There exists a risk that the insurance policy may be eroded by paying other claims or unavailable based on a coverage position.

In short, DHAC has incorrectly suggested that Toll rejected its offer of defense and indemnity. DHAC has not made an offer of defense and indemnity. Meanwhile, its insurer's offer was predicated upon unacceptable conditions that prejudiced Toll's rights in this case. The factual history illustrates the repeated attempts by DHAC to deprive Toll of its right to seek the full benefit of the defense and indemnity clauses set forth in the Agreement. Accordingly, Toll has asserted a Breach of Contract claim against DHAC in order to obtain the sought-after relief, and petitioned this Court for declaratory judgment.[7]

---

[7] The parties previously stipulated to the dismissal of Counts I (Negligence) and III (Premise Liability) of the Third-Party Complaint.

ME1 7320542v.1

## STANDARD OF REVIEW

The Court may not grant the Motion where DHAC lacks a legal basis to defeat Toll's

contractual claims for defense and indemnity.  A party is entitled to summary judgment where:

> The pleadings, depositions, answers to interrogatories, and
> admissions on file, together with affidavits, if any, show that there
> is no genuine issue of material fact and that the moving party is
> entitled to a judgment as a matter of law.

FED.R.CIV.P. 56(c).  The moving party bears the burden, and the court "must view the facts in

the light most favorable to the nonmoving party and draw all inferences in that party's favor."

*Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994).  Where a reasonable juror could

find in favor of the non-moving party, summary judgment must be denied.  *See Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

DHAC has fallen considerably short in demonstrating how and why summary judgment

is warranted.  The Court, in fact, may not arrive at the second step of the analysis - the question

of fact - where DHAC has failed to prove that the applicable law allows for a judgment in its

favor.  Where Toll has rightfully contracted for a right of defense and indemnity, the Motion

must fail as a matter of law.

**ARGUMENT**

I.     **DHAC Possesses A Contractual Obligation To Defend And Indemnify Toll Against All Claims Arising From DHAC's Work At Brandywine Hunt.**

The Agreement obligates DHAC to defend and indemnify Toll against all claims arising from the construction services performed at Brandywine Hunt. DHAC attempts to rid itself of these contractual obligations through an erroneous interpretation of the applicable law and Agreement. The law affords parties considerable freedom of contract, and Toll, a Pennsylvania corporation, rightfully utilized these freedoms to negotiate a duty of defense and indemnity.

DHAC Lacks A Legal Basis for Recovery Under Pennsylvania Law

Pennsylvania law[8] - the law governing the interpretation of the Agreement and resolution of Toll's contractual claims against DHAC - permits a subcontractor to defend and indemnify a general contractor against all claims, including those arising from the general contractor's tortious conduct. Unlike Delaware, the Commonwealth of Pennsylvania does not encroach upon the rights of its citizens to insulate themselves from harm through a contractual right of indemnification. The court, in light of this freedom, focuses on the contractual language to determine whether the all-encompassing indemnification provision may be enforced. *See Ruzzi v. Butler Petroleum Co.,* 588 A.2d 1, 7 (Pa. 1991). "[I]ndemnification provisions are given effect only when clearly and explicitly stated in the contract between two parties." *Integrated Projected Services v. HMS Interiors, Inc., et al.,* 931 A.2d 724, 735 (Pa. Super. 2007) (citing *Green v. City of Phil., et al.,* 795 A.2d 376, 380 (Pa. 2002). Where a party's duties are set forth in clear and unambiguous language, the court will uphold the indemnification provision as "an accepted means of transferring risk." *Id.*

---

[8] Article 15 of the Agreement indicates that Pennsylvania law governs the resolution of the dispute. DHAC has ignored the choice of law provision.

The Agreement outlines - in clear and concise language - DHAC's obligation to defend and indemnify Toll against any claim that arises from its work at Brandywine Hunt. These duties, according to the Agreement, apply to all claims without regard for who is ultimately found liable. *See Ruzzi,* 588 A.2d at 7. DHAC may not escape its responsibilities where its supervisors or representatives, based upon their years of experience, possess a familiarity with the language included in construction contracts. *See generally John B. Conomos, Inc. v. Sun Co., Inc.,* 831 A.2d 696, 709 (Pa. Super. 2003). The subcontractor has previously been a party to a contract with language identical or similar to the Agreement, specifically during their past dealings with Toll.[9] As a signatory to the Agreement, DHAC knowingly consented to the terms. *See Simeone v. Simeone,* 581 A.2d 162, 166 (Pa. 1990) (citing *Montgomery v. Levy,* 177 A.2d 448, 450 (Pa. 1962) (court held that a party was bound to know the terms of the contract). DHAC may not now claim ignorance or paint themselves in an innocent light to avoid its contractual obligations. *See Crispo v. Crispo,* 909 A.2d 308, 313 (Pa. Super. 2006) (court found that the parties "are bound 'without regard to whether the terms were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains'").

DHAC may not discard its duties of defense and indemnity where its rights and responsibilities are set forth in a clear and unambiguous manner. Three (3) separate portions of the Agreement advise DHAC of its expansive duty to defend and indemnify Toll:

- [DHAC] shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses … whether or not such claim, damages, loss or expense is based in whole or in part upon any negligent act or omission of Toll;

---

[9] Toll has previously retained the services of DHAC on a number of construction projects, in which the contract for these previous assignments used the same - or nearly identical - language. Where DHAC failed to contest the indemnity language in previous instances, the subcontractor is estopped from asserting the argument herein. Conversely, where DHAC has previously challenged the indemnity clause, its failure to raise the argument in the pleadings or the Motion constitute a waiver. A copy of DHAC's Answer to the Third-Party Complaint is attached hereto as Exhibit E. DHAC's failure to assert a counterclaim against Toll - in tort or contract - further weakens its position. *Id.*

- [DHAC] expressly acknowledges that the parties are contractually allocating these risks to [DHAC];

- Toll shall not be liable to [DHAC], its agents, servants, workmen or employees for any consequential damages arising from the reach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement (to be prorated if the work is not yet completed). Contractor shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum.

Exh. A. The quoted language evince Toll's unmistakable intention to transfer liability to DHAC. The subcontractor is aware of the various dangers and potential for liability that can be incurred. DHAC, nevertheless, expressly acknowledged and consented to the allocation of risk. *See* Exh. A, Article 3.

The Agreement also makes use of "plain English" in describing the obligations that DHAC has contractually assumed. The Agreement is free of legal jargon, which allows the subcontractor to understand the arrangement under which it is bound and take appropriate precautionary measures. The manner in which Toll allocated liability to DHAC illustrates the clarity of the Agreement:

- DHAC shall indemnify "whether or not such claim … is based in whole or in part upon any negligent act or omission of Toll;"

- DHAC "acknowledges that the parties are contractually allocating these risks;"

- "Toll's sole liability shall be for the payment of the contract sum set forth in the Agreement;" and

- DHAC "shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum."

Exh. A. These sections of the Agreement, individually and/or collectively, outline DHAC's contractual obligation to bear the risk of incurring liability. DHAC may not avoid its duties to defend and indemnify Toll against all claims.

10

Finally, the Agreement makes use of unique lettering - CAPITAL LETTERS - to mark subject headings and designate the individual duties assumed under the terms of the contract, such as INDEMNIFICATION and LIMITATION OF LIABILITY. *See* Exh. A. The subject headings and form of lettering assist the subcontractor in its review of the Agreement. The subject headings also inform the subcontractor of the topic or obligation to be addressed in each article of the Agreement so as to keep the subcontractor apprised of the responsibilities it has accepted. In sum, Toll has utilized clear language in transferring the risk associated with the performance of HVAC services to DHAC alone. *See Ruzzi,* 588 A.2d at 7. DHAC entered into the Agreement with open eyes, and the Court must uphold the Indemnification Provision.

<u>DHAC Lacks A Legal Basis for Recovery Under Delaware Law</u>

Assuming *arguendo* that the Court applies Delaware law in lieu of the parties' express choice of law, Title 6, Section 2704 of the Delaware Code does not invalidate the Indemnification Provision *in toto*.[10] The statute carries a limited scope in that the General Assembly elected to address only those provisions which:

> Purport[] to indemnify or hold harmless the promisee or indemnitee … for damages arising from liability for bodily injury or death to persons or property caused partially or solely out of the negligence of such promisee or indemnitee or others than the promisor or indemnitor ...

6 *Del. C.* § 2704. The legislative body is noticeably silent as to those contractual provisions which confer (1) rights of defense;[11] or (2) rights of indemnity for harm suffered as a result of the

---

[10] Title 6, Section 2704 of the Delaware Code, if applicable, prohibits DHAC from indemnifying Toll for damages arising from Toll's sole negligence. *Cf. J.S. Alberici Construction Co., Inc. v. Mid-West Conveyor Co., Inc., et al.,* 750 A.2d 518, 521 (Del. 2000). DHAC, however, remains responsible for defending Toll against all claims as well as indemnifying Toll for damages caused by the subcontractor's tortious activities.

[11] DHAC fails to address the General Assembly's select choice of words in enacting Title 6, Section 2704 of the Delaware Code or the legal distinction between a right of defense and a right of indemnity. The rights to defense and indemnity are distinct, as the former - a much broader obligation - requires the promisor to defend the promisee in "any litigation that includes a potentially covered claim." *Continental Casualty Co. v. Alexis I. DuPont School*

11

promisor's wrongdoing. *See id.* The Court should appreciate the General Assembly's shallow footprints in this realm and honor the parties' right to contract freely. *See West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC,* 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007) (Exh. F); *Texas Instruments, Inc. v. Tandy Corp.,* 1992 WL 200604, at *5 (Del. Ch. Aug. 13, 1992) (Exh. G). Toll and DHAC have negotiated for certain contractual rights regarding defense and indemnity. *See* Exh. A. Thus, where Title 6, Section 2704 of the Delaware Code does not address the duty to defend, DHAC must honor its contractual obligation to defend Toll against all claims. *See* Exh. A. Likewise, the General Assembly's limited encroach does not relieve DHAC of its duty to indemnify Toll for damages related to DHAC's tortious conduct.

While Title 6, Section 2704 of the Delaware Code may prevent Toll from using DHAC to insulate itself from the fallout of its sole negligence, the statute may not invalidate the entire Indemnification Clause so as to relieve DHAC of its contractual obligations to defend and indemnify Toll. *See* Exh. A, Articles 3, 14. *See Handler Corp. v. State Drywall Co., Inc.,* 2007 WL 3112466, at *2-3 (Del. Super. Sept. 27, 2007) (court found that "there [was] no need to nullify the remainder of the [i]ndemnification section") (Exh. H). The Delaware Superior Court recently addressed this issue in a written opinion.[12] *Id.* In *Handler*, a general contractor entered into an agreement with a subcontractor to hang drywall. The contract obligated the subcontractor to indemnify and hold harmless the general contractor "as to all claims, damages or liabilities resulting from accident, negligence, *including the Company's negligence*, or any other cause … ." *Id.* at *2 (*emphasis* added). While the italicized language was found to be void under Delaware law, the *Handler* court found "no need to nullify the remainder of the

---

*District, et al.,* 317 A.2d 101 (Del. 1974). Where the statute wholly ignores the right of defense, DHAC may not avoid its contractual obligation to defend Toll against all claims.

[12] Ironically, DHAC failed to address the *Handler* decision in its Memorandum of Law even though its attorneys participated in the briefing and oral argument before Judge Johnston last year.

[i]ndemnification section." *Id.* at *3. Honoring the severability clause, the court upheld the subcontractor's duty to indemnify the general contractor for the former's vicarious liability. *Id.*

DHAC may not escape its duty to hold Toll harmless where the Severability Provision has preserved the remainder of the Agreement, specifically the clauses that impose a duty to defend Toll against all claims and a duty to indemnify Toll for those damages arising from the subcontractor's misconduct. *See Handler Corp.,* 2007 WL 3112466, at *2-3. *See generally Comrie v. Enteravs Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch. 2003) (court found that it must look to a contract in its totality). The Severability Provision states:

> To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

Exh. A. If Delaware law should apply, Toll concedes that a portion of the Indemnification Provision - "... *whether or not such claim, damages, loss of expense is based in whole or in part upon any negligent act or omission of [Toll] ...*" - is invalid with respect to the right of indemnity.[13] Exh. A (*emphasis* added). *See* 6 *Del. C.* § 2704. Toll and DHAC were otherwise free to negotiate and contract for certain rights. *See Davis v. R.C. Peoples, Inc.,* 2003 WL 21733013, at *4 (Del. Super. July 25, 2003) (court found that the parties to a contract may expressly provide for rights of indemnification) (Ex. I). These contractual rights of defense and indemnity do not run afoul of any statute, regulation or public policy of the State of Delaware. *See id. See also* 6 *Del. C.* § 2704. Striking the unenforceable phrase alone, the remainder of the Indemnification Provision will survive. The Severability Provision, in effect, performs a delicate

---

[13] The Delaware courts recognize a distinction between a right of defense and indemnity. *See Continental Casualty Co.,* 317 A.2d 101. Given the General Assembly's specific language, as set forth in Title 6, Section 2704 of the Delaware Code, Toll rightfully argues that the parties to a construction contract may negotiate a duty of defense against all claims.

13

balancing act in honoring the grand freedoms afforded contracting parties within the legal boundaries that the legislative and judicial branches have set forth.  Toll has rightfully availed itself of these freedoms and secured not only a right of defense against all claims, but also a right to indemnity for damages arising from DHAC's tortious conduct.  Exh. A.  Accordingly, DHAC lacks a basis of support to strike the Indemnification Provision, and the Motion must fail.

## II.    DHAC's Conditional Defense And Limited Indemnity Does Not Constitute Full Performance Under The Terms Of The Agreement.

DHAC's conditional defense and limited indemnity of Toll does not allow for an award of summary judgment.  The subcontractor argues that Toll's breach of contract claim must fail where it purchased an insurance policy that named Toll as an additional insured.  This argument incorrectly presumes that the Indemnification Provision is void.  DHAC, in light of this presumption, then overestimates the role that insurance plays in satisfying its duties to defend and indemnify Toll.  The subcontractor's position also reflects a gross misunderstanding of its defense and indemnity obligations.  DHAC, consequently, has fallen short of its contractual obligations, and the Motion must fail as a matter of law

First, DHAC incorrectly presumes that the Indemnification Provision is null and void.  Toll utilized the contractual freedoms afforded under Pennsylvania law in negotiating the Indemnification Provision.  *See Ruzzi*, 588 A.2d at 7.  The duties of defense and indemnity were stated clearly, and DHAC must honor its contractual obligations or, in the alternative, be found in breach of the Agreement.  Even if the Court elected to ignore the negotiated choice of law provision, DHAC has adopted an unreasonably-expansive reading of Delaware law.  Title 6, Section 2704 of the Delaware Code excuses DHAC from indemnifying Toll for its sole negligence; the statute was otherwise silent as to the remainder of the Indemnification Provision.  *See* 6 *Del. C.* § 2704.  The Severability Provision effectively insulates the Indemnification

14

Provision from further contamination, and DHAC remains responsible for defending Toll against all claims as well as indemnifying Toll for harm suffered as a result of the subcontractor's tortious conduct.

Second, the insurance policy does not relieve DHAC of its contractual obligation to defend and indemnify Toll. While the Agreement required DHAC to secure insurance, the Indemnification and Insurance Provisions are separate and distinct, as the duty to defend and indemnify Toll "shall not be limited in any way by any limitation on the amount or type of damages." Exh. A, Article 3. The Agreement explains further that the insurance policy would provide some "financial means to support [the] indemnification provision." *Id.* The possibility that Kempski could recover a damages award in excess of the insurance policy limits or that the amount of available coverage could be exhausted by other claims only serves to ratify Toll's position that insurance coverage alone does not eliminate DHAC's duties of defense and indemnity.

Third, Penn National's conditional defense and limited indemnity undercuts DHAC's argument that the insurance policy somehow obviates its contractual obligations. As described above, Penn National has repeatedly attempted to limit the defense and indemnity coverage afforded Toll. These restrictions include: (1) a demand that Toll dismiss its third-party claims against DHAC; (2) the requirement that Toll and DHAC share legal representation;[14] and (3) an explicit refusal to pay Toll for the costs incurred in prosecuting its third-party claims. DHAC's exclusive reliance on Penn National's coverage rings hollow.

Fourth, DHAC has incorrectly asserted that Toll refused its offer of defense and indemnity. This statement reflects a misunderstanding of DHAC's contractual obligations as well as an ignorance of the numerous limitations placed on its offers of defense and indemnity.

---

[14] The Motion is *prima facie* evidence of the conflict of interest between Toll and DHAC.

DHAC possesses a contractual duty to defend and indemnify Toll without limitation. *See* Exh. A. Where its insurer, as opposed to DHAC itself, attempts to condition its offer upon the acceptance of extraneous terms, such offers cannot be seen as full performance under the Agreement. The Court, therefore, may not construe Toll's response in a negative light if DHAC and its insurer have failed to make an unconditional offer of defense and indemnity.

Above all, the limitations that DHAC and Penn National have unilaterally attached to its offers of defense and indemnity illustrate a clear breach of the Agreement. DHAC did not negotiate - nor would Toll have consented to - any restrictions to the Indemnification and Insurance Provisions, *see generally* Exh. A, yet the subcontractor and its insurance carrier have repeatedly attempted to limit the resources made available to Toll. DHAC's conditional defense and limited indemnity does not amount to full performance and, accordingly, the Court must deny summary judgment as a matter of law.

16

## **CONCLUSION**

The Court must deny summary judgment where DHAC lacks a legal basis of support. The Agreement obligates DHAC to defend and indemnify Toll against all claims arising from the HVAC-type services performed at Brandywine Hunt.  Pennsylvania law affords parties considerable freedom of contract, and Toll rightfully utilized these freedoms to negotiate expansive duties of defense and indemnity.  DHAC's repeated attempts to condition its defense and indemnity of Toll constitute a clear breach of the Agreement.  The Court, therefore, must deny summary judgment as a matter of law.

Assuming *arguendo* that the Court elects to apply Delaware law, DHAC lacks a legal basis to prevail on summary judgment.  The subcontractor has improperly expanded the scope of Title 6, Section 2704 of Delaware Code - the sole legal authority underlying DHAC's argument - in an attempt to invalidate the Indemnification Provision *in toto*.  *Compare Handler Corp.,* 2007 WL 3112466, at *2-3.  Such an expansive reading of the Delaware Code is unreasonable, and the Delaware courts have failed to follow suit.  While the statute prohibits DHAC from indemnifying Toll for Toll's negligence, the General Assembly elected not to address the duty to defend or the duty to indemnify a contractor for the subcontractor's tortious activities.  DHAC, consequently, lacks a legal basis to strike these privileges.  Toll also utilized its freedoms of contract to include the Severability Provision.  *See* Exh. A, Article 14.  The Severability Provision, in effect, surgically removes the void word or word(s) from the Agreement so as to insulate the remainder of the Agreement from further contamination.  *See Handler Corp.,* 2007 WL 3112466, at *2-3.  DHAC, therefore, remains responsible for (1) defending Toll against all claims; and (2) indemnifying Toll for damages causally-related to DHAC's tortious conduct. Accordingly, the Motion must fail.

ME1 7320542v.1

MCCARTER & ENGLISH, LLP

/s/ Michael P. Kelly
Michael P. Kelly (#2295)
David A. White (#2641)
Matthew J. Rifino (#4749)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300 telephone
(302) 984-6399 facsimile
Attorneys for Defendant / Third-Party
Plaintiff, Toll Bros., Inc.

Dated:  April 28, 2008

18

# EXHIBIT A-1

# CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:

| | |
|---|---|
| CONTRACTOR | **JD Framing Contractors Inc.** |
| ADDRESS: | **200 Delores Drive Cinnaminson, NJ 08077** |
| PHONE: | **(856) 786-8300**    CONTACT:    **John Sousa** |
| FACSIMILIE: | **(856) 786- 7666**    E-MAIL: |

162883

Contractor, representing that it is skillful and experienced in the craft **Rough Carpentry** and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:

Reference Exhibit "A", page(s) 1 through __9__, Toll architectural plans, construction detail documents and detail documents for specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ _Varies_
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through __4__, for "Payment Schedule."
Reference Exhibit "C", page(s) 1 through __1__ for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and contained herein.

**It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.**

ARBITRATION: Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization selected by Seller. In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless and until Contractor has first given Toll specific written notice of each claim (at 250 Gibraltar Rd., Horsham, PA 19044, Attn: Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

RECEIVED
APR _ 2005
CONTRACT LOADING

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: **59-3784129**

| CONTRACTOR: | TOLL BROS., INC.: |
|---|---|
| By: _Jose A. De Sousa_ | By: _Kevin H. Grubb_ |
| Print Name: _JOSE A. DE SOUSA_ | Print Name: **Kevin H. Grubb** |
| Title: _V. President_ | Title: **Project Manager** |
| Date: _4/18/05_ | Date: **4/14/05** |
| | Senior Manager Initial: |

4/19/05

☐ Check if secondary contract so budget will not be loaded - For File Only.

**Article 1. TIME OF PERFORMANCE:** Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's schedule...

**Article 2. CHANGES IN THE WORK:** Toll may at any time, without notice to Contractor's surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work...

**Article 3. INDEMNIFICATIONS:** The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents...

**Article 4. INSURANCE:** Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of insurance from a company or companies with an A.M. Best rating of not less than B, VI:

A. General Liability –
  Type: Occurrence Basis
  Limits:
  | | |
  |---|---|
  | Per occurrence | $1,000,000 |
  | General Aggregate | $2,000,000 |
  | Products/Completed | |
  | Operations Aggregate | $1,000,000 |
  Special Provision:
  Additional Insured Endorsement
  (Endorsement CG 20 10 11/85 or its equivalent)

B. Vehicle Liability –
  Limits:
  Bodily Injury/Property
  | Damage per occurrence | $1,000,000 |
  |---|---|
  Special Provision:
  Coverage shall include owned, hired and non-owned vehicles. The insurance policies in Article 4A and 4B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties for work performed by Contractor under the Construction Agreement...

C. Workers' Compensation –
  | Limits: | Statutory |
  |---|---|

D. Employer's Liability –
  Limits:
  | | |
  |---|---|
  | Each accident | $100,000 |
  | Disease - Policy Limit | $500,000 |
  | Disease - each employee | $100,000 |
  Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage required above is in effect.

**Article 5. MECHANICS AND/OR MATERIALMENS LIENS AND CLAIMS:** TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANICS AND/OR MATERIALMENS LIEN OR MECHANICS AND/OR MATERIALMENS NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDINGS THEREON OR THE GROUND APPURTENANT THERETO...

**Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR:** Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled labor and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work...

others, (g) permit and provide sufficient safe and proper facilities for the inspection or testing by Toll or its representative of the Work...

**Article 7. DEFAULT:** In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent, or should Contractor refuse or neglect to supply a sufficiency of properly skilled or other workmen or any adequacy of materials, tools and equipment, to prosecute vigorously the performance of the Work, or fail to make prompt payment for labor, services, materials, tools or equipment supplied in connection with the performance of the Work...

**Article 8. OTHER ITEMS:** Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work...

**Article 9. MISCELLANEOUS:** Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll...

**Article 10. LIMITATION OF LIABILITY:** Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damages arising from the breach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement (to be prorated if the Work is not completed)...

**Article 11. OPTION POLICY:** Contractor agrees not to sell options, install extras or to do work of any kind of description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home...

**Article 12. SAFETY PRECAUTIONS/MESD COMPLIANCE:** Contractor has agreed to comply with and has full knowledge of the latest revised Occupational Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects...

**Article 13. NON-EXCLUSIVE; TERMINATION:** Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor at any time for any reason whatsoever. In addition, Contractor agrees that Toll shall have the right to terminate this Agreement...

**Article 14. SEVERABILITY:** To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

**Article 15. GOVERNING LAWS:** This Agreement shall be governed by the laws of Pennsylvania.

| | | | |
|---|---|---|---|
| Contract No.: | | Contractor: | Dated: 4/18/05 |
| Community: Brandywine Hunt | | Toll: | Dated: 4/14/05 |

Project: _Brandywine Hunt_     Page 1 of 11 7
C.C. #4304, 4605, 40052-MPT    Document 116-2    Filed 04/28/2008    Page 4 of 53
EFFECTIVE DATE: 04-01-05

## EXHIBIT "A"

## ROUGH CARPENTRY

Subcontractor understands that all construction performed under this contract shall be in accordance with all P.W.C. standards, Federal, State, and Local codes, O.S.H.A. safety regulations and be in accordance with Toll Bros., Inc. standard details located in the construction trailer, and also attached nailing schedule.

Subcontractor shall be responsible to supply contractor with current copies of all MSDS (Material Safety Data Sheets) applicable to the product(s), material(s), additives, etc. which will be used in the execution of this contract. Materials which qualify as hazardous materials must be properly labeled, must not be disposed of on Toll Bros., Inc. property, and shall be disposed of at subcontractor's sole expense in full compliance with all applicable federal, state, and local statutes, rules, and regulations, etc...

Subcontractor shall report to TBI construction manager any unsatisfactory conditions that may affect his finished product before he begins work. In the event this subcontractor puts "good work over bad work" this Subcontractor will be held equally responsible for the correction or repair. It is this subcontractor's responsibility to inspect his own work for both quality and completeness and to protect the materials and work of all other trades preceding him.

Subcontractor shall furnish all labor, material, equipment and supervision necessary to complete all work covered under this contract.

Subcontractor shall be responsible to perform all work in accordance with the latest revised construction drawings for each appropriate model.

This subcontractor shall take whatever steps necessary to protect carpet, vinyl, or hardwood flooring from dirt or damages, should it become necessary to enter the home after these materials have been installed.

Subcontractor shall be responsible to keep all community roadways clean. Any mud or debris deposited by subcontractor's employees or vehicles must be removed at subcontractor's expense.

If possible, Toll Bros., Inc. will supply power to within 250 feet of the job site. In the event that power is not supplied, the subcontractor shall supply a portable generator at the job site.

All service work shall be completed within fourteen (14) days of request by Toll Bros., Inc. This subcontractor's personnel shall be instructed by subcontractor to treat all homeowners and their property with the utmost courtesy and respect. Subcontractor's personnel must also be instructed to refrain from derogatory or sarcastic remarks concerning work performed by other trades or by Toll Bros., Inc. Subcontractor or their employees shall not contact Toll Brothers' homebuyers without the express written consent of the Project Manager.

The subcontractor shall be responsible for and agrees to provide on a routine and periodic basis, in-depth safety training for subcontractor's employees to fully cover all aspects related to the type of work the particular tradesman/laborer is performing for Toll Brothers. Such training shall be in accordance and compliance with federal, state, local and OSHA safety directives and regulations.

Subcontractor shall send _enough_ personnel to the job site to complete rough framing in _21_ days. Supervision must include a professional representative who looks and acts like a qualified tradesman and who can communicate clearly.

Subcontractor shall install all windows, doors and skylights as per manufacturer's recommendations.

Subcontractor shall install material deemed good and usable by Toll Bros., Inc. inspections. Replacements shall be at subcontractor expense.

Subcontractor shall punch out house previous to Toll Bros., Inc. Construction manager or framing inspection.

## EXHIBIT "A"

## ROUGH CARPENTRY

SCOPE OF WORK:

* On Multi Unit product lines, no exterior penetrations are to be made within 5 feet of any party wall.

**Subcontractor shall supply and install the following:**

Nails

"C" series aluminum or galvanized roof clips.

Fasteners

Pan flashing at side and rear door thresholds

Joist Hangers; Approved construction connector hardware: Simpson Strong-Tie or equal.

Approved construction adhesive: The only approved construction adhesives are the following non-staining products: **Pratt & Lambert - Miracle SFA66; W. W. Henry - #617 Adhesive; TACC - #RL1168; Surebond - #PS800; Franklin – Tite Bond all weather subfloor adhesive.**

Approved construction connector hardware: Simpson Strong-Tie or equal.

Foam type sill seal (Fiberglass is unacceptable)

Note: All nails, screws, collated nails (pneumatic nail guns), fasteners and connectors that come in contact with any pressure treated lumber must be post hot-dip galvanized (HDG>G90), stainless steel (type 304 or 316) or triple zinc coated (G185 electroplated) as per the treated wood supplier's recommendations. However, under no circumstance shall stainless steel nails, bots, screws or fasteners be used in conjunction with any galvanized connectors or other fasteners. All Simpson Strong-Tie triple zinc coated connectors must have a "Z" stamped into the connector at the end of the part number and the words "Z Max" imprinted on a white label which is affixed to the inside of the bottom of the connector.

**Subcontractor shall install the following supplied by Toll Bros., Inc.:**

White "Z" flashing at the panel and door intersection below Palladian window

Prefabricated sill pan at all exterior doors.

Permanent truss bracing

Wood shims

Approved metal T-channel wind bracing (when required)

Pre-fabricated stairs

Windows and exterior doors (including operating hardware on casement windows)

## EXHIBIT "A"

## ROUGH CARPENTRY

Installer is to write their company name on the inside of the window jamb around the AAMA label.

Diagonal Wood or Metal Bridging

Framing material for fabrication of roof crickets

Adjustable Metal Turnbuckles to support bay windows - 2 per window

Cornice Work

Basement Bracing (where applicable)

Firestops (where required)

Pent Roofs

One half (1/2") inch continuous bead of solvent-free non-silicone caulk/sealant is required in the interior side of the nail fin.

Exterior Millwork

_Subcontractor_    **shall supply the following which will be installed by the subcontractor:**

Felt paper behind all window and door millwork, and behind ladder framing at frieze board on brick and stone facades.

_O Rourke (#2)_ , municipality approved adjustable steel columns, with manufacturer's label attached, rated for a minimum of 20,000 lbs. for basements, and rated at a minimum of 12,500 lbs. for garages.
Main basement beams are to be ___Steel (#3)___ and are to be installed by ___Subcontractor (#4)___ . All steel beams must bear a minimum of 3". Wood beams must bear a minimum of 3 ½" or as plans dictate.

If this subcontractor is responsible for installing basement or garage lally columns, this subcontractor shall make sure that the columns rest directly on top of pier footings, not slabs. If this is not possible, subcontractor shall immediately notify Toll Bros., Inc. construction manager.

All splices in wood beams shall always occur directly above a support column.

All beams are to be permanently fastened to support columns.

(#2)    State manufacturer of adjustable steel columns. Adjustable steel columns shall be used exclusively - except where municipalities will not allow.
(#3)    wood, steel
(#4)    Subcontractor, Steel supplier

## EXHIBIT "A"

## ROUGH CARPENTRY

### WORKMANSHIP:

Subcontractor shall install galvanized nails and countersink all nails installed in exterior millwork materials, including but not limited to: sunbursts, pediments, panels, rakes, cornice work, door frames, etc.

Subcontractor shall glue and nail plywood sub-flooring to floor joists, with better side face up, mill labels down. All plywood sub-flooring shall be completely face nailed before glue dries. All roof sheathing shall be installed rough side up with <u>mill labels down</u>.

Subcontractor shall install a pressure-treated 2 x 12 kickplate under the door sill on rear and side exterior doors.

Subcontractor shall fabricate wood step from house to garage from pressure-treated lumber supplied by Toll Bros., Inc.

ALL FLOOR SHEATHING SHALL BE GLUED AND SPACED AS FOLLOWS:

Spread only enough glue to lay one or two sheets at a time or follow specific recommendations of glue manufacturer. Wipe any mud, dirt or water from joists before gluing.

Lay first panel with tongue side to wall and nail in place.

Apply a continuous line of glue (about 1/4 inch diameter) to framing members. Apply glue in a serpentine pattern on wide areas.

Apply two lines of glue on joists where panel ends butt to assure proper gluing of each end.

After first row of subflooring is in place, spread glue in groove of one or two sheets at a time before laying next row. Glue line may be continuous or spaced, but avoid squeeze-out by applying a thinner line (1/8 inch) than on joists.

Tap second-row panels into place, using a block to protect groove edges.

Stagger end joints in each succeeding row, leaving 1/8 inch between all end joints and 1/8 inch at all edges, including T&G. (Use a spacer tool to assure accurate and consistent spacing.)

Complete all nailing of each panel before glue sets. Check the manufacturer's recommendations for allowable time. (Warm weather accelerates glue setting.)

Subcontractor shall be responsible for insuring that any interior chase that requires insulation above, and that will not have the ceiling drywalled, be capped with sheathing.

Subcontractor shall verify fireplace hearth dimensions (width and depth) previous to framing.

Subcontractor shall install solid bridging where 5'0"steel/fiberglass tub front edge falls parallel with floor joist. Solid bridging shall be perpendicular to floor joist at three locations.

Subcontractor shall install cross-blocking underneath parallel walls which fall between floor joists.

Subcontractor shall be responsible to install solid blocking at all point load locations indicated on Architectural Plans or as identified by Construction Manager. Unless otherwise noted, blocking shall be equal to the depth and type material of the floor system. Subcontractors shall check on each side of bearing wall openings, ends and intermediate support of beams, roof girders and trusses and if any of these locations do not fall exactly on top of a floor joist, beam or foundation, blocking will be installed by Subcontractor. When a platform tub is specified, subcontractor shall install 6" high x 11 1/4" deep step as per detail on sheet A-6 of construction drawings.

Project: Brandywine Hunt                                    Page 5 of 29 q
C.C. #43041 4605 v 40052-MPT    Document 116-2    Filed 04/28/2008    Page 8 of 53
EFFECTIVE DATE: 04-01-05

## EXHIBIT "A"

## ROUGH CARPENTRY

Subcontractor shall be responsible to hang all exterior doors as per plans. Subcontractor shall be required to notify Toll Bros., Inc. Construction manager of any incorrect door swings at time of discovery.

If door shall require reinstallation, subcontractor shall do it at no additional cost if it was deemed subcontractor was at error by Toll Bros., Inc. Construction manager/Project Manager.

Diagonal wood bridging shall be installed with two nails, top and bottom. All bridging shall be nailed complete (top and bottom) within one (1) week of completion of rough carpentry work. Bridging must be installed so that it does not touch subfloor and does not touch adjoining pieces of bridging.

Subcontractor shall patch all holes in exterior sheathing before siding is applied at no additional cost to Toll Bros., Inc.

Nails must be 11 gauge, 1 1/4" galvanized roof nails. Staples must be 16 gauge, 7/16" crown, 1 1/4" leg.

### NAILING SCHEDULE

|  | NAIL SIZE | EDGES | INTERMED. |
|---|---|---|---|
| 3/4" T & G glued Sturdifloor | 6d(1) | 12" | 12" |
| 7/16" OSB roof sheathing | 6d | 6" | 12" |
| 7/16" OSB wall sheathing | 6d | 6" | 12" |
| 1/2" CDX roof sheathing | 6d | 6" | 12" |
| 1/2" CDX wall sheathing | 6d | 6" | 12" |

(1) Ring or screw shank nail

Subcontractor shall not install any Thermoply sheathing over first or second floor band boards or over garage door headers.

All exterior doors and windows shall be installed in accordance with the manufacturer's recommended installation procedures. Exterior doors require 20 mil (.020") Nervastral or aluminum pan flashing and three continuous beads of construction adhesive at the bottom corners and beneath the sill. All exterior doors shall be installed in the pre-fabricated sill pans supplied by Toll Bros., Inc. and flashed with 20 mil (.020") Nervastral or aluminum flashing. All aluminum door and window flashing that comes in direct contact with any pressure treated lumber (i.e. daylight basement windows & doors, exterior basement entrance doors, etc.) must be PVC coated w/the coated side facing towards the pressure treated materials. Windows require approx. 1/4" spacing between header & top of window.

All usable lumber shall be neatly stacked in one place. Subcontractor shall pile all scraps in front of the house, mini-mum 20' from house. In communities with T.B.I. recycling areas, all applicable recyclable materials shall be transported to the recycling center and deposited in the proper dumpster. Otherwise, all debris caused under this contract shall be removed by sub-contractor. If not, subcontractor shall be backcharged at a rate of 1 1/2 times the cost of removal.

Subcontractor shall broom clean unit prior to mechanical trades, including basement.

Subcontractor shall be responsible for repairing or replacing up to 50 studs and replacing delaminated plywood in living unit at no additional cost to Toll Bros., Inc. When plywood subfloor is replaced, all butt edge seams must rest on solid blocking and be screwed and glued in place.

Subcontractor shall install OSB on the cold side of attic exposed walk-in closet walls, OSB shall be installed on attic sidewall framing members.

Subcontractor shall fabricate Whirlpool Tub covers from materials supplied by TBI. Covers shall be designed to be portable and to protect Whirlpool Tubs during construction.

## EXHIBIT "A"

## ROUGH CARPENTRY

Subcontractor shall also install solid floor joist blocking in unheated room areas in such a manner as to prevent under floor air infiltration into heated room areas.

When roof trusses or roof rafters are spaced greater than 16" on center it is necessary to use clips with the roof sheathing. Roof sheathing is only approved up to 16" on center without clips. Spacing shall be as follows: Butt ends 1/8" spacing and sides 1/16" spacing.

Where ridge venting is specified, roof sheathing shall be left open 2" for roof truss and 3" to conventional framing with a ridge pole.

Subcontractor shall be responsible for aligning or heading out all framing members to accommodate heating, plumbing and electric.

Subcontractor shall install CAT blocking on all Provincial models where shutters will be installed.

On houses with copper bay roofs, subcontractor shall be responsible to install drywall screws through the subhead of bay window into bottom of copper roof.

Subcontractor shall install PVC coated aluminum or 20 mil (.020") Nervastral flashing at all locations where a concrete porch slab contacts a framed wall. Flashing shall extend at least 6" above and 3" below band joist. All required flashing that comes in direct contact with any pressure treated lumber (i.e. deck/porch ledger boards, sill plates, etc.) must be PVC coated aluminum with the coated side facing towards the pressure treated material.

On houses which do not receive aluminum wrapped trim, rake boards must be packed out with 3/4" strips of subfloor material (from waste) to create a pocket to receive siding.

VERTICAL CEDAR SIDING:

For all models which receive vertical cedar siding subcontractor shall be responsible for installing horizontal cross blocking between studs spaced not more than 32" o.c. vertically.

Subcontractor shall install nailers for horizontal or vertical cedar siding as required and as directed by Toll Bros., Inc. Construction manager.

PANEL INSTALLATION:

Subcontractor shall install fasteners spaced 16" vertically o.c. where panels abut.

Panels shall be secured through the bottom plate at each stud bay.

Subcontractor shall notify Toll Bros., Inc. Construction manager of any discrepancies in window and/or door openings, prior to installation of panel.

Subcontractor shall be responsible for a reasonable amount of panel and truss modifications and/or repairs. Subcontractor shall mark up a set of panel prints reflecting any required modifications.

Subcontractors shall install all top plates in such a manner to allow equal spacing at panel abutments.

Subcontractor shall properly lap double top plates to tie interior walls together.

**EFFECTIVE DATE: 04-01-05**

## EXHIBIT "A"

## ROUGH CARPENTRY

### ROOF TRUSS INSTALLATION:

For interior partitions within the center third of the bottom chord, 2 x 6 nailers will be installed for drywall at all truss bays perpendicular to interior partitions. The truss will be nailed "down" with one nail through the 2 x 4 bottom chord into the top plate, and left sticking out 3/4". Bottom chords that bear on exterior walls shall be nailed fast with 3 - 12P common nails at the end third of each truss. Roof trusses shall be diagonally racked and braced as per shop drawings.

Trusses shall be temporarily braced to prevent wind damage during assembly. Trusses will be permanently braced with 2 x 4's as required per the engineered truss drawing bracing requirements for each individual truss. NOTE: "green stickers" on trusses are a reminder to brace trusses and should not be construed as the only location a brace is required. H2.5A or equal ties must be installed by subcontractor per manufacturer specifications to meet the current code.

Subcontractor ___shall__ (#1)___ Supply H2.5A or equal hurricane ties.

### INSTALLATION OF TUDOR BOARDS (Cost Code 4307):

Subcontractor shall install tudor boards as per plans.

Subcontractor shall supply and install galvanized 12d common nails.

Subcontractor shall not install any tudor boards not primed.

Subcontractor shall install tudor boards after stucco scratch coat, or as directed by Toll Bros., Inc. Construction manager.

### INSTALLATION OF STUCCO BAND BOARDS AND/OR ARCHES:

When wood bands/arches are installed on stucco homes, subcontractor will affix bands/arches with galvanized 12d common nails.

### INSTALLATION OF JSI "I" JOISTS

I-Joist

1.  SPACING: As designated by Architectural Plan.

2.  NAILING: All I-Joist shall be nailed to bearing plate with 2-3-1/2" nails toe nailed per end, a minimum of 1-1/2" from end.

3.  BEARING: All I-Joist shall bear on the sill plate a minimum of 1-1/2". All split joist shall bear a minimum 1-1/2" on the center bearing. All continuous span I-Joist bear a minimum of 2" on the bearing wall. Joist ends shall not extend past any bearing point more than 1 foot.

4.  DAMAGE: I-Joists shall not have damage to the cords including:

    a.  Cutting
    b.  Notching
    c.  Drilling
    d.  Nail split that continues to the edge

(#1)    Shall/Shall Not

**EFFECTIVE DATE: 04-01-05**

## EXHIBIT "A"

## ROUGH CARPENTRY

I-Joist shall not have damage to the web that exceeds the allowable guidelines of the hole cutting guide or tears continuing to the chord.

### RIMBOARD:

1. <u>BEARING</u>: All rimboard must bear entirely on the sill plate.

2. <u>NAILING</u>: Rimboard must be nailed to the sill plate every 12" with 3" (10d) nails.

3. <u>CLEARANCE</u>: Rimboard shall not overhang foundation so a minimum of 1" from brick veneer is maintained with OSB sheathing only, Rimboard shall be held back 7/16" so sheathing covers Rimboard.

### DECKING:

1. Deck material should bear continuously on the top chord of I-Joist.

### HANGERS:

1. Install hangers as specified by Architectural Plans (Top mount or face mount).

2. Hangers shall be blocked as required to prevent twisting of the I-joist. If a 1/4" gap or more exists between top of hanger and I-Joist blocking should be used.

3. Hangers must be blocked to insure proper fastening when intersecting a perpendicular I-Joist.

4. All nail holes must be used.

### BLOCKING:

1. 2x4 lateral blocking is required 24" o.c. under non-load bearing interior walls which are between I-Joist.

### SQUASH BLOCKING:

1. Squash blocks are required only at exterior bearing walls when the rimboard does not have adequate strength. Refer to Architectural Drawings for proper locations.

2. Squash blocks installed in every 4th bay are required to transfer loads from upper bearing walls to lower bearing walls.

   When required by Architectural Drawings blocks will be 2x4 or 2x6 cut 1/8" higher than the joist height then nailed top and bottom with 2-3" (10d) nails.

### WEB STIFFENERS:

1. Web stiffeners are required in joist hangers when sides of the hanger do not provide direct lateral support to top chord of the joist (1/8" or more gap).

2. Web stiffeners should be cut 1/8" shorter than the web height.

### POINT LOADS:

1. When a point load occurs on an exterior wall the load should be blocked continuously down outside wall to sill plate.

2. If a point load falls directly on an I-Joist squash blocking must be used to carry load around the joist.

<div align="center">

## EXHIBIT "A"

## <u>ROUGH CARPENTRY</u>

</div>

3.   If a point load falls between I-Joist, blocking should be a double piece of I-Joist with continuous filler between the two I-Joist and proper hangers at each end or a single piece of I-Joist with 2x4 web stiffeners used on each side. The 2x4 web stiffeners should be tight to the top chord of I-Joist and nailed with 3 (10d) nails minimum 3" o.c.

## <u>HOLE CUTTING:</u>

1.   Any hole required through an I-Joist shall follow all criteria specified in manufacturers guidelines.

## <u>CANTILEVERS:</u>

1.   In unreinforced cantilevers I-Joist blocking must be installed and nailed with 2-3-1/2" (16d) nails toe nailed into top-bottom.

## <u>AREA SEPERATION WALLS/SHAFTWALL (Multi-Family Dwellings):</u>

1.   When cement block is not required by local governing authorities, the subcontractor shall install GP Dens-Glass Ultra Shaftliner as per code requirements and assembly details.

2.   Where Dens-Glass Ultra Shaftliner is not allowed and cement block is required by local governing the Subcontractor _____N A_____ (#1)_____ Install Thermacrete as per code requirements and assembly details.

(#1)   Shall/Shall not

## EXHIBIT "B"
## PAYMENT SCHEDULE SPECIFICATIONS
## FOR SUBCONTRACTOR AGREEMENT

All prices in Payment Schedule become effective with all new living units **STARTED AFTER** ___April 14, 2005___
The following lots were started prior to the above referenced date and shall be invoiced at the old contract prices as per the previous Subcontract Agreement # ___N/A___ :

Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____

Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____ ;  Lot _____

NOTE TO P.M.: Above clause only applies to renegotiated contracts; would not apply to vendors with whom we don't have a previous Subcontract Agreement with.)

All prices are firm for all work started on or before ___**April 14, 2006**___ and shall automatically renew for 30-day periods until written notice is given by either party; such written notice must be given at least 30 days prior to the expiration of the existing contract or any of the automatic renewal periods.

*Each invoice for base house and/or options must include a REFERENCE INVOICE NUMBER and must be submitted in writing for lump sum amounts as per Payment Schedule. The following information must be included: <u>VENDOR NAME, VENDOR NUMBER, DATE, PROJECT NAME, LOT NUMBER, MODEL NAME, COST CODE, and OPTION NUMBERS</u>. (The above information can be found in the Payment Schedule.)

Subcontractor understands that Base House and options for various lots may be billed on one invoice provided they are clearly separated on the invoice and that the lump sum contract amount (per cost code category) is shown next to each base house and/or option. Field conditions must be billed separately.

All invoices for work other than Base House or options must be authorized through the issuance of a Toll Bros., Inc. "Field Work Order". Copies of the Toll Bros., Inc. "Field Work Orders" will be given to subcontractor upon authorization of the work by the Construction Manager and prior to commencing work.

Upon completion of work authorized by "Field Work Order", subcontractor must submit "Invoice Copy" to Construction Manager for signature, retaining the "Subcontractor Copy" of work order for subcontractor's own records. Invoicing for work other than Base House or options shall be in accordance with the "Additional Work Price List" attached which includes all applicable taxes.

Signed "Invoice Copy" shall then be submitted for payment.

Prior to purchasing materials for model homes, subcontractor shall meet with community P.M. to review model home programs available to Toll Bros., Inc. Subcontractor agrees to credit Toll Brothers' model home invoice with any manufacturer's model home rebates and/or to reduce the invoice by the amount of any "no charge" materials supplied by a manufacturer for the model home.

Subcontractor understands that all Base House and option prices in Payment Schedule reflect all Specifications stated.

Payment shall not be made until work outlined in Specifications is 100% complete and current insurance certificate is on file.

All options shall be billed when the standard house is 100% complete; no payment of option invoices will be made until this time.

All invoices received without the proper information as stated shall be returned unpaid. The invoices can then be resubmitted with the proper information included for payment.

## EXHIBIT "B"

## PAYMENT SCHEDULE SPECIFICATIONS
## FOR SUBCONTRACTOR AGREEMENT

All invoices and other correspondence shall be submitted to Toll Bros., Inc., c/o

*4100 Brandywine Parkway, Wilmington, DE 19810 ~*

*Construction Trailer*

no later than 10:00 A.M. Tuesday ten days prior to the Friday that checks are to be issued for that project. Invoices received by any other means will be refused and held until the next regular pay cycle. All invoices received after this deadline will also be held until the next regular pay cycle.

All invoices must be submitted within 90 days of completion of the prescribed work for each Base House, option or Field Work Order. Invoices submitted after 90 days of the completion of the work will not be accepted nor paid and shall be considered null and void.

In order to insure timely resolution of outstanding invoices, any invoices which are unpaid for any reason must be appealed in writing to the Project Manager within 90 days of the original due date of the invoice. Invoices which are not appealed in writing within 90 days of the original due date will not be accepted.

*25* % retainage shall be held on each of the first _____ (#1) *4* _____ invoices until a total of $ *2,000.00* (#2) _____ is held. Retainage to be held until project is completed and all service work is satisfied. (Note to P.M.: Total retainage should equal the contracted price of one home.)

Prices in Payment Schedule are subject to a _____ *0* _____ % (percent) discount for all invoices paid within 20 days of receipt of invoice in the appropriate Toll Bros., Inc. office stated above.

Minimum retainage is one complete home for <u>all trades</u> except: rough carpentry, finish carpentry, wood siding installation, stone, brick, stucco, siding and flooring. These trades will require a fixed retainage of <u>$2000.00 per community</u>. Project Manager is advised that these amounts are the minimum approved retainages. If a vendor has no past track record, Project Managers shall increase retainage as he deems necessary.

(#1) maximum of 4 invoices
(#2) Dollar amount must be indicated (centralized corp. retainage, if applicable, excepted).

C:\Documents and Settings\toll\Local Settings\Temporary Internet Files\Content.IE5\AVMBQ5AJ\SUB PAYMENT SPEC[1].doc
EFFECTIVE DATE: 2/01/03

No. 0080   P. 14                                                      Mar. 13. 2006 11:47AM

# EXHIBIT "B"

## PAYMENT SCHEDULE SPECIFICATIONS
## FOR SUBCONTRACTOR AGREEMENT

**MODEL HOMES:**

Prior to purchasing materials for model homes, subcontractor shall meet with community P.M. to review model home programs available to Toll Bros., Inc. Subcontractor agrees to credit Toll Brothers' model home invoice with any manufacturer's model home rebates and/or to reduce the manufacturer for the model home. Additionally, there may be instances when the community P.M. may supply the subcontractor with certain materials for the model home, in which case the subcontractor agrees to document and credit the model home invoice for materials furnished by Toll Brothers, Inc.

Subcontractor agrees to the following concessions with regard to labor/materials for all model homes to be constructed in this community:

_NA For Rough Carpentry_

**The above will be reflected, as required, on model home invoices.**

EXHIBIT "B"

## PAYMENT SCHEDULE SPECIFICATIONS
## FOR SUBCONTRACTOR AGREEMENT

Below, subcontractor is to provide all contracted work references over the last three (3) years. Please include all companies names (including Toll Bros., Inc.), addresses, phone numbers, points of contact (POCs), type, quantity, location, and date(s) of contracted work performed, and whether you left and/or are currently on good terms. If more than 4 references continue on separate pages.

| Company Name, POC, & Phone No. | Address | Type/Quantity of Work, & Work Location/Date(s) | Left/Currently on Good Terms? Yes/*No (*If "No" list problem) |
|---|---|---|---|
| Riviera At concord | Toll Bros | Framing | yes |
| Charlestown MEADOWS | | | yes |
| Reserve at Garnet valley | | | yes |
| | | | |

I warrant the above information to be true, accurate, and correct to the best of my knowledge.

**Subcontractor's Signature:** _Jose A. DeSousa_

C:\Documents and Settings\toll\Local Settings\Temporary Internet Files\Content.IE5\AVMBQ5AJ\SUB PAYMENT SPEC[1].doc
EFFECTIVE DATE: 2/01/03

No. 0800    P. 16    Mar. 13. 2006 11:47AM

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    61
Date - . .    2/16/05

Division:  1616040000 Brandywine Hunt
of Work:  Rough Carpentry
Contract No  .  33545 BC Contractor:  *162083 JD CARPENTRY, INC.*

*162883 JD Framing inc*
*JD KHG*

Expiration Date: 07/01/05

SUBCONTRACTOR:  *JD Framing Cont. inc*    DATE:  *4/18/05*

CHECK ONE OF THE FOLLOWING:
___ ORIGINAL CONTRACT

TOLL BROS., INC.,  *K Att. Gut*    DATE:  *4/14/05*    X REPLACES EXISTING CONTRACT ~~REPLACES VENDOR~~

V.D APPROVAL:  _____    DATE:  *4/19/05*    ___ REPLACES ESTIMATED BUDGETS

Signature not required on all pages
for lst time contract.

*Pg 61-73*

___ CONTRACT UPDATE-PRICE CHANGE

% INCREASE/DECREASE    EFFECTIVE DATE:  ___ CONTRACT UPDATE-SPEC CHANGE
(Attach changed specs)

| Option | Option Description | Pln  Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|---------|-----------|-------------|------------|
| | | Savoy | | | |
| | BASE HOUSE | 852 *  4304 | Rough Carp.- First Draw Bs H | ~~7,300.00~~ | *7,500.00* |
| | BASE HOUSE | 853 *  4305 | Rough Carp.- Second Draw | 7,300.00 | |
| | | Chesapeake | | | |
| | BASE HOUSE | 862 *  4204 | Rough Carp.- First Draw Bs H | ~~7,800.00~~ | *8,000.00* |
| | BASE HOUSE | 862 *  4305 | Rough Carp.- Second Draw | 7,800.00 | |
| | | Inglewood | | | |
| | BASE HOUSE | 865 *  4304 | Rough Carp.- First Draw Bs H | ~~7,600.00~~ | *7,800.00* |
| | BASE HOUSE | 866 *  4305 | Rough Carp.- Second Draw | 7,600.00 | |
| | | Malvern | | | |
| | BASE HOUSE | 895 *  4304 | Rough Carp.- First Draw Bs H | ~~8,975.00~~ | *9,175.00* |
| | BASE HOUSE | 895 *  4305 | Rough Carp.- Second Draw | 8,975.00 | |
| | | Saratoga | | | |
| | BASE HOUSE | 898 *  4304 | Rough Carp.- First Draw Bs H | ~~5,950.00~~ | *8,150.00* |
| | BASE HOUSE | 898 *  4305 | Rough Carp.- Second Draw | 5,950.00 | |
| | | Marion | | | |
| | BASE HOUSE | 841 *  4304 | Rough Carp.- First Draw Bs H | ~~6,550.00~~ | *6,750.00* |
| | BASE HOUSE | 941 *  4305 | Rough Carp.- Second Draw | 6,550.00 | |
| | BASE HOUSE | *   *  4172 | Steel Installation | 500.00 | |
| | BASE HOUSE | *   *  4308 | Carpentry Crane | 700.00 | |
| | | Savoy | | | |
| 001 | THREE CAR SIDE ENTRY GARAGE | 853 *  4305 | Rough Carp.- Second Draw | 1,100.00 | |
| 004 | GARAGE STORAGE ADDITION | 853 *  4305 | Rough Carp.- Second Draw | 1,100.00 | |
| 005 | GUEST FIRST FLOOR SUITE | 853 *  4305 | Rough Carp.- Second Draw | 480.00 | |
| | | Chesapeake | | | |
| 005 | GUEST FIRST FLOOR SUITE | 862 *  4305 | Rough Carp.- Second Draw | 480.00 | |
| | | Inglewood | | | |
| 005 | GUEST FIRST FLOOR SUITE | 865 *  4305 | Rough Carp.- Second Draw | 480.00 | |
| | | Savoy | | | |
| 006 | THREE CAR SIDE ENTRY | 853 *  4305 | Rough Carp.- Second Draw | 1,100.00 | |
| | | SAVOY  COL | | | |
| 009 | ROOF DORMERS | 853 01  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | SAVOY  FED | | | |
| 009 | ROOF DORMERS | 853 06  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | SAVOY  WILL | | | |
| 009 | ROOF DORMERS | 853 07  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | SAVOY  PROV | | | |
| 009 | ROOF DORMERS | 853 08  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | SAVOY  CHAT | | | |
| 009 | ROOF DORMERS | 853 09  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | SAVOY  VERS | | | |
| 009 | ROOF DORMERS | 853 10  4305 | Rough Carp.- Second Draw | 750.00 | |
| | | CHESAPEAKE  MAN | | | |
| 009 | ROOF DORMERS | 862 03  4305 | Rough Carp.- Second Draw | 1,500.00 | |
| | | CHESAPEAKE  FED | | | |
| 009 | ROOF DORMERS | 862 06  4305 | Rough Carp.- Second Draw | 600.00 | |
| | | CHESAPEAKE  FARM | | | |
| 009 | ROOF DORMERS | 862 14  4305 | Rough Carp.- Second Draw | 1,200.00 | |
| | | INGLEWOOD  COL | | | |
| 009 | ROOF DORMERS | 865 01  4305 | Rough Carp.- Second Draw | 2,100.00 | |
| | | INGLEWOOD  FED | | | |
| 009 | ROOF DORMERS | 865 06  4305 | Rough Carp.- Second Draw | 1,800.00 | |

*14,800*

*KHG*
*JD*

*9175*
*8975*
*8,150.50*
*18,907.50*

*19 057.50*

*14-8*
*15-8*
*15-4*
*18-2*
*13-3*

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - .        62
Date - .  .  2/16/05

Division:  1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No .  33545 BC Contractor..  172092 JN CARPENTRY,INC.

Expiration Date. 07/01/05

CHECK ONE OF THE FOLLOWING:

SUBCONTRACTOR:  _____  DATE: _____    ___ ORIGINAL CONTRACT

TOLL BROS., INC.:  _____  DATE. _____   ___ REPLACES EXISTING CONTRACT  ___ NEW VENDOR

V.P. APPROVAL:  _____  DATE: _____   ___ REPLACES ESTIMATED BUDGETS
          Signature NOT Required on all pages
          for 1st time contract.                       ___ CONTRACT UPDATE-PRICE CHANGE

* INCREASE/DECREASE _____    EFFECTIVE DATE: _____   ___ CONTRACT UPDATE-SPEC CHANGE
                                                           (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|---------|-----------|-------------|-----------|
|  |  | INGLEWOOD  PROV |  |  |  |
| 009 | ROOF DORMERS | 865 08 | 4305 | Rough Carp - Second Draw | 1,500.00 |
|  |  | MARION  COL |  |  |  |
| 009 | ROOF DORMERS | 941 01 | 4305 | Rough Carp.- Second Draw | 900.00 |
|  |  | MARION  PARM |  |  |  |
| 009 | ROOF DORMERS | 941 14 | 4305 | Rough Carp.- Second Draw | 900.00 |
| 015 | EXTERIOR BASEMENT ENTRANCE | *  * | 4305 | Rough Carp.- Second Draw | 100.00 |
| 018 | DAYLIGHT BASEMENT | *  * | 4305 | Rough Carp.- Second Draw | 175.00 |
|  |  | Marion |  |  |  |
| 020 | FINISHED ROOM | 941 * | 4305 | Rough Carp.- Second Draw | 750.00 |
|  |  | Chesapeake |  |  |  |
| 023 | EXPANDED FAMILY ROOM | 862 * | 4305 | Rough Carp.- Second Draw | 1,390.00 |
|  |  | Saratoga |  |  |  |
| 023 | EXPANDED FAMILY ROOM | 898 * | 4305 | Rough Carp.- Second Draw | 1,390.00 |
|  |  | Marion |  |  |  |
| 023 | EXPANDED FAMILY ROOM | 941 * | 4305 | Rough Carp.- Second Draw | 1,390.00 |
|  |  | Chesapeake |  |  |  |
| 025 | GREENHOUSE | 862 * | 4305 | Rough Carp.- Second Draw | 400.00 |
|  |  | Malvern |  |  |  |
| 025 | GREENHOUSE | 895 * | 4305 | Rough Carp.- Second Draw | 400.00 |
|  |  | Marion |  |  |  |
| 025 | GREENHOUSE | 941 * | 4305 | Rough Carp.- Second Draw | 400.00 |
|  |  | Chesapeake |  |  |  |
| 026 | PALM BEACH | 862 * | 4305 | Rough Carp.- Second Draw | 900.00 |
|  |  | Inglewood |  |  |  |
| 026 | PALM BEACH | 865 * | 4305 | Rough Carp.- Second Draw | 900.00 |
|  |  | Malvern |  |  |  |
| 026 | PALM BEACH | 895 * | 4305 | Rough Carp.- Second Draw | 900.00 |
|  |  | Saratoga |  |  |  |
| 026 | PALM BEACH | 898 * | 4305 | Rough Carp.- Second Draw | 900.00 |
|  |  | Inglewood |  |  |  |
| 028 | FIFTH BEDROOM | 865 * | 4305 | Rough Carp.- Second Draw | 400.00 |
|  |  | Saratoga |  |  |  |
| 028 | FIFTH BEDROOM | 898 * | 4305 | Rough Carp - Second Draw | 400.00 |
|  |  | Savoy |  |  |  |
| 031 | RETREAT ADDITION | 853 * | 4305 | Rough Carp.- Second Draw | 700.00 |
|  |  | Chesapeake |  |  |  |
| 031 | RETREAT ADDITION | 862 * | 4305 | Rough Carp - Second Draw | 700.00 |
|  |  | Inglewood |  |  |  |
| 031 | RETREAT ADDITION | 865 * | 4305 | Rough Carp - Second Draw | 700.00 |
|  |  | Malvern |  |  |  |
| 031 | RETREAT ADDITION | 895 * | 4305 | Rough Carp - Second Draw | 700.00 |
|  |  | Saratoga |  |  |  |
| 031 | RETREAT ADDITION | 898 * | 4305 | Rough Carp - Second Draw | 700.00 |
|  |  | Marion |  |  |  |
| 031 | RETREAT ADDITION | 941 * | 4305 | Rough Carp - Second Draw | 700.00 |
|  |  | Savoy |  |  |  |
| 032 | GREAT ROOM ELITE ADDITION | 853 * | 4305 | Rough Carp - Second Draw | 1,600.00 |
|  |  | Chesapeake |  |  |  |
| 032 | GREAT ROOM ELITE ADDITION | 862 * | 4305 | Rough Carp - Second Draw | 1,600.00 |
|  |  | Inglewood |  |  |  |
| 032 | GREAT ROOM ELITE ADDITION | 865 * | 4305 | Rough Carp - Second Draw | 1,600.00 |

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    63
Date - . .    2/16/05

Division:  1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No .   33545 BC Contractor..  172092 JN CARPENTRY, INC.

Expiration Date. 07/01/05

SUBCONTRACTOR: _____  DATE. _____
TOLL BROS., INC.: _____  DATE. _____
V.P APPROVAL: _____  DATE: _____

Signature NOT required on all pages
for 1st time contract.

% INCREASE/DECREASE _____  EFFECTIVE DATE: _____

CHECK ONE OF THE FOLLOWING:
___ ORIGINAL CONTRACT
___ REPLACES EXISTING CONTRACT   ___ NEW VENDOR
___ REPLACES ESTIMATED BUDGETS
___ CONTRACT UPDATE-PRICE CHANGE
___ CONTRACT UPDATE-SPEC CHANGE
    (Attach changed specs)

| Option | Option Description | Pln | Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|-----|-----|-----------|-------------|------------|
| 032 | GREAT ROOM ELITE ADDITION | 895 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 032 | GREAT ROOM ELITE ADDITION | 941 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 035 | GUEST ELITE SUITE | 853 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 035 | GUEST ELITE SUITE | 862 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 035 | GUEST ELITE SUITE | 865 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 035 | GUEST ELITE SUITE | 895 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 035 | GUEST ELITE SUITE | 941 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 037 | GRAND CONSERVATORY | 853 | * | 4305 | Rough Carp.- Second Draw | 2,310.00 |
| 037 | GRAND CONSERVATORY | 862 | * | 4305 | Rough Carp.- Second Draw | 2,310.00 |
| 037 | GRAND CONSERVATORY | 895 | * | 4305 | Rough Carp.- Second Draw | 2,310.00 |
| 037 | GRAND CONSERVATORY | 941 | * | 4305 | Rough Carp.- Second Draw | 2,310.00 |
| 039 | CONSERVATORY ELITE | 853 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 039 | CONSERVATORY ELITE | 862 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 039 | CONSERVATORY ELITE | 865 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 039 | CONSERVATORY ELITE | 895 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 039 | CONSERVATORY ELITE | 941 | * | 4305 | Rough Carp.- Second Draw | 1,600.00 |
| 041 | COVERED PORCH ADDITION | 898 | 01 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 041 | COVERED PORCH ADDITION | 898 | 22 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 041 | COVERED PORCH ADDITION | 941 | 01 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 041 | COVERED PORCH ADDITION | 941 | 14 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 043 | MORNING ROOM | 862 | * | 4305 | Rough Carp.- Second Draw | 600.00 |
| 043 | MORNING ROOM | 898 | * | 4305 | Rough Carp.- Second Draw | 600.00 |
| 043 | MORNING ROOM | 941 | * | 4305 | Rough Carp.- Second Draw | 600.00 |
| 044 | GRAND MASTER SUITE | 898 | 01 | 4305 | Rough Carp.- Second Draw | 180.00 |
| 044 | GRAND MASTER SUITE | 898 | 06 | 4305 | Rough Carp - Second Draw | 180.00 |
| 044 | GRAND MASTER SUITE | 898 | 22 | 4305 | Rough Carp.- Second Draw | 180.00 |

445014

TOLL BROTHERS, INC
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    64
Date - . . .  2/16/05

Division: 1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No.    33545 BC Contractor..    172092 JN CARPENTRY,INC.

Expiration Date. 07/01/05
CHECK ONE OF THE FOLLOWING:

SUBCONTRACTOR: _____    DATE: _____    ___ ORIGINAL CONTRACT

TOLL BROS., INC.: _____    DATE: _____    ___ REPLACES EXISTING CONTRACT    ___ NEW VENDOR

V.P. APPROVAL: _____    DATE: _____    ___ REPLACES ESTIMATED BUDGETS
Signature NOT Required on all pages
for 1st time contract.    ___ CONTRACT UPDATE-PRICE CHANGE

% INCREASE/DECREASE _____    EFFECTIVE DATE: _____    ___ CONTRACT UPDATE-SPEC CHANGE
(Attach changed specs)

| Option | Option Description | Pln | Elv | Cost Code | Description | Bid Amount |
|--------|-------------------|-----|-----|-----------|-------------|-----------|
| | | Chesapeake | | | | |
| 065 | ALTERNATE MASTER SUITE | 862 | * | 4305 | Rough Carp.- Second Draw | 350.00 |
| 076 | FIRST FLOOR BEDROOM | 862 | * | 4305 | Rough Carp.- Second Draw | 80.00 |
| | | Saratoga | | | | |
| 081 | ALTERNATE FAMILY ROOM LAYOUT | 898 | * | 4305 | Rough Carp.- Second Draw | 100.00 |
| | | Savoy | | | | |
| 101 | CLEARSPAN GARAGE | 853 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| | | Inglewood | | | | |
| 101 | CLEARSPAN GARAGE | 865 | * | 4305 | Rough Carp.- Second Draw | 160.00 |
| | | Marion | | | | |
| 101 | CLEARSPAN GARAGE | 941 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| | | Chesapeake | | | | |
| 103 | COUNTRY KITCHEN PACKAGE | 862 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| | | SAVOY | COL | | | |
| 118 | PEACHTREE 8' HIGH | 853 | 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY | FED | | | |
| | PEACHTREE 8' HIGH | 853 | 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY | WILL | | | |
| 118 | PEACHTREE 8' HIGH | 853 | 07 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY | PROV | | | |
| 118 | PEACHTREE 8' HIGH | 853 | 08 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY | CHAT | | | |
| 118 | PEACHTREE 8' HIGH | 853 | 09 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY | VERS | | | |
| 118 | PEACHTREE 8' HIGH | 853 | 10 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | CHESAPEAKE | MAN | | | |
| 118 | PEACHTREE 8' HIGH | 862 | 03 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | CHESAPEAKE | FED | | | |
| 118 | PEACHTREE 8' HIGH | 862 | 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | CHESAPEAKE | PROV | | | |
| 118 | PEACHTREE 8' HIGH | 862 | 08 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | CHESAPEAKE | VERS | | | |
| 118 | PEACHTREE 8' HIGH | 862 | 10 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | CHESAPEAKE | FARM | | | |
| 118 | PEACHTREE 8' HIGH | 862 | 14 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD | COL | | | |
| 118 | PEACHTREE 8' HIGH | 865 | 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD | FED | | | |
| 118 | PEACHTREE 8' HIGH | 865 | 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD | PROV | | | |
| 118 | PEACHTREE 8' HIGH | 865 | 08 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SARATOGA | COL | | | |
| 118 | PEACHTREE 8' HIGH | 898 | 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SARATOGA | FED | | | |
| 118 | PEACHTREE 8' HIGH | 898 | 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SARATOGA | HER | | | |
| 118 | PEACHTREE 8' HIGH | 898 | 22 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION | COL | | | |
| 118 | PEACHTREE 8' HIGH | 941 | 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION | FED | | | |
| | PEACHTREE 8' HIGH | 941 | 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION | CHAT | | | |

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . . 65
Date - . . . 2/16/05

Division: 1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No . 23545 BC Contractor.. 172092 JN CARPENTRY,INC.

Expiration Date: 07/01/05

CHECK ONE OF THE FOLLOWING:

SUBCONTRACTOR: _____ DATE: _____ ___ ORIGINAL CONTRACT

TOLL BROS., INC.: _____ DATE: _____ ___ REPLACES EXISTING CONTRACT ___ NEW VENDOR

V.P. APPROVAL: _____ DATE: _____ ___ REPLACES ESTIMATED BUDGETS
Signature NOT Required on all pages
for 1st time contract.
___ CONTRACT UPDATE-PRICE CHANGE

% INCREASE/DECREASE _____ EFFECTIVE DATE: _____ ___ CONTRACT UPDATE-SPEC CHANGE
(Attach changed specs)

| Option | Option Description | Pln | Elv | Cost Code | Description | Bid Amount |
|---|---|---|---|---|---|---|
| 118 | PEACHTREE 8' HIGH | MARION CHAT 941 08 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 118 | PEACHTREE 8' HIGH | MARION FARM 941 14 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY COL 853 01 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY FED 853 06 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY WILL 853 07 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY PROV 853 08 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY CHAT 853 09 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SAVOY VERS 853 10 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | CHESAPEAKE MAN 862 03 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | CHESAPEAKE FED 862 06 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | CHESAPEAKE PROV 862 08 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | CHESAPEAKE VERS 862 10 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | CHESAPEAKE FARM 862 14 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | INGLEWOOD COL 865 01 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | INGLEWOOD FED 865 06 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | INGLEWOOD PROV 865 08 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MALVERN WILL 895 07 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MALVERN CHAT 895 09 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MALVERN VERS 895 10 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MALVERN HER 895 22 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SARATOGA COL 898 01 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SARATOGA FED 898 06 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | SARATOGA HER 898 22 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MARION COL 941 01 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MARION FED 941 06 | | 4305 | Rough Carp.- Second Draw | 300.00 |
| 119 | BEVELED GLASS 8' HIGH | MARION CHAT 941 09 | | 4305 | Rough Carp.- Second Draw | 300.00 |

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    66
Date - . . .  2/16/05

Division:  1616040000 Brandywine Hunc
of Work: Rough Carpentry
Contract No .    33545 EC Contractor .   172092 JN CARPENTRY,INC.

Expiration Date. 07/01/05

CHECK ONE OF THE FOLLOWING:

SUBCONTRACTOR: _____ DATE: _____  ___ ORIGINAL CONTRACT

TOLL BROS., INC.: _____ DATE: _____  ___ REPLACES EXISTING CONTRACT  ___ NEW VENDOR

V.P. APPROVAL: _____ DATE: _____  ___ REPLACES ESTIMATED BUDGETS

Signature NOT Required on all pages
for 1st time contract.                                ___ CONTRACT UPDATE-PRICE CHANGE

% INCREASE/DECREASE _____ EFFECTIVE DATE: _____  ___ CONTRACT UPDATE-SPEC CHANGE
                                                               (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|---------|-----------|-------------|------------|
| | | MARION FARM | | | |
| 119 | BEVELED GLASS 8' HIGH | 941 14 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION COL | | | |
| 123 | GABLE PORTICO WITH | 941 01 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | CHESAPEAKE MAN | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 862 03 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | CHESAPEAKE FED | | | |
| 125 | 12'-6" WIDE RECT. PORTICO | 862 06 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | CHESAPEAKE PROV | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 862 08 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | INGLEWOOD COL | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 865 01 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | INGLEWOOD FED | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 865 06 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | MARION COL | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 941 01 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | MARION FARM | | | |
| 125 | 12'-8" WIDE RECT. PORTICO | 941 14 | 4305 | Rough Carp.- Second Draw | 890.00 |
| | | MARION COL | | | |
| 132 | COPPER ROOF ABOVE | 941 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION FARM | | | |
| 132 | COPPER ROOF ABOVE | 941 14 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD COL | | | |
| 137 | CIRCULAR PORTICO WITH | 865 01 | 4305 | Rough Carp.- Second Draw | 400.00 |
| | | INGLEWOOD FED | | | |
| 137 | CIRCULAR PORTICO WITH | 865 06 | 4305 | Rough Carp.- Second Draw | 400.00 |
| | | MARION COL | | | |
| 137 | CIRCULAR PORTICO WITH | 941 01 | 4305 | Rough Carp.- Second Draw | 400.00 |
| 139 | PENT PORTICO WITH | 941 01 | 4305 | Rough Carp.- Second Draw | 400.00 |
| | | Savoy | | | |
| 141 | REAR DECK - FIRST SIZE | 853 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | Chesapeake | | | |
| 141 | REAR DECK - FIRST SIZE | 862 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | Inglewood | | | |
| 141 | REAR DECK - FIRST SIZE | 865 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | Malvern | | | |
| 141 | REAR DECK - FIRST SIZE | 895 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | Saratoga | | | |
| 141 | REAR DECK - FIRST SIZE | 898 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | Marion | | | |
| 141 | REAR DECK - FIRST SIZE | 941 * | 4305 | Rough Carp.- Second Draw | 840.00 |
| | | SAVOY COL | | | |
| 144 | MASTER BEDROOM COFFERED | 853 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY FED | | | |
| 144 | MASTER BEDROOM COFFERED | 853 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY WILL | | | |
| 144 | MASTER BEDROOM COFFERED | 853 07 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY PROV | | | |
| 144 | MASTER BEDROOM COFFERED | 853 08 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY CHAT | | | |
| | MASTER BEDROOM COFFERED | 853 09 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | SAVOY VERS | | | |

JD
7/5/06

445014

TOLL BROTHERS, INC.                                                Page . . . .    67
CONTRACT LOAD CONFIRMATION                                   Date . . . . .  2/16/05
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Division:  1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No .   33545 HC Contractor..   172092 JN CARPENTRY,INC.

Expiration Date: 07/01/05

SUBCONTRACTOR:_____  DATE:_____      CHECK ONE OF THE FOLLOWING:
                                                              ___ ORIGINAL CONTRACT

TOLL BROS., INC.:_____  DATE:_____     ___ REPLACES EXISTING CONTRACT   ___ NEW VENDOR

V.P. APPROVAL:_____  DATE:_____     ___ REPLACES ESTIMATED BUDGETS
               Signature NOT Required on all pages
               for 1st time contract.                        ___ CONTRACT UPDATE-PRICE CHANGE

% INCREASE/DECREASE _____  EFFECTIVE DATE:_____  ___ CONTRACT UPDATE-SPEC CHANGE
                                                              (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|---------|-----------|-------------|-----------|
| | | SAVOY   VERS | | | |
| 144 | MASTER BEDROOM COFFERED | 853 10 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD   COL | | | |
| 144 | MASTER BEDROOM COFFERED | 865 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD   FED | | | |
| 144 | MASTER BEDROOM COFFERED | 865 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | INGLEWOOD   PROV | | | |
| 144 | MASTER BEDROOM COFFERED | 865 08 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   COL | | | |
| 144 | MASTER BEDROOM COFFERED | 941 01 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   FED | | | |
| 144 | MASTER BEDROOM COFFERED | 941 06 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   HILL | | | |
| 144 | MASTER BEDROOM COFFERED | 941 07 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   CHAT | | | |
| 144 | MASTER BEDROOM COFFERED | 941 09 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   VERS | | | |
| 144 | MASTER BEDROOM COFFERED | 941 10 | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | MARION   FARM | | | |
| 144 | MASTER BEDROOM COFFERED | 941 16 | 4305 | Rough Carp.- Second Draw | 300.00 |
| 151 | SKYLIGHT - 22" x 46" | *   * | 4305 | Rough Carp.- Second Draw | 75.00 |
| | | Savoy | | | |
| 152 | SKYLIGHT - 45" x 46" | 853 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Chesapeake | | | |
| 152 | SKYLIGHT - 45" x 46" | 862 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Inglewood | | | |
| 152 | SKYLIGHT - 45" x 46" | 865 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Malvern | | | |
| 152 | SKYLIGHT - 45" x 46" | 895 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Saratoga | | | |
| 152 | SKYLIGHT - 45" x 46" | 898 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Marion | | | |
| 152 | SKYLIGHT - 45" x 46" | 941 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| | | Savoy | | | |
| 153 | TWO SKYLIGHTS - 45" x 46" | 853 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Chesapeake | | | |
| 153 | TWO SKYLIGHTS - 45" x 46" | 862 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Inglewood | | | |
| 153 | TWO SKYLIGHTS - 45" x 46" | 865 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Malvern | | | |
| 153 | TWO SKYLIGHTS - 45" x 46" | 895 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Saratoga | | | |
| 153 | TWO SKYLIGHTS - 45" x 46" | 898 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Marion | | | |
| 153 | TWO SKYLIGHTS - 45° x 46" | 941 * | 4305 | Rough Carp.- Second Draw | 300.00 |
| | | Savoy | | | |
| 154 | 6' HINGED PATIO DOOR ILO | 853 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| | | Chesapeake | | | |
| 154 | 6' HINGED PATIO DOOR ILO | 862 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| | | Inglewood | | | |
| | 6' HINGED PATIO DOOR ILO | 865 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| | | Malvern | | | |

175.00

JS HG

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    68
Date - . . .  2/16/05

Division,  1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No .   13545 BC Contractor.   172093 JN CARPENTRY,INC.

SUBCONTRACTOR,  _____  DATE:  _____

TOLL BROS., INC.:  _____  DATE,  _____

V.P. APPROVAL:  _____  DATE,  _____

Signature NOT Required on all pages
for 1st time contract.

% INCREASE/DECREASE  _____  EFFECTIVE DATE:  _____

Expiration Date. 07/01/05
CHECK ONE OF THE FOLLOWING:
__ ORIGINAL CONTRACT
__ REPLACES EXISTING CONTRACT   __ NEW VENDOR
__ REPLACES ESTIMATED BUDGETS
__ CONTRACT UPDATE-PRICE CHANGE
__ CONTRACT UPDATE-SPEC CHANGE
   (Attach changed specs)

| Option | Option Description | Pin Elv | Cost Code | Description | Bid Amount |
|---|---|---|---|---|---|
| 154 | 6' HINGED PATIO DOOR ILO | Malvern 895 * | 4305 | Rough Carp.- Second Draw | |
| 154 | 6' HINGED PATIO DOOR ILO | Marion 941 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| 155 | WALK-OUT BAY | Savoy 853 * | 4305 | Rough Carp - Second Draw | 325.00 |
| 155 | WALK-OUT BAY | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 155 | WALK-OUT BAY | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 155 | WALK-OUT BAY | Marion 941 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 156 | WALK-OUT BAY IN LIEU OF | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 156 | WALK-OUT BAY IN LIEU OF | Malvern 895 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| 156 | WALK-OUT BAY IN LIEU OF | Saratoga 898 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| 156 | WALK-OUT BAY IN LYEU OF | Marion 941 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| 157 | FIREPLACE WINDOW PACKAGE | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 325.00 |
| 157 | FIREPLACE WINDOW PACKAGE | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 157 | FIREPLACE WINDOW PACKAGE | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 157 | FIREPLACE WINDOW PACKAGE | Marion 941 * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | CHESAPEAKE VRG 862 10 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | CHESAPEAKE FARM 862 14 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | INGLEWOOD COL 865 01 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | INGLEWOOD FED 865 06 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | SARATOGA COL 898 01 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | SARATOGA HER 898 22 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | MARION COL 941 01 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | MARION FED 941 06 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | MARION WILL 941 07 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | MARION CHAT 941 09 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 158 | PALLADIAN ENTRY | MARION FARM 941 14 | 4305 | Rough Carp.- Second Draw | 150.00 |
| 160 | GARDEN WINDOW | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 100.00 |

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - - - .   69
Date - - - .  2/16/05

Division.  1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No -   33545 BC Contractor..  172092 JN CARPENTRY,INC.

SUBCONTRACTOR:                              DATE:              Expiration Date 07/01/05

                                                              CHECK ONE OF THE FOLLOWING:
TOLL BROS., INC.:                           DATE:          ___ ORIGINAL CONTRACT

V.P. APPROVAL:                              DATE:          ___ REPLACES EXISTING CONTRACT  ___ NEW VENDOR
              Signature NOT Required on all pages
              for 1st time contract                        ___ REPLACES ESTIMATED BUDGETS

% INCREASE/DECREASE                    EFFECTIVE DATE:      ___ CONTRACT UPDATE-PRICE CHANGE

                                                           ___ CONTRACT UPDATE-SPEC CHANGE
                                                               (Attach changed specs)

| Option | Option Description | Pln | Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|-----|-----|-----------|-------------|------------|
| 160 | GARDEN WINDOW | Chesapeake 862 | * | 4305 | Rough Carp.- Second Draw | 100.00 |
| 160 | GARDEN WINDOW | Inglewood 865 | * | 4305 | Rough Carp - Second Draw | 100.00 |
| 160 | GARDEN WINDOW | Malvern 895 | * | 4305 | Rough Carp.- Second Draw | 100.00 |
| 160 | GARDEN WINDOW | Marion 941 | * | 4305 | Rough Carp.- Second Draw | 100.00 |
| 163 | MUD ROOM EXTERIOR DOOR | Savoy 853 | * | 4305 | Rough Carp.- Second Draw | 90.00 |
| 163 | MUD ROOM EXTERIOR DOOR | Malvern 895 | * | 4305 | Rough Carp.- Second Draw | 90.00 |
| 164 | ADDITIONAL EXTERIOR DOOR | * | * | 4305 | Rough Carp.- Second Draw | 125.00 |
| 179 | FIREPLACE WINDOW PACKAGE | Savoy 853 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 179 | FIREPLACE WINDOW PACKAGE | Chesapeake 862 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 179 | FIREPLACE WINDOW PACKAGE | Inglewood 865 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 179 | FIREPLACE WINDOW PACKAGE | Marion 941 | * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY COL 853 01 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY PED 853 06 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY WILL 853 07 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY PROV 853 08 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY CHAT 853 09 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SAVOY VERS 853 10 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | CHESAPEAKE VERS 862 10 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | CHESAPEAKE FARM 862 14 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | INGLEWOOD PED 865 06 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | INGLEWOOD PROV 865 08 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SARATOGA COL 898 01 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SARATOGA FED 898 06 | | 4305 | Rough Carp - Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | SARATOGA HER 898 22 | | 4305 | Rough Carp - Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | MARION COL 941 01 | | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | MARION PED 941 06 | | 4305 | Rough Carp.- Second Draw | 450.00 |
|  | WALK-OUT BAY WINDOWS | MARION WILL | | | Rough Carp.- Second Draw | 450.00 |

445014

**TOLL BROTHERS, INC.**
**CONTRACT LOAD CONFIRMATION**
**(EXCLUDES CUSTOM OPTIONS)**
**(Option Sequence)**

Page - . . . 70
Date - . . . 2/16/05

Subdivision: 1616040000 Brandywine Hunt
of Work: Rough Carpentry
Contract No . 33545 BC Contractor.. 172092 JN CARPENTRY, INC.

| SUBCONTRACTOR: | _____ | | | Expiration Date. 07/01/05 |
|---|---|---|---|---|
| | | DATE: _____ | | CHECK ONE OF THE FOLLOWING: |
| TOLL BROS., INC.: | _____ | | | ___ ORIGINAL CONTRACT |
| | | DATE: _____ | | ___ REPLACES EXISTING CONTRACT ___ NEW VENDOR |
| V.P. APPROVAL: | _____ | | | |
| | Signature NOT required on all pages | DATE: _____ | | ___ REPLACES ESTIMATED BUDGETS |
| | for 1st time contract. | | | |
| % INCREASE/DECREASE _____ | | EFFECTIVE DATE: _____ | | ___ CONTRACT UPDATE-PRICE CHANGE |
| | | | | ___ CONTRACT UPDATE-SPEC CHANGE |
| | | | | (Attach changed specs) |

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|---|---|---|---|---|---|
| 189 | WALK-OUT BAY WINDOWS | MARION WILL 941 07 | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | MARION CHAT 941 09 | 4305 | Rough Carp.- Second Draw | 450.00 |
| 189 | WALK-OUT BAY WINDOWS | MARION VERS 941 10 | 4305 | Rough Carp.- Second Draw | 450.00 |
| 190 | TRAY CEILING IN DINING ROOM | CHESAPEAKE MAN 862 03 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | CHESAPEAKE FED 862 06 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | CHESAPEAKE PROV 862 08 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | CHESAPEAKE VERS 862 10 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | CHESAPEAKE FARM 862 14 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | INGLEWOOD COL 865 01 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | INGLEWOOD FED 865 06 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | INGLEWOOD PROV 865 08 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MALVERN WILL 895 07 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MALVERN CHAT 895 09 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MALVERN VERS 895 10 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MALVERN HER 895 22 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | SARATOGA COL 898 01 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | SARATOGA FED 898 06 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | SARATOGA HER 898 22 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION COL 941 01 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION FED 941 06 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION WILL 941 07 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION CHAT 941 09 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION VERS 941 10 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 190 | TRAY CEILING IN DINING ROOM | MARION FARM 941 14 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | CHESAPEAKE MAN 862 03 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | CHESAPEAKE FED 862 06 | 4305 | Rough Carp.- Second Draw | 335.00 |

*175.00*

443014

TOLL BROTHERS, INC
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page -          71
Date -        2/16/05

Division:  1616040000 Brandywine Hunt
of Work:  Rough Carpentry
Contract No.   33545 BC Contractor..   172032 JN CARPENTRY,INC

Expiration Date. 07/01/05

SUBCONTRACTOR.  _____    DATE:  _____

TOLL BROS., INC.   _____    DATE:  _____

V.P. APPROVAL:   _____    DATE:  _____
                 Signature NOT Required on all pages
                 for 1st time contract.

＊ INCREASE/DECREASE  _____    EFFECTIVE DATE:  _____

CHECK ONE OF THE FOLLOWING.
___ ORIGINAL CONTRACT

___ REPLACES EXISTING CONTRACT    ___ NEW VENDOR

___ REPLACES ESTIMATED BUDGETS

___ CONTRACT UPDATE-PRICE CHANGE

___ CONTRACT UPDATE-SPEC CHANGE
    (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|---|---|---|---|---|---|
| 191 | TRAY CEILING IN LIVING ROOM | CHESAPEAKE PROV 862 08 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | CHESAPEAKE VERS 862 10 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | CHESAPEAKE FARM 862 14 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | INGLEWOOD COL 865 01 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | INGLEWOOD FED 865 06 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | INGLEWOOD PROV 865 08 | 4305 | Rough Carp - Second draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MALVERN WILL 895 07 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MALVERN CHAT 895 09 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MALVERN VERS 895 10 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MALVERN HER 895 22 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION COL 941 01 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION FED 941 06 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION WILL 941 07 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION CHAT 941 09 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION VERS 941 10 | 4305 | Rough Carp - Second Draw | 335.00 |
| 191 | TRAY CEILING IN LIVING ROOM | MARION FARM 941 14 | 4305 | Rough Carp.- Second Draw | 335.00 |
| 199 | CURVED BALCONY WITH COLUMNS | Malvern 895 ＊ | 4305 | Rough Carp.- Second Draw | 450.00 |
| 199 | CURVED BALCONY WITH COLUMNS | Marion 941 ＊ | 4305 | Rough Carp - Second Draw | 450.00 |
| 240 | SQUARE COLUMNS IN LIEU | Savoy 853 ＊ | 4305 | Rough Carp - Second Draw | 75.00 |
| 240 | SQUARE COLUMNS IN LIEU | Chesapeake 862 ＊ | 4305 | Rough Carp - Second Draw | 75.00 |
| 367 | ADDITIONAL BATH | Inglewood 865 ＊ | 4305 | Rough Carp - Second Draw | 300.00 |
| 367 | ADDITIONAL BATH | Saratoga 898 ＊ | 4305 | Rough Carp.- Second Draw | 300.00 |
| 367 | ADDITIONAL BATH | Marion 941 ＊ | 4305 | Rough Carp.- Second Draw | 300.00 |
| 378 | PRIVATE TUB/TOILET AREA | Savoy 853 ＊ | 4305 | Rough Carp.- Second Draw | 900.00 |
| 378 | PRIVATE TUB/TOILET AREA | Inglewood 865 ＊ | 4305 | Rough Carp.- Second Draw | 900.00 |
| 501 | SOLARIUM ADDITION | Savoy 853 ＊ | 4305 | Rough Carp.- Second Draw | 900.00 |

445014

TOLL BROTHERS, INC
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    72
Date - . . .    2/16/05

Division:  1616040000 Brandywine Hunt
Of Work: Rough Carpentry
Contract No .   33545 BC Contractor.   17209Z JN CARPENTRY,INC.

SUBCONTRACTOR: _____    DATE: _____
TOLL BROS., INC.: _____    DATE: _____
V.P. APPROVAL: _____    DATE: _____
Signature NOT Required on all pages
for 1st time contract.

% INCREASE/DECREASE _____    EFFECTIVE DATE: _____

Expiration Date. 07/01/05
CHECK ONE OF THE FOLLOWING:
____ ORIGINAL CONTRACT
____ REPLACES EXISTING CONTRACT    ____ NEW VENDOR
____ REPLACES ESTIMATED BUDGETS
____ CONTRACT UPDATE-PRICE CHANGE
____ CONTRACT UPDATE-SPEC CHANGE
        (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|--------|-------------------|---------|-----------|-------------|------------|
| 501 | SOLARIUM ADDITION | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 900.00 |
| 501 | SOLARIUM ADDITION | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 900.00 |
| 501 | SOLARIUM ADDITION | Marion 941 * | 4305 | Rough Carp.- Second Draw | 900.00 |
| 502 | ATRIUM ELITE ADDITION | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 700.00 |
| 502 | ATRIUM ELITE ADDITION | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 700.00 |
| 502 | ATRIUM ELITE ADDITION | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 700.00 |
| 502 | ATRIUM ELITE ADDITION | Marion 941 * | 4305 | Rough Carp.- Second Draw | 700.00 |
| 5** | MEDIA ROOM ADDITION PLAYROOM ABOVE | Savoy 853 * 853 * | 4305 4305 | Rough Carp.- Second Draw Rough Carp.- Second Draw | 635.00 400.00 |
| 520 | PLAYROOM ABOVE | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 520 | PLAYROOM ABOVE | Marion 941 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 521 | BEDROOM SUITES ABOVE | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 521 | BEDROOM SUITES ABOVE | Marion 941 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 529 | NAPLES SUN ROOM ADDITION | 941 * | 4305 | Rough Carp.- Second Draw | 1,150.00 |
| 530 | CULINARY KITCHEN | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 630.00 |
| 530 | CULINARY KITCHEN | Malvern 895 * | 4106 | Rough Carp.- Second Draw | 630.00 |
| 530 | CULINARY KITCHEN | Marion 941 * | 4305 | Rough Carp.- Second Draw | 630.00 |
| 532 | PALLADIAN KITCHEN ADDITION | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 450.00 |
| 532 | PALLADIAN KITCHEN ADDITION | Malvern 895 * | 4305 | Rough Carp.- Second Draw | 450.00 |
| 532 | PALLADIAN KITCHEN ADDITION | Marion 941 * | 4305 | Rough Carp.- Second Draw | 450.00 |
| 533 | GREENHOUSE WITH | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 533 | GREENHOUSE WITH | Malvern 895 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 533 | GREENHOUSE WITH DAYLIGHT WINDOW | Marion 941 * | 4305 | Rough Carp.- Second Draw | 400.00 |
| 543 | | * * | 4305 | Rough Carp.- Second Draw | 75.00 |
| 628 | GAS DIRECT VENT FIREPLACE - | * * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 629 | ADDITIONAL GAS DIRECT VENT | * * | 4305 | Rough Carp.- Second Draw | 150.00 |
| 631 | GAS DESIGNER FIREPLACE - | Chesapeake 862 * | 4305 | Rough Carp.- Second Draw | 175.00 |
| | GAS DESIGNER FIREPLACE - | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 175.00 |
| | | Saratoga | | | |

445014

TOLL BROTHERS, INC.
CONTRACT LOAD CONFIRMATION
(EXCLUDES CUSTOM OPTIONS)
(Option Sequence)

Page - . . .    73
Date - . . .  2/16/05

division:   1616040000 Brandywine Hunt
of Work:  Rough Carpentry
Contract No .   33545 BC Contractor..   172092 JN CARPENTRY,INC.

SUBCONTRACTOR: _____        DATE: _____

TOLL BROS., INC.: _____      DATE: _____

V.P  APPROVAL: _____        DATE: _____
           Signature NOT Required on all pages
           for 1st time contract.

% INCREASE/DECREASE _____        EFFECTIVE DATE: _____

Expiration Date. 07/01/05
CHECK ONE OF THE FOLLOWING:
___ ORIGINAL CONTRACT

___ REPLACES EXISTING CONTRACT   ___ NEW VENDOR

___ REPLACES ESTIMATED BUDGETS

___ CONTRACT UPDATE-PRICE CHANGE

___ CONTRACT UPDATE-SPEC CHANGE
      (Attach changed specs)

| Option | Option Description | Pln Elv | Cost Code | Description | Bid Amount |
|--------|--------------------|---------|-----------|-------------|------------|
| 631 | GAS DESIGNER FIREPLACE - | Saratoga 898 * | 4305 | Rough Carp.- Second Draw | 175.00 |
| 632 | THREE SIDED GAS DESIGNER | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| 632 | THREE SIDED GAS DESIGNER | Inglewood 865 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| 632 | THREE SIDED GAS DESIGNER | Malvern 895 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| 632 | THREE SIDED GAS DESIGNER | Marion 941 * | 4305 | Rough Carp.- Second Draw | 200.00 |
| 648 | FIREPLACE WINDOW ARRAY | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 225.00 |
| 648 | FIREPLACE WINDOW ARRAY | Saratoga 898 * | 4305 | Rough Carp.- Second Draw | 225.00 |
| 6.. | FIREPLACE WINDOW ARRAY | Marion 941 * | 4305 | Rough Carp.- Second Draw | 225.00 |
| 6.. | FIREPLACE WINDOW ARRAY | Savoy 853 * | 4305 | Rough Carp.- Second Draw | 240.00 |
| 649 | FIREPLACE WINDOW ARRAY | Saratoga 898 * | 4305 | Rough Carp.- Second Draw | 240.00 |
| 649 | FIREPLACE WINDOW ARRAY | Marion 941 * | 4305 | Rough Carp.- Second Draw | 240.00 |

PROJECT: _Brandywine Hunt_                               Page 1 of _1_
C.C. #4304, #4305, #4307
**EFFECTIVE DATE: 04/01/05**

<div align="center">

**EXHIBIT "C"**

**ADDITIONAL WORK PRICE LIST**

</div>

NOTE:    All work other than as contracted on the "Exhibit B Payment Schedule" must be pre-authorized
through the issuance of a Toll Bros., Inc. "Field Work Order". Invoices for additional work must
have the pre-authorized Field Work Order attached.

| | | | |
|---|---|---|---|
| MECHANIC | 4305 | $ _30_ | /HR |
| LABORER | 4305 | $ _30_ | /HR |
| BRACE BASEMENT WALLS | 4301 | $ _N/A_ | /BSMNT |
| COVER PANELS/TRUSSES WITH PLASTIC | | $ _N/A_ | /EA |

PROJECT: _Brandywine Hunt_                         Page 1 of _1_
C.C. #4304, 4305, 4307
**EFFECTIVE DATE: 04-01-05**

## EXHIBIT "G"

## ROUGH CARPENTRY

PRODUCTS USED THIS CONTRACT

Please check below which manufacturers below will be used under this contract at this community.  *Be advised that any time a product is to be used other than specifically listed below, PMs must attach a completed Product Variation Request with sound rationale for use.  **NOTES: 1)** Contracts submitted without completing this information will not be loaded into JD Edwards and will be returned; **2)** It is imperative to insure accuracy in reporting which manufacturer you will be using.  Failure to do so will delay or eliminate receipt of your rebates.

Rough Carpentry

___X___      Simpson Strong.Tie

_____      *Other _____

Area Separation Wall/Shaftwall

_____      Georgia Pacific (GP) Dens-Glass Ultra Shaftliner

_N/A_      Thermacrete ("Preferred" when block is required)

_____      *Other _____

Toll Brothers Project Manager    _Kevin H. Grubb_
                                                       (Please Print Name)
                                       _____    Date: _4/14/05_
                                                         (Signature)

**BID ANALYSIS REPORT**  COMMUNITY NAME: Brandywine Hunt

Material or Trade Required: _____ open _____ Was old bid used (yes/no) _____ If not, why _____

Replacing bad framer.

1. Minimum of 3 bids **MUST** be solicited with at least **one** (1) bid from a subcontractor NOT working at any Toll Bros.' communities.
2. Bid prices for the most popular models and elevations shall be recorded below.
3. Prices for the three **most costly** no charge and/or mandatory options must be considered in making contract award decision.
4. *Attach *Company Base Budget & Options Reports* to this form for like models/options in neighboring communities.
5. Transfer information from each bidders' Exhibit "C" to page 2 of this form. This must also be taken into consideration in the awarding of the contract.

| Subcontractor/Supplier | Bid #1 | Bid #2 | Bid #3 | Bid #4 |
|---|---|---|---|---|
| Company name: | | | | |
| Address: | | | | |
| | | | | |
| Point of Contact: | | | | |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Base House for Model: ____ / ____ Elev. | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |
| Bid on Major Option ____, option # ____ | $ | $ | $ | $ |

Model Home(s) Discounts/Concessions: _____

**Circle lowest bid for each Model/Elev including options above and indicate awardee here:** _____

**Justification if awarding to other than low bidder or if less than the minimum bids were used (check below as appropriate)**

☒ No other bidders available in area (explain how bids were unsuccessfully solicited) _____

_____ Low bidder not qualified (explain) _____

*Waiver requires two Signatures:*

Proj. Mngr. Sign: _____ Date: _____ Snr Mgr. Appr: _____ Date: _____

*NOTE: THIS FORM (orig.) MUST BE FORWARDED WITH CONTRACT FOR BUDGET LOADING

Mar. 13. 2006 11:49AM   No. 0800   P. 32

Contract: Rough Carpentry

Subcontractor Name: JD Framing Contractors Inc.

| Description from contract's Exhibit 'C' (e.g. mechanical, Installation charge, Labor, Additional product, helper, etc.) | Quantity (I.e. per hr, sq.ft., LF., EA, etc.) | Bidder #1 | Bidder #2 | Bidder #3 | Bidder #4 |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  | Same as | | | | |
|  | Old Frame | | | | |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

PC041P

BATCH CONTRACT EXPIRATION DATE CHANGE

RUN DATE  4/28/05    PAGE  1

| PROJECT | CONTRACT NUMBER | VENDOR NUMBER | VENDOR NAME | EFFECTIVE DATE | OLD EXPIRE DATE | NEW EXPIRE DATE |
|---------|-----------------|---------------|-------------|----------------|-----------------|-----------------|
| 01616 Brandywine Hunt | 33545 | .172092 | JN CARPENTRY,INC. | 07/01/04 | 07/01/05 | 1/01/50 |

35912

APR 28 2005

6/3/05

# JD FRAMING, INC

STEEL INSTALATION----------------------- 500.00

CARPENTRY CRANE-------------------------700.00

017- WALK-OUT BSMT. --------------------150.00

018- DAYLIGHT BSMT. --------------------150.00

GOTHIC PORTICO-------------------------450.00

K maintenance

# EXHIBIT A-2

3103 Philmont Avenue
Huntingdon Valley, PA 19006

Contract No:
Community: _Brandywine Hunt_

## CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:
CONTRACTOR _Delaware Heat and Air_
ADDRESS: _713 Millcreek Lane  Bear DE 19701_
PHONE: _302-738-4669_
FACSIMILE: _302-738-4680_     CONTACT: _Frank Bartuski_
E-MAIL:

Contractor, representing that it is skillful and experienced in the craft _HVAC_
and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:

Reference Exhibit "A", page(s) 1 through __5__, Toll architectural plans, construction detail documents and detail documents for specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ _varies_.
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through __1-5__ for "Payment Schedule."   1 - 5 )
Reference Exhibit "C", page(s) 1 through __1__ for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and contained herein.

## It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.

ARBITRATION: Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization selected by Seller. In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless and until Contractor has first given Toll specific written notice of each claim (at 3103 Philmont Avenue, Huntingdon Valley, PA 19006, Attn: Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: _51 0362156_

CONTRACTOR:                                TOLL BROS., INC.:
By: _Delaware Heating and Conditioning_     By: _____
Print Name: _Frank J. Bartuski_  _Services Inc_  Print Name: _Kevin Grubb_
Title: _President_                         Title: _Project Manager_
Date: _8/18/04_                            Date: _8/23/04_
                                           Senior Manager Initials: _____  8/25/04_

☐ Check if secondary contract so budget will not be loaded - For File Only.

Page Two

**Article 1. TIME OF PERFORMANCE:** Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's construction schedule. Contractor shall begin the Work when directed by Toll and shall continue prosecuting, and complete its performance of the Work by the act or omission of Toll...

**Article 2. CHANGES IN THE WORK:** Toll may at any time, without notice to Contractor's Surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work...

**Article 3. INDEMNIFICATION:** The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees...

**Article 4. INSURANCE:** Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of insurance from a company or companies with an A.M. Best rating of not less than B, VI:

A. General Liability—
   Types: Occurrence Basis
   Limits:
   Per occurrence          $1,000,000
   General Aggregate       $2,000,000
   Products/Completed
   Operations Aggregate    $1,000,000
   Special Provisions:
   Additional Insured Endorsement
   (Endorsement) CG 20 10 11/85 or its equivalent)

B. Vehicle Liability—
   Limits:
   Bodily Injury/Property
   Damage per occurrence
   Special Provisions:      $1,000,000
   Coverage shall include owned, hired and non-owned vehicles. The insurance policies in A and B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties...

C. Workers' Compensation—
   Limits:                  Statutory

D. Employer's Liability—
   Limits:
   Each accident            $100,000
   Disease - Policy Limit   $500,000
   Disease - Each employee  $100,000
   Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage specified above is in effect.

**Article 5. MECHANICS AND/OR MATERIALMENS LIENS AND CLAIMS:** TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANICS AND/OR MATERIALMENS LIEN OR MECHANICS AND/OR MATERIALMENS NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDING THEREON OR THE GROUND APPURTENANT THERETO...

**Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR:** Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work...

**Article 7. DEFAULT:** In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent...

**Article 8. OTHER ITEMS:** Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents...

**Article 9. MISCELLANEOUS:** Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll...

**Article 10. LIMITATION OF LIABILITY:** Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damages arising from the breach of this Agreement...

**Article 11. OPTION POLICY:** Contractor agrees not to sell options, install extras or to do work of any kind or description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home...

**Article 12. SAFETY PRECAUTIONS/OSHA COMPLIANCE:** Contractor has agreed to comply with and has full knowledge of the requirements therein contained regarding the safety precautions...

**Article 13. NON-EXCLUSIVE TERMINATION:** Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor...

**Article 14. SEVERABILITY:** To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement, otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

**Article 15. GOVERNING LAWS:** This Agreement shall be governed by the laws of Pennsylvania.

Contract No.: _____

Community:  Brandywine Hunt

Contractor:
Toll:

Dated: 8/16/04
Dated: 8/22/04

8/25/04

Project: Brandywine Hunt (BH)
C.C. #4451, 4452, 4453, 4454
EFFECTIVE DATE: 08-01-04

## EXHIBIT "A"

## H.V.A.C.
## (Projects with Gas Furnace Standard)

Subcontractor understands that all material supplied and work performed under this contract shall be in accordance with all P.W.C. standards, all BOCA National, Federal, State, (Act 222 PA Only) Local codes, O.S.H.A. safety regulations and be in accordance with Toll Bros., Inc. standard details located in the construction trailer.

Subcontractor shall be responsible to supply contractor with current copies of all MSDS (Material Safety Data Sheets) applicable to the product(s), material(s), additives, etc. which will be used in the execution of this contract. Materials which qualify as hazardous materials must be properly labeled, must not be disposed of on Toll Bros., Inc. property, and shall be disposed of at subcontractor's sole expense in full compliance with all applicable federal, state, and local statutes, rules, and regulations, etc...

Subcontractor shall report to TBI construction manager any unsatisfactory conditions that may affect his finished product before he begins work. In the event this subcontractor puts "good work over bad work" this Subcontractor will be held equally responsible for the correction or repair. It is this subcontractor's responsibility to inspect his own work for both quality and completeness and to protect the materials and work of all other trades preceding him.

H.V.A.C. subcontractor shall be responsible to perform all work in accordance with the latest revised mechanical drawings for each appropriate model. The mechanical drawings represent suggested designs, sizing and layout. Any errors or deficiencies in the plans should be brought to the attention of the Toll Bros., Inc. Project Construction manager and/or the Project Manager so that a solution can be arrived at prior to beginning work. The H.V.A.C. contractor is ultimately responsible for the guaranteed efficient operation of this H.V.A.C. system.

Subcontractor shall obtain and pay for all applicable H.V.A.C. permits and inspections. Proof of valid permit must accompany invoice at rough, except New Jersey.

Subcontractor understands that the standard system in each living unit shall be a gas furnace with central air conditioning.

All service work shall be completed within two (2) days of request. All emergency service work shall be completed within twelve (12) hours of request by Toll Bros., Inc. Emergency phone number with a 24 hour answering service and warranty envelope shall be attached to unit.

This subcontractor's personnel shall be instructed by subcontractor to treat all homeowners and their property with the utmost courtesy and respect. Subcontractor's personnel must also be instructed to refrain from derogatory or sarcastic remarks concerning work performed by other trades or by Toll Bros., Inc. Subcontractor or their employees shall not contact Toll Brothers' homebuyers without the express written consent of the Project Manager.

The subcontractor shall be responsible for and agrees to provide on a routine and periodic basis, in-depth safety training for subcontractor's employees to fully cover all aspects related to the type of work the particular tradesman/laborer is performing for Toll Brothers. Such training shall be in accordance and compliance with federal, state, local and OSHA safety directives and regulations.

This subcontractor shall take whatever steps necessary to protect carpet, vinyl, or hardwood flooring from dirt or damages, should it become necessary to enter the home after these materials have been installed.

The heating system shall provide a minimum of 70 degree heat when measured 5' above the floor in the center of all rooms when out-side temperature is at the ASHRAE winter dry bulb 97.5% design criteria for the specified area.

Subcontractor shall be responsible to keep all community roadways clean. Any mud or debris deposited by subcontractor's employees or vehicles must be removed at subcontractor's expense.

Project: *D.H.*

C.C. #4451, 4452, 4453, 4454

**EFFECTIVE DATE: 08-01-04**

## EXHIBIT "A"

## H.V.A.C.
## (Projects with Gas Furnace Standard)

The cooling system shall provide a minimum of 18 degrees F. differential from inside temperature to outside temperature when measured 5' above the floor in the center of all rooms when outside temperature is at or below 94 degrees F. Calculations are to be based on ASHRAE summer dry bulb at 1% design criteria for the specific area.

**NOTE:** PA Act 222 allows a +60% margin on heating equipment to compensate for the oversizing needed to meet cooling requirements.

When options affecting heating and cooling loads are selected, subcontractor is responsible to submit heating and cooling load calculations to Project Manager prior to the installation of the HVAC system. The invoice will not be paid without receipt of the heating and cooling load calculations.

Subcontractor shall provide the following guarantees:

One year warranty on all parts, and labor.
Five year warranty on all compressors.
Ten year warranty on all heat exchangers.
Two year warranty on all refrigerant line leaks and ductwork separations.

All warranty periods begin on the day of settlement.

After initial one year warranty on all parts and labor has expired, subcontractor shall service samples (labor only) at no charge to Toll Bros., Inc. for as long as subcontractor is under contract.

After initial one year warranty has expired on each homeowner's H.V.A.C. system, subcontractor shall provide the homeowner with an optional service contract.

Subcontractor shall send _____ personnel to the job site to complete each unit's rough in _____ working days and finish in _____ working days. Supervision must include a professional representative who looks and acts like a qualified tradesman and who can communicate clearly.

Emergency phone number and warranty envelope shall be affixed to unit.

Subcontractor is responsible to clean up all debris created by his trade before leaving the property, each day.

In communities with T.B.I. recycling areas, all applicable recyclable materials shall be transported to the recycling center and deposited in the proper dumpster. All debris shall be compacted. Otherwise, all debris caused under this contract shall be removed by subcontractor. If not, subcontractor shall be backcharged at a rate of 1 1/2 times the cost of removal.

Subcontractor shall furnish serial numbers for all warrantable items. Said number shall be affixed to staged payment invoice for payment. Warranty envelopes, noting lot number must be turned in to field construction manager prior to last stage payment.

Subcontractor shall protect against theft or vandalism by securing in place all equipment. Stolen items will not be paid for.

SCOPE OF WORK:

Subcontractor shall be responsible for the following:

Supply all labor, materials, equipment, and supervision necessary to complete all work covered under this contract.

Project: ~~PH~~
C.C. #4451, 4452, 4453, 4454
**EFFECTIVE DATE: 08-01-04**

## EXHIBIT "A"

### H.V.A.C.
### (Projects with Gas Furnace Standard)

Supply and install _____ *[RANG#1]* _____ 90% direct vent and 10 SEER efficiency gas furnaces and air conditioning units as per the model #, and sizes stated in Model Specifications (Note: Direct Vent is not required in North Carolina. **[NOTE: NJ Energy Star Program requires a minimum of 92% efficiency direct vent gas furnaces and a minimum 13 seer air conditioning units (check energy star calculations by model for exact efficiency requirements and sizing, Carrier brand only.)**

*Supply and install all ductwork with return air plenums. All supply ducts shall be mastic sealed and constructed in a leak-free, workmanlike manner. All supply systems must be fully ducted to include sealing all required seams and joints on all supplies, stack heads, and boxes to the drywall or subfloor. No flex duct is to be installed in basements or between first and second floors.

-When allowed by code, panned stud wall cavities and the spaces between solid floor joists to be utilized as air plenums shall not convey air from more than one floor level; not be a part of a required fire-resistance-rated assembly and not be used as a plenum for supply air. Furthermore, panned stud wall cavities and joist space plenums shall be isolated from adjacent concealed spaces by tight-fitting fire blocking in accordance with all IRC, IMC, National, Federal, State and Local codes.

*[NOTE: NJ Energy Star Program requires that all return plenums be fully ducted (i.e.: without the use of panned joists or wall cavities for air return) in a leak-free manner with joints and return duct boots that are screwed and sealed with metal foil tape. Air leakage must be less than 10% on both supplies and returns.]

*When panning joists or studs for return air ducts, subcontractor shall use _Blue_ (#2) _Thermoply_. Regardless of type of panning, subcontractor shall caulk all panning to wood member, to eliminate air infiltration.

When installing flexible ductwork for Nutone bathroom exhaust fans a maximum length of 14' may not be exceeded unless otherwise specifically prescribed by the flexible duct manufacturer.

Supply and install all ductwork vented to exterior for bathroom exhaust fans. (Final electrical hook-up shall be done by electrical subcontractor.)

Supply and install all ductwork for downdraft cooktop including outside wall cap (if applicable, wall cap must be as supplied or recommended by appliance manufacturer). Ductwork shall be a minimum of 6" in diameter or 3 1/4" x 10" per manufacturer's specifications (5" diameter is not acceptable, except when straight duct run is less than 6' and only one elbow is used).

Supply and install all thermostats and wiring. (NOTE: NJ Energy Star requires digital set-back thermostats). Model homes must have automatic thermostats manufactured by Hunter "Autotemp Plus" model #44422 or Honeywell Chronotherm IV model #T8600D2028 Auto Change-Over.

Supply and install all refrigerant and condensate lines. Refrigerant piping shall be long enough to allow for settlement of exterior units.

Upon completion of installing air conditioning equipment, sub-contractor shall charge the system with refrigerant as per manufacturer's specifications.

Supply and install air conditioning compressor upon fiberglass or concrete pad(s). (Subcontractor is also responsible for supplying the compressor pad.) Units shall be set 3' from house. Pad(s) shall be set upon unexcavated ground to properly support unit. Any outside unit that settles more than 1 1/2" per horizontal foot during the first year shall be straightened by the sub-contractor at no charge.

(#1) Trane, Lennox, York or Carrier/Bryant (whichever provides lowest cost to Toll Brothers).
-(#2) Blue Thermoply, galvanized sheet metal, minimum #30 gauge.

Project:
C.C. #4451, 4452, 4453, 4454
EFFECTIVE DATE: 08-01-04

## EXHIBIT "A"

### H.V.A.C.
### (Projects with Gas Furnace Standard)

**NOTE:** Plumber shall be responsible for final gas connection to furnace.

Subcontractor shall supply and install the required size piping (based upon length of run) for the direct vent furnace(s). No "B" vent shall be used. Exterior vent protrusion(s) shall not be in front of the house, shall be in non-intrusive location and shall be a 2 pipe system with 1 pipe for intake & 1 pipe for outtake. This shall not be within 1' of any window, door, dryer or downdraft vents.

Supply and install filter plenum with washable permanent filters. If authorized by Toll Bros. to place heating unit(s) in the attic space, unit(s) shall have a centralized return with the filter behind the return grill for easy maintenance and access by the homeowner.

In basement situations, any time gas furnace is located more than 5' from an exterior basement wall and soil conditions permit, the condensate line shall drain directly into a hole in the basement slab. Condensate pumps shall only be used on slab homes or at the Project Manager's discretion. If used, subcontractor shall install a condensate pump and line to pump water to the exterior of the house next to the condensing unit. If gas furnace is within 5' of an exterior basement wall subcontractor shall run a line from air handler into basement perimeter trough.

Supply and install one dryer vent in each living unit.

Maximum length of 4" diameter rigid metal duct:

| # of 90 degree Bends | L.F. |
|---|---|
| 0 | 36 |
| 1 | 26 |
| 2 | 16 |

Maximum length of 4" diameter flexible white duct:

| # of 90 degree Bends | L.F. |
|---|---|
| 0 | 24 |
| 1 | 18 |
| 2 | 10 |

Supply and install all necessary grilles and registers, Hart & Cooley or equal approved by Toll Bros., Inc. Project Manager. (Grilles shall be installed prior to painting.)

Hanging all basement ductwork from straps at intervals of not more than 10'. All supply ductwork shall be held down 1" from structural members and subflooring so that it does not rattle when floor is walked on.

Subcontractor shall install temporary sheet metal covers over all floor register openings after installation of rough ductwork.

Insulated ductwork in attic (if applicable) shall have a minimum R-Value of 5. [NOTE: R-6 duct insulation in attic is required in NJ Energy Star constructed homes]

Install all thermostats and registers in the same location as per drawings. Under no circumstances will design changes be allowed without prior approval of Project Manager.

Make all cutouts in floors and walls: subcontractor shall be responsible to install metal straps to prevent further separation of plates that have been completely cut.

Gas furnace will be set on common bricks, rubber pad or 4" solid cinder blocks so that base of unit is not sitting directly on concrete floor. Bottom of air handler must be enclosed with a metal pan.

T:\Contracts\East Region\HVAC-GAS.doc

Project:  DH
C.C. #4451, 4452, 4453, 4454
EFFECTIVE DATE: 08-01-04

Page 5 of 9

## EXHIBIT "A"

### H.V.A.C.
### (Projects with Gas Furnace Standard)

Subcontractor shall add their name and emergency phone number, and insert the following "Heat and Air Conditioning Trouble Shooting Guide" in a plastic sleeve. This sheet is to be attached to the furnace.

### HEAT AND AIR CONDITIONING TROUBLE SHOOTING GUIDE

If you experience no heat in your home, please check the following:

1.    Is the thermostat in the "heat" and "auto" selection position?

2.    Is the temperature selector on the thermostat above the room temperature indicator?

3.    Is the Red switch at the top of the basement steps in the "ON" position?

4.    Is the switch on the furnace in the "ON" position?

5.    Is the door to the furnace on and closed tightly?

6.    Is the circuit breaker in the electrical panel box switched to the "ON" position?

If you experience no air conditioning in your home, please check the following:

1.    Is the thermostat in the "air conditioning" and "auto" selection positions?

2.    Is the temperature selector on the thermostat below the room temperature indicator?

3.    Is the Red switch at the top of the basement steps in the "ON" position?

4.    Is the switch on the furnace in the "ON" position?

5.    Is the door to the furnace on and closed tightly?

6.    Is the circuit breaker in the electrical panel box switched to the "ON" position?

7.    Is the disconnect, located outside at the compressor unit, "ON" (plugged in)?

If you have checked all of the above and still do not have heat or A/C, call  302-738-4669 at
_____ to set up an appointment.

Project: ~~B H~~
C.C. #4451, 4452, 4453, 4454
**EFFECTIVE DATE: 08-01-04**

<div align="center">

**EXHIBIT "A"**

**H.V.A.C.**
**(Projects with Gas Furnace Standard)**

</div>

Supply and install label on gas furnace showing subcontractors name and phone number for service.

Subcontractor shall add their name and emergency phone number, and insert the following "Heat and Air Conditioning Trouble Shooting Guide" in a plastic sleeve. This sheet is to be attached to the furnace.

Upon Toll Bros., Inc. Construction manager's request subcontractor shall set furnace in rough ductwork stage to provide heat to house while under construction.

Install all ductwork in a manner to prevent oil canning. All ductwork shall comply with ASHRAE and/or SMACNA regulations with regard to gauge and bracing requirements.

Supply and install all necessary under slab P.C.D. coated spiral ductwork to all areas that cannot be heated or cooled from above as per drawings.

<u>WORKMANSHIP:</u>

Subcontractor shall be responsible to meet the following requirements:

Any standard or optional multiple zone systems shall have both gas furnaces located in basement area. Heat system shall be balanced so that the maximum temperature differential between any two rooms is 5 degrees F., measured in the center of each room 5' above the floor.

Any holes cut in floors or walls in error shall be patched immediately by subcontractor or subcontractor shall be back charged if work must be done by others. Subcontractor shall also be responsible for sealing any holes subcontractor places through masonry foundation walls or exterior sheathing.

Consecutively bored holes must be placed in the center of the joist vertically, and restricted to the middle third of the joist horizontally. Holes can be no larger than three inches (3") in diameter, with a minimum center to center spacing of two times the hole diameter. A series of holes is limited to a twelve inch (12") linear distance, between which is a twelve inch (12") space of solid, uncut joist. Hole placement is not to exceed a maximum total distance of thirty six inches (36").

Individually bored hole diameters shall not exceed 3 1/8" for 2 x 10 joists or 3 3/4" for 2 x 12 joists. Bored holes must not be within 2" of the top or bottom of joists. Where allowed, notches in the top and bottom of floor joists shall not exceed 1 1/2" for 2 x 10 joists or 1 7/8" for 2 x 12 joists, and shall not be located in the middle third of any joist span. Do not notch or cut any paralam beams or cantilevered joist. Should this regulation be violated, the building inspector can require that the joist be taken down and replaced, in which case, the subcontractor responsible shall be back charged for labor and materials required to replace the joist and any cost billed to the contractor by another subcontractor to remove and replace his work within the area

When piping or ductwork is placed in an exterior or interior load bearing wall, necessitating a cutting of top plate by more than 50 percent of its width, the plate shall be reinforced with 16 gage steel angle spanning the distance between adjacent studs.

Trunk line dampers shall be installed for proper balance and air control. All feeder lines shall be properly sized for efficient air flow to each room. This system must not rely on adjusting air registers for balancing.

When routing duct work, subcontractor shall not cut floor joists or beams. If diagonal bridging is removed, this subcontractor shall be responsible to install scrap 2x lumber at the base of the floor joists to maintain the integrity of the floor system.

All cuts, notches & drilling of JSI joists shall be done according to manufactures specs.

Project: _____ IS H _____        Page 7 of 9
C.C. #4451, 4452, 4453, 4454
**EFFECTIVE DATE: 08-01-04**

## EXHIBIT "A"

### H.V.A.C.
### (Projects with Gas Furnace Standard)

All ductwork shall be kept away from exterior walls, and wall or ceilings next to unconditioned areas; in the event that ductwork must be run in such areas ducts shall be insulated to an R-6.

All wall return registers shall be installed 10" down from the rough ceiling to the top of the return and with louvers facing up. Heat supply registers installed in floor under windows shall be installed a minimum of 6" from the wall.

No return air grill is to be installed directly behind another return air grill.  If 2 return air grills are on a common wall they must be staggered.

All bath supply vents shall be installed 8" above finished floor to bottom of grill and not located on outside wall. Where vent can not be installed in the wall, a floor register may be installed.

Wall thermostats shall be installed in locations as per drawings.

Flexible duct connector must be installed where supply duct work connects to air handler.
Staged Payment Breakdowns:

The following schedule shall be followed for all staged payment breakdowns:

| COST CODE | DESCRIPTION | PERCENTAGE OF CONTRACT TOTAL |
|---|---|---|
| 4451 (130) | H.V.A.C. - Rough Ductwork | 30% |
| 4452 (131) | H.V.A.C. - Gas Furnace Set | 30% |
| 4453 (132) | H.V.A.C. - Compressor & Thermostat Set | 30% |
| 4454 (133) | H.V.A.C. - Registers | 10% |

PROJECT: *B. Hunt*

C.C. #4451, 4452, 4453, 4454

EFFECTIVE DATE: 08-01-04

Page 1 of ___

## EXHIBIT "G"
## H.V.A.C.
## (Projects with Gas Furnace Standard)

PRODUCTS USED THIS CONTRACT

Please check below which manufacturers below will be used under this contract at this community. *Be advised that any time a product is to be used other than specifically listed below, PMs must attach a completed Product Variation Request with sound rationale for use. NOTES: 1) Contracts submitted without completing this information will not be loaded into JD Edwards and will be returned; 2) It is imperative to insure accuracy in reporting which manufacturer you will be using. Failure to do so will delay or eliminate receipt of your rebates.

Thermostats (Type: Setback or Auto Change Over – Circle as applicable (No Project Exception Required))

_____ Hunter Type: Standard/Programmable Setback/Auto Change Over. Model #: _____

___X___ Honeywell Type (Standard)/Programmable Setback/Auto Change Over. Model #: *BAYSTAT* 305

_____ Carrier Type: Standard/Programmable Setback/Auto Change Over. Model #: _____

_____ Bryant Type: Standard/Programmable Setback/Auto Change Over. Model #: _____

_____ Other _____ Type: Standard/Programmable Setback/Auto Change Over. Model #: _____

Furnaces/Air Conditioning

___X___ Trane

_____ Trane High Efficiency

_____ Bryant

_____ Bryant High Efficiency

_____ Bryant Puron

_____ Carrier

_____ Carrier High Efficiency

_____ Carrier Puron

_____ York 10 Seer/80%

_____ York 12 Seer/90%

_____ Lennox

_____ *Other _____

*Note: Only Trane or Carrier/Bryant may be used in Pennsylvania communities. In New Jersey, Connecticut, Massachusetts, New Hampshire, Rhode Island, North Carolina, South Carolina, Virginia & Maryland Carrier/Bryant only may be used.

PROJECT: Brandywine Hunt

C.C. #4451, 4452, 4453, 4454

**EFFECTIVE DATE: 08-01-04**

Page 2 of 2

## EXHIBIT "G"

### H.V.A.C.
### (Projects with Gas Furnace Standard)

Humidifiers (No Project Exception Required)

_____ Honeywell

___/___ April-Aire

_____ *Other _____

Filters (No Project Exception Required)

_____ Honeywell

___/___ *Other  White Rodgers

Average # of zones per house

_____ 1

_____ 2

_____ 3

_____ 4

_____ *Other _____

Toll Brothers Project Manager    Kevin H. Grubb

(Please Print Name)

    (Signature)    Date: 8/23/04

PROJECT: Brandywine Hunt                    Page 1 of 4o 5

## EXHIBIT "B"
### PAYMENT SCHEDULE SPECIFICATIONS
### FOR SUBCONTRACTOR AGREEMENT

All prices in Payment Schedule become effective with all new living units **STARTED AFTER** June I, 2004 **(EFFECTIVE DATE)** .The following lots were started prior to the above referenced date and shall be invoiced at the old contract prices as per the previous Subcontract Agreement# NA :

| Lot | | ;lot | | ;lo t | | ;lot | | ;lo t | | ;lo t . | |
| lot | | ;lot | | ;lo t | | ;lot | | ;lo t | | ;lo t | |

(NOTE TO P.M.: Above clause only applies to renegotiated contracts; would not apply to vendors with whom we don't have a previous Subcontract Agreement with.)

All prices are firm for all work started on or before June 1, 2005 **(EXPIRATION DATE)**, and shall automatically renew for 30-day periods until written notice is given by either party; such written notice must be given at least 30 days prior to the expiration of the existing contract or any of the automatic renewal periods.

*Each invoice for base house and/or options must include a REFERENCE INVOICE NUMBER and must be submitted in writing for lump sum amounts as per Payment Schedule. The following information must be included: VENDOR NAME, VENDOR NUMBER, DATE, PROJECT NAME, LOT NUMBER, MODEL NAME, COST CODE, and OPTION NUMBERS. (The above information can be found in the Payment Schedule.)

Subcontractor understands that Base House and options for various lots may be billed on one invoice provided they are clearly separated on the invoice and that the lump sum contract amount (per cost code category) is shown next to each base house and/or option. Field conditions must be billed separately.

All invoices for work other than Base House or options must be authorized through the issuance of a Toll Bros., Inc. "Field Work Order". Copies of the Toll Bros., Inc. "Field Work Orders" will be given to subcontractor upon authorization of the work by the Construction Manager and prior to commencing work.

Upon completion of work authorized by "Field Work Order", subcontractor must submit "Invoice Copy" to Construction Manager for signature, retaining the "Subcontractor Copy" of work order for subcontractor's own records. Invoicing for work other than Base House or options shall be in accordance with the "Additional Work Price List" attached which includes all applicable taxes.

Signed "Invoice Copy" shall then be submitted for payment.

PROJECT: Brandywine Hunt                      Page 2 of ~~4~~ 5

Prior to purchasing materials for model homes, subcontractor shall
meet with community P.M. to review model home programs available to
Toll Bros., Inc.  Subcontractor agrees to credit Toll Brothers' model
home invoice with any manufacturer's model home rebates and/or to
reduce the invoice by the amount of any "no charge" materials supplied
by a manufacturer for the model home.

## EXHIBIT "B"

### PAYMENT SCHEDULE SPECIFICATIONS
### FOR SUBCONTRACTOR AGREEMENT

Subcontractor understands that all Base House and option prices in
Payment Schedule reflect all Specifications stated.

Payment shall not be made until work outlined in Specifications is
100% complete and current insurance certificate is on file.

All options shall be billed when the standard house is 100% complete;
no payment of option invoices will be made until this time.

All invoices received without the proper information as stated shall
be returned unpaid. The invoices can then be resubmitted with the
proper information included for payment.

All invoices and other correspondence shall be submitted to Toll
Bros., Inc., c/o
Construction trailer, Brandywine Parkway, Wilmington DE

no later than 10:00 A.M. Tuesday ten days prior to the Friday that
checks are to be issued for that project. Invoices received by any
other means will be refused and held until the next regular pay cycle.
All invoices received after this deadline will also be held until the
next regular pay cycle.

All invoices must be submitted within 90 days of completion of the
prescribed work for each Base House, option or Field Work Order.
Invoices submitted after 90 days of the completion of the work will
not be accepted nor paid and shall be considered null and void.

In order to insure timely resolution of outstanding invoices, any
invoices which are unpaid for any reason must be appealed in writing
to the Project Manager within 90 days of the original due date of the
invoice. Invoices which are not appealed in writing within 90 days of
the original due date will not be accepted.

25     % retainage shall be held on each of the first     (#1) 4
invoices until a total of $     (#2) $10,000.—     is held.  Retainage
to be held until project is completed and all service work is
satisfied.  (Note to P.M.: Total retainage should equal the contracted
price of one home.)

Prices in Payment Schedule are subject to a  0   % (percent) discount
E:\Contracts\SUB PAYMENT SPEC.doc
EFFECTIVE DATE: 2/01/03

PROJECT:  <u>Brandywine Hunt</u>                    Page 3 of  4~~5~~ ̶6̶

for all invoices paid within 20 days of receipt of invoice in the
appropriate Toll Bros., Inc. office stated above.

Minimum retainage is one complete home for <u>all trades</u> except: rough
carpentry, finish carpentry, wood siding installation, stone, brick,
stucco, siding and flooring.   These trades will require a fixed
retainage of <u>$2000.00 per community</u>.  Project Manager is advised that
these amounts are the minimum approved retainages.  If a vendor has no
past track record, Project Managers shall increase retainage as he
deems necessary.

(#1) maximum of 4 invoices
(#2) Dollar amount must be indicated (centralized corp. retainage, if applicable, excepted).

PROJECT: _Brandywine Hunt_    Page 4 of _5_

**EXHIBIT "B"**

**PAYMENT SCHEDULE SPECIFICATIONS
FOR SUBCONTRACTOR AGREEMENT**

**MODEL HOMES:**

Prior to purchasing materials for model homes, subcontractor shall meet
with community P.M. to review model home programs available to Toll
Bros., Inc.  Subcontractor agrees to credit Toll Brothers' model home
invoice with any manufacturer's model home rebates and/or to reduce the
manufacturer for the model home.  Additionally, there may be instances
when the community P.M. may supply the subcontractor with certain
materials for the model home, in which case the subcontractor agrees to
document and credit the model home invoice for materials furnished by
Toll Brothers, Inc.

Subcontractor agrees to the following concessions with regard to
labor/materials for all model homes to be constructed in this community:

See exhibit E if applicable

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

The above will be reflected, as required, on model home invoices.

PROJECT: _Brandywine Hent_     Page 5 of __5__

EXHIBIT "B"

PAYMENT SCHEDULE SPECIFICATIONS
FOR SUBCONTRACTOR AGREEMENT

Below, subcontractor is to provide all contracted work references over the last three (3) years.  Please include all companies names (including Toll Bros., Inc.), addresses, phone numbers, points of contact (POCs), type, quantity, location, and date(s) of contracted work performed, and whether you left and/or are currently on good terms.  If more than 4 references continue on separate pages.

| Company Name, POC, & Phone No. | Address | Type/Quantity of Work, & Work Location/Date(s) | Left/Currently on Good Terms? Yes/*No (*If "No" list problem) |
|---|---|---|---|
| Toll Bros. | Hockessin Chase | HVAC | Yes |
| Toll Bros | Garnett Valley Woods | | Yes |
| Toll Brothers, Inc. | Hockessin Valley Falls | | Yes |
| Toll Brothers, Inc. | Tall Trees | | yes |

I warrant the above information to be true, accurate, and correct to the best of my knowledge.

Subcontractor's Signature: _____  8/18/04

PROJECT: _Brandywine Hunt_    Page 1 of _1_
C.C. #4451, #4452, #4453, #4454
**EFFECTIVE DATE: 05/01/04**

## EXHIBIT "C"

## ADDITIONAL WORK PRICE LIST

NOTE:    All work other than as contracted on the "Exhibit B Payment Schedule" must be pre-authorized through the issuance of a Toll Bros., Inc. "Field Work Order". Invoices for additional work must have the pre-authorized Field Work Order attached.

| DESCRIPTION | COST | |
|---|---|---|
| MECHANIC | $ 85 | /HR |
| HELPER | $ 40 | /HR |

# EXHIBIT B

# Toll Brothers
### America's Luxury Home Builder™

KRISTINE MACIOLEK SMALL, ESQUIRE
GENERAL COUNSEL'S OFFICE

Direct Dial: (215) 938-6922
Fax: (215) 938-8255

February 9, 2006

Jeffrey Good
S.T. Good Insurance, Inc.
67 Christiana Road
New Castle, DE  19720

Frank Bartuski
Delaware Heating and Air Conditioning
713 Millcreek Lane
Bear, DE  19701

**RE:    Penn National Insurance Company Policy: AC90613137
    Insured:   Delaware Heating and Air Conditioning
    Litigation: Robert Kempski v. Toll Brothers, Inc.
    Superior Court of New Castle County, DE
    Case No.: 06C-01-145-JEB**

Dear Messrs. Good and Bartuski:

I am corporate counsel for Toll Bros, Inc. ("Toll"). The above matter rises out of an incident which allegedly occurred on or about August 25, 2005 when the plaintiff, Robert Kempski was allegedly injured while working as a heating and air conditioning installer for Delaware Heating and Air Conditioning at the property known as Brandywine Hunt in Wilmington, Delaware. A copy of plaintiff's complaint is enclosed.

Penn National Insurance Company's ("Penn National") insured, Delaware Heating and Air Conditioning, is a party to a contract with Toll, in which they agreed to, among other things, indemnify and hold Toll harmless from and against all claims, damages, losses, and other expenses. A copy of the executed Construction Agreement is enclosed. Delaware Heating and Air Conditioning also provided a Certificate of Liability Insurance evidencing coverage by Penn National and naming Toll as an additional insured. A copy of the Certificate of Liability Insurance is enclosed.

In accordance with Article 3 of the Construction Agreement and the Certificate of Liability Insurance mentioned above, we hereby demand that Delaware Heating and Air Conditioning assume Toll's defense, and indemnify and hold Toll harmless from and against all claims, damages, losses or other expenses in connection with this case. Please forward this matter to Penn National so that a claims adjuster can begin administration of this case.

S.T. Good Insurance, Inc.
February 9, 2006
Page 2 of 3


    We look forward to hearing from Penn National as soon as possible so that we may coordinate the handling of this matter. Feel free to contact me with any questions or concerns.

                          Sincerely,

                          Kristine Maciolek Small


KMS/jgk
Enclosures

S.T. Good Insurance, Inc.
February 9, 2006
Page 3 of 3


bcc:    Jeff Bartos (w/o enclosures)
        Ryan Moore (w/o enclosures)

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT P. KEMPSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 06-252 KAJ |
| | ) |
| TOLL BROS., INC., a corporation of | ) |
| the Commonwealth of Pennsylvania, | ) |
| | ) |
| Defendant. | ) |
| ——————————————————— | ) |
| TOLL BROS., INC., a corporation of | ) |
| the Commonwealth of Pennsylvania, | ) |
| | ) |
| Third Party Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| DELAWARE HEATING AND AIR | ) |
| CONDITIONING SERVICES, INC., a corporation | ) |
| of the State of Delaware, and | ) |
| JD FRAMING CONTRACTORS, INC., a | ) |
| corporation of the State of New Jersey, | ) |
| | ) |
| Third Party Defendants | ) |

## THIRD PARTY COMPLAINT

COMES NOW, Defendant/Third-Party Plaintiff, by and through its undersigned

attorneys and pursuant to Fed. R. Civ. P. 4 and 14, files this Third Party Complaint against

Delaware Heating and Air Conditioning Services, Inc., and JD Framing Contractors, Inc.,

alleging as follows:

1

The Parties

1.      Plaintiff Robert P. Kempski ("Kempski") is an adult resident of the State of Delaware and resides at 818 Woodlawn Avenue, Apartment C3, Wilmington, Delaware.

2.      Defendant/Third Party Plaintiff Toll Bros., Inc. ("TBI") is a Pennsylvania corporation with its principal place of business in Horsham, Pennsylvania.

3.      Third Party Defendant Delaware Heating and Air Conditioning Services, Inc. ("DHAC") is a Delaware corporation that may be served through its registered agent Corporate Agents, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware.  DHAC lawfully conducts business in the State of Delaware.

4.      Third Party Defendant JD Framing Contractors, Inc. ("JD Framing") is a New Jersey corporation that may be served at its principal place of business located at 200 Delores Drive, Cinnaminson, New Jersey.  JD Framing lawfully conducts business in the State of Delaware.

Venue and Jurisdiction

5.      Venue is proper in this Court as the incident giving rise to this lawsuit took place in Wilmington, Delaware, which is located in this judicial district.

6.      Jurisdiction over the initial Complaint is proper under 28 U.S.C. § 1441(a).  This Court has supplemental jurisdiction over this Third Party Complaint under 28 U.S.C. § 1367(a).

The Contracts

7.      TBI lawfully conducts business in Delaware.

8.      One of TBI's business projects was developing a subdivision in Wilmington, Delaware (the "Development").

9.      DHAC entered into a contract with TBI (the "DHAC Contract") to perform work on the Development as a contractor.  (Relevant portions of DHAC Contract attached hereto as Exhibit A).

10.     The DHAC Contract required DHAC to defend and indemnify TBI for any claims related to DHAC's work.

11.     The DHAC Contract required DHAC to procure liability insurance designating TBI as a named insured and beneficiary of the policy, to cover TBI for any claims associated with work performed under the DHAC Contract.

12.     In compliance with the DHAC Contract, DHAC procured liability insurance with Penn National Insurance Company (the "Penn National Policy").

13.     JD Framing entered into a contract with TBI (the "JD Framing Contract") to perform work on the Development as a contractor.  (Relevant portions of JD Framing Contract attached hereto as Exhibit B).

14.     The JD Framing Contract required JD Framing to defend and indemnify TBI for any claims related to JD Framing's work.

15.     The JD Framing Contract required JD Framing to procure liability insurance designating TBI as a named insured and beneficiary of the policy, to cover TBI for any claims associated with work performed under the JD Framing Contract.

16.     Pursuant to the JD Framing Contract, JD Framing submitted an insurance certificate to TBI evidencing coverage from Sirius America Insurance Company.

The Alleged Accident

17.     Upon information and belief, Kempski was an employee of DHAC at all relevant times.

3

18.    Kempski allegedly fell from a floorboard while working in a certain house (the "House") in the Development (the "Alleged Accident").

19.    Kempski has filed a Complaint (Exhibit C) that seeks to hold TBI liable for the Alleged Accident on theories of negligence and premises liability.

20.    Kempski has sought damages and compensation for the injuries sustained in the Alleged Accident from TBI.

21.    TBI has filed an Answer to the Complaint denying liability to Kempski in any manner.

The Dispute

22.    TBI did not control the House at the time of the Alleged Accident.  Instead, the House was controlled by whatever contractor was in charge of it at the time.

23.    DHAC was the contractor in charge of HVAC work in the House.

24.    TBI had no duty to control DHAC's worksite or employees.  Instead, DHAC, as an independent contractor, was solely responsible for the work of its employees, including their safety.

25.    The DHAC Contract required DHAC to procure insurance listing TBI as a named additional insured for losses related to work under the DHAC Contract.

26.    The DHAC Contract requires DHAC to defend and indemnify TBI.

27.    The House was in "frame" condition at the time of the Alleged Accident.

28.    JD Framing was the contractor in charge of framing the House.

29.    TBI had no duty to control JD Framing's worksite or employees.  Instead, JD Framing, as an independent contractor, was solely responsible for the work of its employees, including liability to third parties for claims related to that work.

4

30.    The JD Framing Contract required JD Framing to procure insurance listing TBI as a named additional insured for losses related to work under the JD Framing Contract.

31.    The JD Framing Contract requires JD Framing to defend and indemnify TBI.

<u>Count I – Negligence (Indemnification/Contribution)</u>

<u>Against DHAC</u>

32.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

33.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

34.    DHAC, and not TBI, was responsible for the work and safety of its employees, including Kempski.

35.    TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, DHAC was negligent by, *inter alia*:

      a.    Failing to properly supervise its employees;

      b.    Failing to properly train its employees;

      c.    Failing to properly inspect the work area of its employees;

      d.    Failing to properly secure the allegedly loose floor board;

      e.    Failing to implement proper safety procedures for work of the type at issue;

      f.    Failing to observe its employees performing work in an unsafe manner;

      g.    Failing to adequately warn its employees of the dangers associated with their work;

5

h.      Failing to use proper materials;

i.      Failing to comply with applicable statutes, regulations, and ordinances regarding worker safety;

j.      Failing to use due care to prevent foreseeable injury to its employees.

36.     TBI is entitled to indemnification and/or contribution from DHAC to whatever extent DHAC is found to have proximately caused Kempski's alleged injuries.

<u>Count II – Negligence (Indemnification/Contribution)</u>

<u>Against JD Framing</u>

37.     TBI incorporates by reference all preceding allegations of this Third Party Complaint.

38.     TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

39.     JD Framing, and not TBI, was responsible for the work of its employees, including liability to third parties for claims related to that work.

40.     JD Framing, and not TBI, was responsible for passing the House to the next contractor in a safe condition after JD Framing finished its work.

41.     TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, JD Framing was negligent by, *inter alia*:

a.      Failing to pass the House to the next subcontractor in a reasonably safe condition;

b.      Failing to properly supervise its employees;

c.      Failing to properly train its employees;

6

d.      Failing to properly inspect the work of its employees;

e.      Failing to properly secure the allegedly loose floor board;

f.      Failing to implement proper safety procedures for work of the type at issue;

g.      Failing to observe its employees performing work in an unsafe manner;

h.      Failing to use proper materials;

i.      Failing to warn of a dangerous condition when it had a duty to do so;

j.      Failing to comply with applicable statutes, regulations, and ordinances regarding worker safety;

k.      Failing to use due care to prevent foreseeable injury to third parties from the work of its employees.

42.      TBI is entitled to indemnification and/or contribution from JD Framing to whatever extent JD Framing is found to have proximately caused Kempski's alleged injuries.

<u>Count III – Premises Liability (Indemnification/Contribution)</u>

<u>Against DHAC</u>

43.      TBI incorporates by reference all preceding allegations of this Third Party Complaint.

44.      TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

45.      DHAC, and not TBI, was responsible for maintaining a reasonably safe work area for its employees.

46.    DHAC, and not TBI, controlled the worksite of its employees – the premises at issue.

47.    TBI is entitled to indemnification and/or contribution to whatever extent DHAC's failure to maintain the premises is found to have proximately caused Kempski's injuries.

<u>Count IV – Premises Liability (Indemnification/Contribution)</u>

<u>Against JD Framing</u>

48.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

49.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for indemnification and/or contribution.

50.    JD Framing, and not TBI, was responsible for maintaining its work area in a reasonably safe condition.

51.    JD Framing, and not TBI, was responsible for passing the House to the next subcontractor in a reasonably safe condition at the completion of JD Framing's work.

52.    JD Framing, and not TBI, controlled the premises at issue because it was still working on the House or had so recently passed the premises to the next subcontractor, DHAC, that it remained responsible for any dangerous condition that it had created.

53.    TBI is entitled to indemnity and/or contribution to whatever extent JD Framing's failure to maintain the premises is found to have proximately caused Kempski's injuries.

<u>Count V – Breach of Contract</u>

<u>Against DHAC</u>

54.     TBI incorporates by reference all preceding allegations of this Third Party

Complaint.

55.     TBI denies all liability for the Alleged Accident.  If, however, liability is imposed

on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for

breach of contract.

56.     Article 3 of the DHAC Contract states,

> INDEMNIFICATION: The Contractor [DHAC] shall indemnify, defend
> and hold harmless [TBI] and all of its agents and employees from and
> against all claims, damages, losses and expenses including attorneys' fees
> in any way arising out of or resulting from the performance, existence or
> condition of the Work under the Contract Documents, whether or not such
> claim, damage, loss or expense is based in whole or in part upon any
> negligent act or omission of [TBI] or [TBI]'s participation in the Work or
> upon any statutory duty or obligation.  [DHAC] expressly acknowledges
> that the parties are contractually allocating these risks to [DHAC] and
> [DHAC] has procured and shall maintain for the term of this Agreement
> the insurance polices … for the purpose of providing a financial means to
> support this indemnification provision.  In addition, in any and all claims
> against [TBI] or any of its agents or employees by any employee of
> [DHAC] or anyone for whose acts [DHAC] may be liable, the
> indemnification obligation under this paragraph shall not be limited in any
> way by any limitations on the amount or type of damages, compensation
> or benefits payable by or for [DHAC] under workers' compensation acts,
> disability benefit acts or other employee benefit acts. … [DHAC], at its
> own cost and expense, shall indemnify and defend [TBI] against such
> action, suit or proceeding and take such steps as are necessary to prevent
> the entry of judgment or award against [TBI] and to satisfy such judgment
> or award if entered.

57.     Article 4 of the DHAC Contract required DHAC to procure insurance for its work

on the Development that "shall name Toll Brothers, Inc., its subsidiaries and affiliates as

'Additional Insured' parties for work performed by [DHAC] . . . ."

58.     Article 6 of the DHAC Contract states,

9

ADDITIONAL OBLIGATIONS OF CONTRACTOR: [DHAC] shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to [TBI] to supervise the performance of the Work, . . . (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by [TBI] or promulgated by any governmental body or agent with jurisdiction over the Work . . . .

59.    Article 8 of the DHAC Contract states,

OTHER ITEMS: [DHAC] represents that prior to submitting its proposal, [DHAC] carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work.

60.    Article 12 of the DHAC Contract states,

SAFETY PRECAUTIONS/EEO COMPLIANCE: [DHAC] has agreed to comply with and has full knowledge of the latest revised Occupation Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects. All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project.

61.    The DHAC Contract contractually allocates the duty of providing a safe workplace for DHAC employees to DHAC.

62.    The DHAC Contract creates an absolute duty for DHAC to defend and indemnify TBI for the claims Kempski has made against TBI.

63.    DHAC has breached the DHAC Contract by failing to defend and indemnify TBI from Kempski's suit.

10

64.    TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, then DHAC has breached the DHAC Contract by negligently causing Kempski's alleged injuries.

65.    TBI has been damaged by the aforesaid breaches in an amount to be determined at trial.

<u>Count VI – Breach of Contract</u>

<u>Against JD Framing</u>

66.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

67.    TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for breach of contract.

68.    Article 3 of the JD Framing Contract states,

> INDEMNIFICATION: [JD Framing] shall indemnify, defend and hold harmless [TBI] and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of [TBI] or [TBI]'s participation in the Work or upon any statutory duty or obligation. [JD Framing] expressly acknowledges that the parties are contractually allocating these risks to [JD Framing] and [JD Framing] has procured and shall maintain for the term of this Agreement the insurance polices ... for the purpose of providing a financial means to support this indemnification provision. In addition, in any and all claims against [TBI] or any of its agents or employees by any employee of [JD Framing] or anyone for whose acts [JD Framing] may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for [JD Framing] under workers' compensation acts, disability benefit acts or other employee benefit acts. ... [JD Framing], at its own cost and expense, shall indemnify and defend [TBI] against such action, suit or proceeding and take such steps as are necessary

11

to prevent the entry of judgment or award against [TBI] and to satisfy such judgment or award if entered.

69.     Article 4 of the JD Framing Contract required JD Framing to procure insurance for its work on the Development that "shall name Toll Brothers, Inc., its subsidiaries and affiliates as 'Additional Insured' parties for work performed by [JD Framing] . . . . "

70.     Article 6 of the JD Framing Contract states,

> ADDITIONAL OBLIGATIONS OF CONTRACTOR: [JD Framing] shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to [TBI] to supervise the performance of the Work, . . . (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by [TBI] or promulgated by any governmental body or agent with jurisdiction over the Work . . . .

71.     Article 8 of the JD Framing Contract states,

> OTHER ITEMS: [JD Framing] represents that prior to submitting its proposal, [JD Framing] carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work.

72.     Article 12 of the JD Framing Contract states,

> SAFETY PRECAUTIONS/EEO COMPLIANCE: [JD Framing] has agreed to comply with and has full knowledge of the latest revised Occupation Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects. All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project.

73.     The JD Framing Contract allocates the duty of maintaining a safe workplace, and passing a safe workplace to the next subcontractor, to JD Framing.

74.    The JD Framing Contract creates an absolute duty for JD Framing to defend and indemnify TBI for the claims Kempski has made against TBI.

75.    The JD Framing Contract creates an absolute duty for JD Framing to procure insurance naming TBI as an additional insured and beneficiary for losses of the type alleged by Kempski.

76.    JD Framing has breached the JD Framing Contract by failing to defend and indemnify TBI from Kempski's suit.

77.    TBI denies all liability for the Alleged Accident, but to the extent that TBI may be found liable, JD Framing has breached the JD Framing Contract by conducting its work in such a manner as to cause Kempski's alleged injuries.

78.    JD Framing has breached the JD Framing Contract by failing to ensure that TBI was named an additional insured on its insurance policy.

79.    TBI has been damaged by the aforesaid breaches in an amount to be determined at trial.

<u>Count VII – Declaratory Judgment</u>

<u>Against DHAC</u>

80.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

81.    TBI denies all liability for the Alleged Accident.  If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for declaratory judgment.

82.    Pursuant to the DHAC Contract, DHAC must defend and indemnify TBI both for its costs of defending this matter and for any judgment that might be entered.

13

83.    DHAC has refused to honor its contractual obligation to defend and indemnify TBI.

84.    By reason of the foregoing, an actual and justiciable controversy exists between DHAC and TBI regarding their rights and obligations under the DHAC Contract, and a judicial declaration is necessary to establish TBI's rights and DHAC's duties under the DHAC Contract.

<div align="center">Count VII – Declaratory Judgment</div>

<div align="center">Against JD Framing</div>

85.    TBI incorporates by reference all preceding allegations of this Third Party Complaint.

86.    TBI denies all liability for the Alleged Accident. If, however, liability is imposed on TBI as a result of the matters alleged in the Complaint, TBI makes the following claim for declaratory judgment.

87.    Pursuant to the JD Framing Contract, JD Framing must defend and indemnify TBI both for its costs of defending this matter and for any judgment that might be entered.

88.    JD Framing has refused to honor its contractual obligation to defend and indemnify TBI.

89.    By reason of the foregoing, an actual and justiciable controversy exists between JD Framing and TBI regarding their rights and obligations under the JD Framing Contract, and a judicial declaration is necessary to establish TBI's rights and JD Framing's duties under the JD Framing Contract.

WHEREFORE, Defendant/Third-Party Plaintiff TBI demands judgment against Third Party Defendants DHAC and JD Framing for a declaration of Third-Party Defendants' duties under the relevant contracts, indemnification, contribution, and breach of contract damages,

<div align="center">14</div>

including reasonable attorneys fees and all defense costs as specified in the relevant contracts,

plus pre- and post-judgment interest and any other relief the Court deems just and proper.

**McCARTER & ENGLISH, LLP**

/s/ Michael P. Kelly

By:_____

Michael P. Kelly (DE Bar ID #2295)
Andrew S. Dupre (DE Bar ID #4621)
919 N. Market Street, St. 1800
Wilmington, DE  19801
(302) 984-6300

Attorneys for Defendant

Dated:  May 9, 2006

# EXHIBIT A

3103 Philmont Avenue
Huntingdon Valley, PA 19006

Contract No: _____
Community: **Brandywine Hunt**

## CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:

CONTRACTOR: _Delaware Heat and Air_
ADDRESS: _713 Millcreek Lane Bear DE 19701_
PHONE: _302-738-4669_    CONTACT: _Frank Bartuski_
FACSIMILE: _302-738-4680_    E-MAIL: _____

Contractor, representing that it is skillful and experienced in the craft _HVAC_
and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:

Reference Exhibit "A", page(s) 1 through ___5___, Toll architectural plans, construction detail documents and detail documents for specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ **varies**.
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through ~~3-5~~ for "Payment Schedule." _1-3_
Reference Exhibit "C", page(s) 1 through ___1___ for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and contained herein.

**It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.**

ARBITRATION: Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization selected by Seller. In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless and until Contractor has first given Toll specific written notice of each claim (at 3103 Philmont Avenue, Huntingdon Valley, PA 19006, Attn: Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: _51 0362156_

CONTRACTOR:
By: _Delaware Heating and Air Conditioning_
Print Name: _Frank J. Bartuski_    _Services, LLP_
Title: _President_
Date: _8/18/04_

TOLL BROS., INC.:
By: _[signature]_
Print Name: _Kevin Grubb_
Title: Project Manager
Date: _8/23/04_
Senior Manager Initials: _[initials]_

☐ Check if secondary contract so budget will not be loaded - For File Only.

_8/25/04_

T:\CONTRACTS\ ...\ONPAM\ ...\AGREEMENT.DOC

Article 1. TIME OF PERFORMANCE: Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's construction schedule. Contractor shall begin the Work when directed by Toll and shall perform and complete it during normal business hours unless directed otherwise by Toll. If Contractor shall be delayed in beginning, prosecuting or completing the Work by the act or omission of Toll, by damage caused by fire or other casualty for which Contractor is not responsible, or by strikes or lockouts, then the time for completion of the Work shall be extended for such period of time as the time lost by reason of the aforesaid causes. Such an extension of time shall be Contractor's sole and exclusive remedy for such delay. In no event shall Toll be liable for any costs, expenses or damages incurred or suffered by Contractor as a result of delays in the performance of the Work at the Project, whether or not such delays result in whole or in part from Toll's or other contractors' negligence. If Contractor fails to keep abreast with the general progress of the Work, Contractor shall, if requested by Toll, cause its work force to perform overtime work, the cost of which shall be borne entirely by Contractor. Contractor agrees that Toll may, by two working days written notice mailed to Contractor at Contractor's last known residence or place of business, or notice delivered at such place, or to Contractor's foreman in charge of the Work, terminate this Agreement and take over the Work and prosecute the same to completion by contract or otherwise, and enter at any time and take possession of the Work, materials, tools, appliances and equipment needed to complete the Work, and make such payments as Toll deems necessary for the discharge in whole or in part of the claims, liens or claims for liens, of any person in privity with Contractor on account of this Agreement; and Contractor agrees that the expense of such notice and of the completion of the Work, and the amount paid for the discharge or payment on account of claims, liens, or claims for liens, and the expense thereof, shall be deducted from the amount due or to become due to Contractor, and if more than the amount due, then Contractor shall be liable to Toll for the difference, and Toll may hold, sell or otherwise realize upon any material, machinery, tools or other equipment upon the premises on account of such difference in case Contractor shall fail or refuse to pay the same; all without prejudice to any other remedy Toll may have.

Article 2. CHANGES IN THE WORK: Toll may at any time, without notice to Contractor's surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work. Contractor shall not alter, add to or delete from the Work except upon receipt of such orders. The amount to be allowed or deducted from the contract price for such alterations, additions or deletions shall be agreed upon by Toll and Contractor and, in the event they are unable to agree, shall be equivalent to Contractor's actual out-of-pocket cost or savings for such alterations or additions, plus 15% for overhead and profit; and for deletions shall be equivalent to Contractor's actual out-of-pocket cost of savings for such deletion, plus 7½% for overhead.

Article 3. INDEMNIFICATIONS: The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of Toll or Toll's participation in the Work or upon any statutory duty or obligation. Contractor expressly acknowledges that the parties are contractually allocating these risks to Contractor and Contractor has procured and shall maintain for the term of this Agreement the insurance policies more fully set forth in Article 4 below for the purpose of providing a financial means to support this indemnification provision. In addition, in any and all claims against Toll or any of its agents or employees by any employee of the Contractor or anyone for whose acts Contractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

In the event that any claim or demand arising out of or relating to the performance of the Work is asserted against Toll in any action, suit, or other proceeding, Toll shall within thirty (30) days of notice thereof, give notice thereof to Contractor. Upon receipt of such notice, Contractor, at its own cost and expense, shall indemnify and defend Toll against such action, suit or proceeding and take such steps as are necessary to prevent the entry of judgment or award against Toll and to satisfy such judgment or award if entered. Notwithstanding the foregoing, Toll shall be permitted to be represented by its own counsel should Toll so desire.

Article 4. INSURANCE: Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of insurance from a company or companies with an A.M. Best rating of not less than B, VI:

A. General Liability -
   Type: Occurrence Basis
   Limits:

| | |
|---|---|
| Per occurrence | $1,000,000. |
| General Aggregate | $2,000,000 |
| Products/Completed Operations Aggregate | $1,000,000 |

   Special Provision:
   Additional Insured Endorsement
   (Endorsement CG 20 10 11/85 or its equivalent)

B. Vehicle Liability -
   Limits:

| | |
|---|---|
| Bodily Injury/Property Damage per occurrence | $1,000,000 |

   Special Provisions:
   Coverage shall include owned, hired and non-owned vehicles. The insurance policies in Article 4A and 4B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties for work performed by Contractor under the Construction Agreement and shall provide that the policy may not be cancelled or terminated without at least thirty (30) days prior written notice to Toll. Before beginning the Work, Contractor shall furnish Toll with an Endorsement to Insurance Policy, on Endorsement Form CG-20-10 11/85 or its equivalent, naming Toll as an "Additional Insured" party.

C. Workers' Compensation -
   Limits: Statutory

D. Employer's Liability
   Limits:

| | |
|---|---|
| Each accident | $100,000 |
| Disease - Policy Limit | $500,000 |
| Disease - each employee | $100,000 |

Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage specified above is in effect.

Article 5. MECHANIC'S AND/OR MATERIALMEN'S LIENS AND CLAIMS: TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANIC'S AND/OR MATERIALMEN'S LIEN OR MECHANIC'S AND/OR MATERIALMEN'S NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDINGS THEREON OR THE GROUND APPURTENANT THERETO. Contractor agrees that if any mechanics lien or claim is filed against the Project, the buildings thereon, or the ground appurtenant thereto, for or on account of any work done or materials furnished to the Project by Contractor, its suppliers or contractors, Contractor shall take immediate steps to satisfy and remove from the record such mechanic's and/or materialmen's lien or claim at Contractor's sole expense. In the event that the mechanic's and/or materialmen's lien or claim is not satisfied or removed from the record within forty-eight (48) hours after notice thereof to Contractor, Toll shall have the right to pay all sums necessary to secure the satisfaction or removal of such lien or claim and to deduct such sums from the amount then due or to become due Contractor. Contractor will reimburse Toll for all costs, damages and attorneys' fees resulting from the improper filing of mechanic's and/or materialmen's liens and claims.

Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR: Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to Toll to supervise the performance of the Work, which foreman or superintendent shall not be replaced without written permission of Toll, (c) dismiss any employee whom Toll deems incompetent, insubordinate or otherwise objectionable, (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by Toll or promulgated by any governmental body or agent with jurisdiction over the Work, (f) cooperate fully with Toll and other contractors at the project site and carefully fit the Work to the work provided by others, (g) permit and provide sufficient safe and proper facilities for the inspection or testing by Toll or its representative of the materials or equipment supplied and work performed by Contractor in connection with the Work, such testing or inspection to occur at the Project site, the place of the manufacture of materials, or at any other mutually convenient place, with the cost of such inspection or testing to be borne by Contractor and/or manufacturer, (h) employ in connection with performance of the Work, only workmen of such labor affiliations as are satisfactory to Toll, (i) pay promptly all sums due for labor, services, materials, tools and equipment supplied in connection with the performance of the Work and, when required by Toll, submit to Toll satisfactory evidence of such payment, it being understood that this subparagraph shall not create any right in any third party against Toll, (j) clean up and remove from the Project site all rubbish, debris and waste resulting from the performance of the Work. Where permission is granted by Toll, all rubbish, debris and waste will be placed by Contractor in a central area designated by Toll's job superintendent, (k) pay all federal, state, municipal and local taxes of whatever nature now in force or hereinafter enacted arising out of or relating to the performance of the Work including, without limitation, all sales and use taxes and all taxes required pursuant to the Federal Social Security Act and state unemployment compensation law, it being expressly understood that all such taxes are included in the contract price, (l) reimburse Toll for any loss incurred or damage suffered as a result of Contractor's delay in beginning, prosecuting or completing the Work, except for delay resulting from causes for which Contractor is entitled to extensions of time, (m) perform the Work entirely with its own employees and not transfer or assign all or any portions of this Agreement, the Work or the sum of money payable hereunder without prior written consent of Toll, (n) repair and replace at Contractor's expense all materials, tools, equipment or work damaged or lost as a result of floods, rain, wind, storm, lightning, acts of God, theft, fire or other casualty, (o) when required by Toll, submit at Contractor's expense shop drawings, samples, brochures, manuals and photographs of work or materials to be furnished by Contractor in connection with the performance of the Work, (p) warrant that all material not covered by manufacturer's guarantee, and all workmanship shall be guaranteed for a period of not less than one year or as required in the latest revised warranty issued to Toll's homebuyers of which Contractor acknowledges receipt and full understanding, whichever is greater. Defective work and materials shall be replaced at Contractor's expense. No substitution of material shall be permitted without written authority of Toll, (q) unless otherwise specified, supply only all new materials and comply with the hereinabove referred plans and specifications. All materials and workmanship furnished are subject to inspection and test by the Architect, if any, and Toll at any and all times during manufacture or construction, (r) within twenty-four (24) hours after receiving written notice from Toll, remove from the Project site all work or material determined by Toll to be defective, unsuitable or not as specified and make good all work damaged or destroyed as a result thereof.

Article 7. DEFAULT: In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent, or should Contractor refuse or neglect to supply a sufficiency of properly skilled or other workmen or any adequacy of materials, tools and equipment, to prosecute vigorously the performance of the Work, or fail to make prompt payment for labor, services, materials, tools or equipment supplied in connection with the performance of the Work, or otherwise be in default in the performance of any of its obligations hereunder, Toll, two working days after notice to Contractor, shall have the right to (1) provide and pay for such labor, services, materials, tools and equipment or otherwise to cure Contractor's default hereunder and deduct the cost thereof from any payments due or to become due Contractor; and/or (2) terminate this Agreement and take possession of all materials, tools and equipment at the project for the purpose of completing the Work. In the case of such a termination, Contractor shall not be entitled to receive any further payments from Toll until the Work shall be wholly finished and accepted by Toll, at which time, if the unpaid balance of the amount to be paid Contractor shall exceed the expense incurred by Toll in finishing the Work, such excess shall be paid to Contractor; but if such expense shall exceed the unpaid balance, Contractor shall pay the difference to Toll plus damages, including attorneys' fees. The remedies provided for herein are not exclusive, and Toll may elect any other remedies available under the law and this Agreement, jointly or severally.

Article 8. OTHER ITEMS: Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents; acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work. Toll shall not be responsible for any loss of damage to the Work to be performed and furnished by Contractor, nor shall Toll be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by Contractor or anyone employed by Contractor in the performance of the Work, however caused. It is advised that Contractor insure the Work against such casualty.

Article 9. MISCELLANEOUS: Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll. Contractor's acceptance of final payment hereunder shall constitute a complete release of any and all existing or future claims or demands by Contractor against Toll arising out of or relating to this Agreement or the performance of the Work, including without limiting the generality of the foregoing, claims or demands based in whole or in part upon Toll's negligence.

It is expressly understood and agreed that the performance of the Work is dependent upon Toll's performance of other work at the Project. Should Toll, for any reason in its sole discretion, decide not to proceed with other work at the Project and so notify Contractor, this Agreement shall become null and void and Contractor's compensation hereunder shall be limited solely to payment on a pro-rata basis for work actually completed.

Toll and Contractor and their heirs, executors, administrators, successors and assigns, shall be bound by and severally fully perform the covenants contained herein.

Article 10. LIMITATION OF LIABILITY: Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damages arising from the breach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement (to be prorated if the Work is not yet completed). Contractor shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum.

Article 11. OPTION POLICY: Contractor agrees not to sell options, install extras or to do work of any kind or description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home. Options or extras which Toll refuses to sell may be sold and installed within the aforesaid 120 day period if Toll authorizes same in writing prior to any proposal to the buyer or homeowner. Plumbing and electrical contractors may perform non-warranty emergency work without prior written consent of Toll. Any work permitted pursuant to this Article must be performed so as not to interfere with Contractor's production responsibilities.

Article 12. SAFETY PRECAUTIONS/EEO COMPLIANCE: Contractor has agreed to comply with and has full knowledge of the latest revised Occupational Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects. All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project. Contractor agrees that it will provide a "competent person," as that term is defined under 29 C.F.R. 1926.20(b)(2), to provide for frequent and regular inspections of the Job Site, materials and equipment as part of Contractor's accident prevention program. If Contractor fails to provide such competent person, and/or such competent person fails to perform frequent and regular inspections, Toll may take any action to remedy the situation, including the remedies provided in Article 13 herein. In addition, Contractor shall comply with all other applicable laws, ordinances, codes, rules and regulations, including, without limitation, all applicable laws, rules and regulations relating to equal employment opportunity. Contractor agrees that it will not take any adverse employment action against its employees on the basis of race, color, religion, national origin, age, disability, or other protected category established by applicable law.

Article 13. NON-EXCLUSIVE; TERMINATION: Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor at any time for any reason whatsoever. In addition, Contractor agrees that Toll shall have the right to terminate this Agreement, with or without cause, upon forty-eight (48) hours notice thereof to Contractor. In the event of such termination, Toll shall pay Contractor a pro-rata portion of the contract amount as set forth herein based upon the percentage of the Work completed up to the date of termination, as such amount is determined by Toll in its discretion. Upon such payment, this Agreement shall be terminated and Toll shall have no further liability to Contractor.

Article 14. SEVERABILITY: To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

Article 15. GOVERNING LAWS: This Agreement shall be governed by the laws of Pennsylvania.

Contract No.: ______________________

Community: Brandywine Hunt

Contractor: [signature] Dated: 8/16/04

Toll: [signature] Dated: 8/23/04

[signature] 8/25/04

# EXHIBIT B

250 Gibraltar Road
Horsham, PA 19044

33545

Contract No:
Community:     **Brandywine Hunt**

## CONSTRUCTION AGREEMENT

This Construction Agreement ("Agreement") is between TOLL BROS., INC. ("Toll") and:     162883
CONTRACTOR     **JD Framing Contractors Inc.**
ADDRESS:     **200 Delores Drive Cinnaminson, NJ 08077**
PHONE:     **(856) 786-8300**          CONTACT:     **John Sousa**
FACSIMILIE:     **(856) 786- 7666**          E-MAIL:

Contractor, representing that it is skillful and experienced in the craft   **Rough Carpentry**
and holds all necessary licenses, agrees to furnish all labor, services, materials and equipment necessary to perform and complete
its obligations under the Agreement in a good and workmanlike and timely manner. The construction work ("Work") performed
will be in accordance with the specifications below, as prepared by Toll and any and all revisions, addendums, schedules, exhibits
and riders thereto; and general and special conditions issued in connection therewith. The Contractor agrees that the Work shall be
done subject to the final approval of Toll.

THE WORK: The Work shall consist of but not necessarily be limited to the following:
Reference Exhibit "A", page(s) 1 through   **9** , Toll architectural plans, construction detail documents and detail documents for
specifications (collectively referred to as "Specifications").

PAYMENTS:
Toll shall pay Contractor for the performance of the Work the sum of $ _Varies_
Toll shall pay Contractor progress and final payments in accordance with the payment schedule below.

As a condition precedent to any payments, Contractor, if requested, shall submit a payment request form in a form determined by
Toll. The payment request form shall include release and certification by Contractor to Toll that no mechanics' liens or claims for
mechanics' liens have been or could have been filed or asserted against the Project in connection with the Work as of the date of
such submission. The final payment shall not be made until Contractor delivers to Toll a complete release of liens.
Reference Exhibit "B", page(s) 1 through   **4** , for "Payment Schedule."
Reference Exhibit "C", page(s) 1 through   **1** , for "Additional Work Price List."

It is understood that the execution of this cover page binds the Contractor to all pages of Exhibits attached as referenced above and
contained herein.

**It is agreed between Toll and Contractor that the articles printed on Page Two are part of this Agreement.**

ARBITRATION:  Contractor hereby agrees that any and all disputes or disagreements arising in any way out of this Agreement or
the performance of the work, including but not limited to, the payment of invoices, accidents, indemnification of Toll by
Contractor, naming Toll as an Additional Insured, injuries, breach of contract, representations and/or omissions by Toll, on-site and
off-site conditions and all other torts and statutory causes of action ("Claims") shall be resolved by binding arbitration in
accordance with the rules and procedures of Construction Arbitration Services, Inc or its successor, or an equivalent organization
selected by Seller.  In addition, Contractor agrees that Contractor may not initiate any arbitration proceeding for any Claims unless
and until Contractor has first given Toll specific written notice of each claim (at 250 Gibraltar Rd., Horsham, PA 19044, Attn:
Contractor Dispute Resolution) and given Toll a reasonable opportunity to settle the dispute.

RECEIVED
APR 19 2005
CONTRACT LOADING

Contractor warrants that the information supplied by Contractor in the Request for Bid is truthful and accurate.
In witness whereof, the parties hereto have executed this Agreement on the day and year written below.

FED I.D. NO.: **59 - 3784129**

CONTRACTOR:
By:     _Jose A. de Sousa_
Print Name:     _JOSE A. DE SOUSA_
Title:     _V. President_
Date:     _4/19/05_

TOLL BROS., INC.:
By:     _Kevin H. Grubb_
Print Name:     **Kevin H. Grubb**
Title:     **Project Manager**
Date:     **4/14/05**
Senior Manager Initials:     _4/19/05_

☐  Check if secondary contract so budget will not be loaded - For File Only.

Mar. 13, 2006 11:49AM

## Page Two

Article 1. TIME OF PERFORMANCE: Time being of the essence hereunder, Contractor shall begin, prosecute and complete the Work in accordance with Toll's construction schedule. Contractor shall begin the Work when directed by Toll and shall perform and complete it during normal business hours unless directed otherwise by Toll. If Contractor shall be delayed in beginning, prosecuting or completing the Work by the act or omission of Toll, by damage caused by fire or other casualty for which Contractor is not responsible, or by strikes or lockouts, then the time for completion of the Work shall be extended for such period of time as the time lost by reason of the aforesaid causes. Such an extension of time shall be Contractor's sole and exclusive remedy for such delay. In no event shall Toll be liable for any costs, expenses or damages incurred or suffered by Contractor as a result of delays in the performance of the Work at the Project, whether or not such delays result in whole or in part from Toll's or other contractors' negligence. If Contractor fails to keep abreast with the general progress of the Work, Contractor shall, if requested by Toll, cause its work force to perform overtime work, the cost of which shall be borne entirely by Contractor. Contractor agrees that Toll may, by two working days written notice mailed to Contractor at Contractor's last known residence or place of business, or notice delivered at such place, or to Contractor's foreman in charge of the Work, terminate this Agreement and take over the Work and prosecute the same to completion by contract or otherwise, and enter at any time and take possession of the Work, materials, tools, appliances and equipment needed to complete the Work, and make such payments as Toll deems necessary for the discharge in whole or in part of the claims, liens or claims for liens, of any person in privity with Contractor on account of this Agreement; and Contractor agrees that the expense of such notice and of the completion of the Work, and the amount paid for the discharge or payment on account of claims, liens, or claims for liens, and the expense thereof, shall be deducted from the amount due or to become due to Contractor, and if more than the amount due, then Contractor shall be liable to Toll for the difference, and Toll may hold, sell or otherwise realize upon any material, machinery, tools or other equipment upon the premises on account of such difference in case Contractor shall fail or refuse to pay the same; all without prejudice to any other remedy Toll may have.

Article 2. CHANGES IN THE WORK: Toll may at any time, without notice to Contractor's surety, issue written change orders to Contractor requiring alterations or additions to or deletions from the Work. Contractor shall not alter, add to or delete from the Work except upon receipt of such orders. The amount to be allowed or deducted from the contract price for such alterations, additions or deletions shall be agreed upon by Toll and Contractor and, in the event they are unable to agree, shall be equivalent to Contractor's actual out-of-pocket cost or savings for such alterations or additions, plus 15% for overhead and profit; and for deletions shall be equivalent to Contractor's actual out-of-pocket cost of savings for such deletion, plus 7½% for overhead.

Article 3. INDEMNIFICATIONS: The Contractor shall indemnify, defend and hold harmless Toll and all of its agents and employees from and against all claims, damages, losses and expenses including attorneys' fees in any way arising out of or resulting from the performance, existence or condition of the Work under the Contract Documents, whether or not such claim, damage, loss or expense is based in whole or in part upon any negligent act or omission of Toll or Toll's participation in the Work or upon any statutory duty or obligation. Contractor expressly acknowledges that the parties are contractually allocating these risks to Contractor and Contractor has procured and shall maintain for the term of this Agreement the insurance policies more fully set forth in Article 4 below for the purpose of providing a financial means to support this indemnification provision. In addition, in any and all claims against Toll or any of its agents or employees by any employee of the Contractor or anyone for whose acts Contractor may be liable, the indemnification obligation under this paragraph shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

In the event that any claim or demand arising out of or relating to the performance of the Work is asserted against Toll in any action, suit, or other proceeding, Toll shall within thirty (30) days of notice thereof, give notice thereof to Contractor. Upon receipt of such notice, Contractor, at its own cost and expense, shall indemnify and defend Toll against such action, suit or proceeding and take such steps as are necessary to prevent the entry of judgment or award against Toll and to satisfy such judgment or award if entered. Notwithstanding the foregoing, Toll shall be permitted to be represented by its own counsel should Toll so desire.

Article 4. INSURANCE: Before beginning the Work, Contractor shall procure and shall maintain for the term of this Agreement the following types of insurance from a company or companies with an A.M. Best rating of not less than B, VI;

A. General Liability -
Type: Occurrence Basis
Limits:

| | |
|---|---|
| Per occurrence | $1,000,000 |
| General Aggregate | $2,000,000 |
| Products/Completed Operations Aggregate | $1,000,000 |

Special Provision:
Additional Insured Endorsement
(Endorsement CG 20 10 (11/85 or its equivalent)

Vehicle Liability -
Limits:

| | |
|---|---|
| Bodily Injury/Property Damage per occurrence | $1,000,000 |

Special Provisions:
Coverage shall include owned, hired and non-owned vehicles. The insurance policies in Article 4A and 4B above shall name Toll Brothers, Inc., its subsidiaries and affiliates as "Additional Insured" parties for work performed by Contractor under the Construction Agreement and shall provide that the policy may not be cancelled or terminated without at least thirty (30) days prior written notice to Toll. Before beginning the Work, Contractor shall furnish Toll with an Endorsement to Insurance Policy, on Endorsement Form CG-20-10 11/85 or its equivalent, naming Toll as an "Additional Insured" party.

C. Workers' Compensation -
Limits: Statutory

D. Employer's Liability
Limits:

| | |
|---|---|
| Each accident | $100,000 |
| Disease - Policy Limit | $500,000 |
| Disease - each employee | $100,000 |

Before beginning the Work, Contractor shall furnish Toll with a Certificate of Insurance, on an Acord form, certifying that coverage specified above is in effect.

Article 5. MECHANIC'S AND/OR MATERIALMEN'S LIENS AND CLAIMS: TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONTRACTOR HEREBY EXPRESSLY WAIVES AND RELINQUISHES THE RIGHT TO HAVE, FILE OR MAINTAIN ANY MECHANIC'S AND/OR MATERIALMEN'S LIEN OR MECHANIC'S AND/OR MATERIALMEN'S NOTICE OF INTENTION TO LIEN, AGAINST THE PROJECT, THE BUILDINGS THEREON OR THE GROUND APPURTENANT THERETO. Contractor agrees that if any mechanics lien or claim is filed against the Project, the buildings thereon, or the ground appurtenant thereto, for or on account of any work done or materials furnished to the Project by Contractor, its suppliers or contractors, Contractor shall take immediate steps to satisfy and remove from the record such mechanic's and/or materialmen's lien or claim at Contractor's sole expense. In the event that the mechanic's and/or materialmen's lien or claim is not satisfied or removed from the record within forty-eight (48) hours after notice thereof to Contractor, Toll shall have the right to pay all sums necessary to secure the satisfaction or removal of such lien or claim and to deduct such sums from the amount then due or to become due Contractor. Contractor will reimburse Toll for all costs, damages and attorneys' fees resulting from the improper filing of mechanic's and/or materialmen's liens and claims.

Article 6. ADDITIONAL OBLIGATIONS OF CONTRACTOR: Contractor shall (a) provide and supply, in the performance of the Work, a sufficiency of properly skilled and other workmen and an adequacy of materials, tools and equipment to prosecute vigorously the performance of the Work, (b) provide a foreman or superintendent satisfactory to Toll to supervise the performance of the Work, which foremen or superintendent shall not be replaced without written permission of Toll, (c) dismiss any employee whom Toll deems incompetent, insubordinate or otherwise objectionable, (d) comply with all statutes, ordinances, rules and regulations of the federal, state and/or local governmental body or agency with jurisdiction over the Work and pay all applicable fees for licenses or permits required in connection with the performance of the Work, (e) abide by all safety rules and regulations established by Toll or promulgated by any governmental body or agent with jurisdiction over the Work, (f) cooperate fully with Toll and other contractors at the project site and carefully fit the Work to the work provided by others, (g) permit and provide sufficient safe and proper facilities for the inspection or testing by Toll or its representative of the materials or equipment supplied and work performed by Contractor in connection with the Work, such testing or inspection to occur at the Project site, the place of the manufacture of materials, or at any other mutually convenient place, with the cost of such inspection or testing to be borne by Contractor and/or manufacturer, (h) employ in connection with performance of the Work only workmen of such labor affiliations as are satisfactory to Toll, (i) pay promptly all sums due for labor, services, materials, tools and equipment supplied in connection with the performance of the Work and, when required by Toll, submit to Toll satisfactory evidence of such payment, it being understood that this subparagraph shall not create any right in any third party against Toll, (j) clean up and remove from the Project site all rubbish, debris and waste resulting from the performance of the Work. Where permission is granted by Toll, all rubbish, debris and waste will be placed by Contractor in a central area designated by Toll's job superintendent, (k) pay all federal, state, municipal and local taxes of whatever nature now in force or hereinafter enacted arising out of or relating to the performance of the Work including, without limitation, all sales and use taxes and all taxes required pursuant to the Federal Social Security Act and state unemployment compensation law. It being expressly understood that all such taxes are included in the contract price, (l) reimburse Toll for any loss incurred or damage suffered as a result of Contractor's delay in beginning, prosecuting or completing the Work, except for delay resulting from causes for which Contractor is entitled to extensions of time, (m) perform the Work entirely with its own employees and not transfer or assign all or any portions of this Agreement, the Work or the sum of money payable hereunder without prior written consent of Toll, (n) repair and replace at Contractor's expense all materials, tools, equipment or work damaged or lost as a result of floods, rain, wind, storm, lightning, acts of God, theft, fire or other casualty, (o) when required by Toll, submit at Contractor's expense shop drawings, samples, brochures, manuals and photographs of work or materials to be furnished by Contractor in connection with the performance of the Work, (p) warrant that all material not covered by manufacturer's guarantee, and all workmanship shall be guaranteed for a period of not less than one year or as required in the latest revised warranty issued to Toll's homebuyers of which Contractor acknowledges receipt and full understanding, whichever is greater. Defective work and materials shall be replaced at Contractor's expense. No substitution of material shall be permitted without written authority of Toll, (q) unless otherwise specified, supply only all new materials and comply with the hereinabove referred plans and specifications. All materials and workmanship furnished are subject to inspection and test by the Architect, if any, and Toll at any and all times during manufacture or construction, (r) within twenty-four (24) hours after receiving written notice from Toll, remove from the Project site all work or material determined by Toll to be defective, unsuitable or not as specified and make good all work damaged or destroyed as a result thereof.

Article 7. DEFAULT: In the event that Contractor shall file for bankruptcy or have filed against it a bankruptcy case, make a general assignment for benefit of creditors, or become insolvent, or should Contractor refuse or neglect to supply a sufficiency of properly skilled or other workmen or any adequacy of materials, tools and equipment, to prosecute vigorously the performance of the Work, or fail to make prompt payment for labor, services, materials, tools or equipment supplied in connection with the performance of the Work, or otherwise be in default in the performance of any of its obligations hereunder, Toll, two working days after notice to Contractor, shall have the right to (1) provide and pay for such labor, services, materials, tools and equipment or otherwise to cure Contractor's default hereunder and deduct the cost thereof from any payments due or to become due Contractor, and/or (2) terminate this Agreement and take possession of all materials, tools and equipment at the project for the purpose of completing the Work. In the case of such a termination, Contractor shall not be entitled to receive any further payments from Toll until the Work shall be wholly finished and accepted by Toll, at which time, if the unpaid balance of the amount to be paid Contractor shall exceed the expense incurred by Toll in finishing the Work, such excess shall be paid to Contractor; but if such expense shall exceed the unpaid balance, Contractor shall pay the difference to Toll plus damages, including attorneys' fees. The remedies provided for herein are not exclusive, and Toll may elect any other remedies available under the law and this Agreement, jointly or severally.

Article 8. OTHER ITEMS: Contractor represents that prior to submitting its proposal, Contractor carefully examined all of the contract documents, acquainted itself with the Project site and all other conditions relevant to the Work; and made all investigations essential to full understanding of the difficulties which might be encountered in performing the Work. Toll shall not be responsible for any loss or damage to the Work to be performed and furnished by Contractor, nor shall Toll be responsible for loss of or damage to materials, tools, equipment, appliances or other personal property owned, rented or used by Contractor or anyone employed by Contractor in the performance of the Work, however caused. It is advised that Contractor insure the Work against such casualty.

Article 9. MISCELLANEOUS: Payments made hereunder shall not be evidence of the proper performance of all or any part of the Work or its acceptance by Toll. Contractor's acceptance of final payment hereunder shall constitute a complete release of any and all existing or future claims or demands by Contractor against Toll arising out of or relating to this Agreement or the performance of the Work, including without limiting the generality of the foregoing, claims or demands based in whole or in part upon Toll's negligence.

It is expressly understood and agreed that the performance of the Work is dependent upon Toll's performance of other work at the Project. Should Toll, for any reason in its sole discretion, decide not to proceed with other work at the Project and so notify Contractor, this Agreement shall become null and void and Contractor's compensation hereunder shall be limited solely to payment on a pro-rata basis for work actually completed.

Toll and Contractor and their heirs, executors, administrators, successors and assigns, shall be bound by and severally fully perform the covenants contained herein.

Article 10. LIMITATION OF LIABILITY: Toll shall not be liable to Contractor, its agents, servants, workmen or employees, for any consequential damages arising from the breach of this Agreement and/or Toll's negligence, and Toll's sole liability shall be for the payment of the contract sum set forth in this Agreement (to be prorated if the Work is not yet completed). Contractor shall indemnify and hold Toll harmless from any and all liability in excess of the contract sum.

Article 11. OPTION POLICY: Contractor agrees not to sell options, install extras or to do work of any kind or description on a new home which is part of the described work for a period of 120 days after the settlement or closing day for the home. Options or extras which Toll refuses to sell may be sold and installed within the aforesaid 120 day period if Toll authorizes same in writing prior to any proposal to the buyer or homeowner. Plumbing and electrical contractors may perform non-warranty emergency work without prior written consent of Toll. Any work permitted pursuant to this Article must be performed so as not to interfere with Contractor's production responsibilities.

Article 12. SAFETY PRECAUTIONS/EEO COMPLIANCE: Contractor has agreed to comply with and has full knowledge of the latest revised Occupational Safety and Health Act (OSHA) and all related regulations and will work in accordance with the requirements therein contained regarding the safety precautions to be taken on all construction projects. All applicable sections of the latest approved OSHA requirements and any and all amendments shall be observed in this project. Contractor agrees that it will provide a "competent person," as that term is defined under 29 C.F.R. §1926.20(b)(2), to provide for frequent and regular inspections of the Job Site, materials and equipment as part of Contractor's accident prevention program. If Contractor fails to provide such competent person, and/or such competent person fails to perform frequent and regular inspections, Toll may take any action to remedy the situation, including the remedies provided in Article 13 herein. In addition, Contractor shall comply with all other applicable laws, ordinances, codes, rules and regulations, including, without limitation, all applicable laws, rules and regulations relating to equal employment opportunity. Contractor agrees that it will not take any adverse employment action against its employees on the basis of race, color, religion, national origin, age, disability, or other protected category established by applicable law.

Article 13. NON-EXCLUSIVE; TERMINATION: Contractor agrees that this is not an exclusive contract for the performance of the Work and that Toll can assign all or any portion of the Work to another contractor at any time for any reason whatsoever. In addition, Contractor agrees that Toll shall have the right to terminate this Agreement, with or without cause, upon forty-eight (48) hours notice thereof to Contractor. In the event of such termination, Toll shall pay Contractor a pro-rata portion of the contract amount as set forth herein based upon the percentage of the Work completed up to the date of termination, as such amount is determined by Toll in its discretion. Upon such payment, this Agreement shall be terminated and Toll shall have no further liability to Contractor

Article 14. SEVERABILITY: To the extent that any provision of this Agreement may be declared unenforceable, such provision shall be deemed stricken as though never part of this Agreement; otherwise, every other provision hereof and this Agreement shall remain in full force and effect.

Article 15. GOVERNING LAWS: This Agreement shall be governed by the laws of Pennsylvania.

Contract No.: ____________________
Community: Brandywine Hunt

Contractor: [signature] Dated: 4/18/05
Toll: [signature] Dated: 4/14/05

Mar. 13. 2006 11:45AM

# EXHIBIT C

EFiled: Jan 13 2006 10:08__M EST__
Transaction ID 10248566

IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

ROBERT P. KEMPSKI,                          :

         Plaintiff,                    :          C.A. No. 06C-01-145-JEB
                              :

        v.                             :          <u>ARBITRATION CASE</u>
                              :

TOLL BROTHERS, INC., a corporation         :          <u>JURY TRIAL DEMANDED</u>
of the State of Delaware,                  :
                              :

         Defendants.                    :

## COMPLAINT

    1.    Plaintiff is a resident of the State of Delaware, residing at 818 Woodlawn

Avenue, Apartment C3, Wilmington, Delaware 19806.

    2.    Defendant is a corporation of the State of Delaware. Its registered agent for

service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange

Street, Wilmington, Delaware 19801.

    3.    Upon information and belief, at all times pertinent hereto, defendant was the

owners, possessors, operators, franchisors, franchisees, lessors and/or lessees of the property located

at Brandywine Hunt, Naamans Road, Wilmington, Delaware.

    4.    On or about August 25, 2005, at approximately 12:00 p.m., plaintiff Robert P.

Kempski was lawfully working as a heating and air conditioning installer for Delaware Heating and

Air Conditioning within a stick structure of a new home located at Lot 87 of the Brandywine

Hundred home construction site where defendant was performing construction activities. At all

times pertinent hereto, plaintiff was an employee, worker, invitee, business visitor and/or person

lawfully on the premises and was otherwise lawfully on the aforementioned premises. Plaintiff

was installing duct work in the attic of the home when suddenly and without warning, the floor

board on which he was standing gave way, causing him to fall from the attic to the first floor level of the home.

5.    As a direct and proximate result of the aforementioned incident, plaintiff suffered severe bodily injuries, including, but not limited to, injuries to his head, shoulders, arms, and hands. Some or all of his injuries have continued since the accident and are permanent in nature.

6.    As a further consequence of his injuries, plaintiff has incurred in the past and will continue to incur in the future, medical and medication expenses for the treatment of his injuries.

7.    As a further consequence of his injuries, plaintiff has experienced in the past and will continue to experience in the future, considerable pain, suffering, discomfort, anxiety and anguish, both mental and physical in nature.

8.    As a further consequence of his injuries, plaintiff has incurred in the past and will continue to incur in the future a loss of earnings and a permanent loss of earning capacity.

9.    Defendant, working on and in control of the premises and area in question, owed a duty to the employees, workers, invitees, business visitors and/or persons lawfully on the premises, including plaintiff, to maintain the property in a reasonable and safe condition, free of defects and hazards which would render it unsafe for persons lawfully on the premises. Defendant breached that duty.

10.    The incident and the plaintiff's resulting injuries and damages were proximately caused by the negligence of defendant in that it, through their agents, servants and/or employees:

(a)    failed to properly inspect the construction area to insure that it was safe to work in when it knew or in the exercise of reasonable care should have known that plaintiff and other workers like him intended to work in the area in question;

(b)    failed to properly secure the floor board or see that it was secured when they knew or should have known that the plaintiff and other workers like him intended to work in the area in question;

(c)    failed to employ appropriate safety techniques in setting up the work and allowing it to take place in the construction area when they knew or should have known that plaintiff and other workers like him intended to work in the area in question;

(d)    required and/or permitted its employees, agents, contractors, and/or subcontractors to work in improper, unsafe, and dangerous construction conditions when defendants knew or should have known of the likelihood that employees, workers, invitees, business visitors and/or persons lawfully on the premises would be injured by the condition of the area in question and when defendant had a right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(e)    required and/or permitted its employees, agents, contractors and/or subcontractors to fail to comply with appropriate safety regulations and procedures when defendant had the right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(f)    did not observe the failure of its employees, agents, contractors, and/or subcontractors to use proper and safe materials when defendant knew, or in the exercise of reasonable care, should have discovered and should have realized that the condition of the area in question involved an unreasonable risk of harm to the persons lawfully on the premises and should have expected that these individuals would not discover or realize the danger or would fail to protect themselves against the danger when defendant had the right to control the actions of its employees, agents, contractors and/or subcontractors;

(g)    did not observe the failure of its employees, agents, contractors and/or subcontractors to comply with appropriate safety regulations and procedures when defendant had the right to control the actions of its employees, agents, contractors and/or subcontractors;

(h)    did not prevent the failure of its employees, agents, contractors and/or subcontractors from working in improper, unsafe, and dangerous construction conditions when defendants had the right to control the actions of its employees, workers, invitees, business visitors and/or persons lawfully on the premises;

(i)    did not prevent the failure of its employees, agents, contractors and/or subcontractors to comply with appropriate safety regulations and procedures when defendant had a right to control the actions of their employees, agents, contractors and/or subcontractors;

(j)    permitted improperly attached floor boards to remain in the home construction site on Lot 87 of Brandywine Hunt thereby creating a dangerous, defective and hazardous condition;

(k)    failed to properly and adequately notify its employees, agents, contractors and/or subcontractors that the floor boards had not been properly and adequately installed in the construction area in question;

(l)    failed to adequately warn or otherwise inform its employees, agents, contractors and/or subcontractors that the improperly installed floor boards posed a dangerous and unsafe condition, having actual or constructive knowledge thereof;

(m)    failed to exercise reasonable care to protect plaintiff, by inspection and other affirmative acts, from the danger of reasonably foreseeable injury occurring from reasonably foreseeable uses of the area in question;

(n)    carelessly performed its contractual duties by causing the improper installation of the floor boards of the Lot 87 home construction project, thereby causing a dangerous, defective, and hazardous condition within the home;

(o)    failed to properly train, supervise or hire sufficient personnel to properly inspect, maintain, construct, and/or alter, the assembly of floor boards and/or other equipment in the area in question so as to maintain the work area in a condition free of defects and reasonably safe for use by individuals, such as plaintiff;

(p)    utilized improper materials and equipment during the assembly, construction, and/or installation of floor boards and/or other equipment so as to cause or increase the risk that it would be unstable and/or break; and,

(q)    failed to use due care to provide plaintiff with a safe working environment.

11.    Defendant knew or should have known at the time of the aforementioned incident that the work which was to be done and/or performed normally and inherently involved special dangers to others including the employees of Delaware Heating and Air Conditioning one of whom was plaintiff, unless reasonable precautions were taken against such dangers. Defendant was negligent in failing to take such reasonable precautions. Its negligence was the proximate cause of plaintiff's injuries and damages

12.    The aforementioned negligence of the defendant also constituted negligence per se, said negligence constituting non-compliance on the part of the defendant with pertinent safety and construction statutes, regulations and procedures.

13.    Defendant is also responsible for plaintiff's damages under the doctrine of Res Ipsa Loquitur.

WHEREFORE, plaintiff demands judgment against defendant for his special and general damages, including pain and suffering, the costs of this action plus pre and post judgment interest and other such relief as the Court finds just.

<div style="text-align: right">

/s/ Joseph J. Rhoades
_____
Joseph J. Rhoades, Esquire (ID No. 2064)
A. Dale Bowers, Esquire (ID No. 3932)
1225 King Street, 12 Flr.
Wilmington, Delaware 19801
302-427-9500
Attorneys for Plaintiff(s)

</div>

DATE: January 13, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document

was served on the 9th day of May, 2006 via e-file on the following counsel of record:

> Joseph J. Rhoades, Esquire
> A.  Dale Bower, Esquire
> 1225 King St., 12[th] Floor
> Wilmington, DE  19801


/s/ Michael P. Kelly
_____
Michael P. Kelly (DE Bar ID #2295)

## Complaints and Other Initiating Documents
1:06-cv-00252-KAJ Kempski v. Toll Bros Inc.

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Kelly, Michael P. entered on 5/9/2006 at 2:01 PM EDT and filed on 5/9/2006

**Case Name:**    Kempski v. Toll Bros Inc.
**Case Number:**   1:06-cv-252
**Filer:**         Toll Bros Inc.
**Document Number:** 8

**Docket Text:**
THIRD PARTY COMPLAINT against Delaware Heating and Air Conditioning Services, Inc., JD Framing Contractors, Inc.- filed by Toll Bros Inc.. (Attachments: # (1) Exhibit A to C to Third Party Complaint# (2) Certificate of Service)(Kelly, Michael)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/9/2006] [FileNumber=211024-0]
[d5ad739f4ef0c6e6721a25b7ca3e58e2d973465bc299067b152b91efd29f2c100bc52
96dbe960d959a9bbf22676db62aa20ee291743afb9e0eaf78612f40e97c]]
**Document description:** Exhibit A to C to Third Party Complaint
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/9/2006] [FileNumber=211024-1]
[7a3337a9a64c48db645b3d1ef426852a6667b8f1e1b8544d1c1e2bb4bf22e7fefa8a4
6804a3ab439c34a992e097078d477b7a0ce4775074aab9605a5bd99c2e2]]
**Document description:** Certificate of Service
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=5/9/2006] [FileNumber=211024-2]
[c7c563fb3ae5c93488a85f2e8e5876689c547ecf2d0202fe8ddfb09b79303aad33a48
cd72ab266782fa0ef36c5d7c6b794a3a13645ff10f250f68af10f455ed1]]

**1:06-cv-252 Notice will be electronically mailed to:**

Michael P. Kelly     mkelly@mccarter.com, fboccuti@mccarter.com; tpearson@mccarter.com

**1:06-cv-252 Notice will be delivered by other means to:**

Joseph J. Rhoades
Law Office of Joseph Rhoades, Esq.
1225 King Street, Suite 1200
P.O. Box 874
Wilmington, DE 19899-0874

# EXHIBIT D

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
tel 973.622.4444
fax 973.624.7070
www.mccarter.com

**FREDERIC J. GIORDANO**

Partner
973-639-6988 (Telephone)
973-297-3877 (Facsimile)
fgiordano@mccarter.com



June 28, 2006

## BY FACSIMILE AND FIRST CLASS MAIL

Linda L. Stewart
Claims Specialist
Penn National Insurance
P.O. Box 3880
Harrisburg, PA 17105-3880

> *Re:* ***Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning***
> ***Services, Inc.***
> *Civil Action No.: 06-252-KAJ*
> *Named Insured: Delaware Heating and Air-Conditioning, Inc.*
> *Additional Insured: Toll Bros., Inc.*
> *Your Claim No.: 02749592*

Dear Ms. Stewart:

It was nice speaking with you yesterday.

As we discussed, we received your letter to Michael Kelly accepting the defense and indemnification of Toll Bros., Inc. ("Toll") in *Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning Services, Inc.* on the condition that Toll dismiss its Third Party Complaint against Delaware Heating. Toll is concerned that this condition may prejudice Toll's ability to fully defend itself and subject Toll to disproportionate liability in the event that plaintiff prevails on his claim. We ask, therefore, that you immediately provide us with a copy of Penn National Policy No. AC90613137 so we may review both the scope and conditions of coverage. Please also advise explicitly what policy condition(s) you assert require Toll to waive its claim against a potentially responsible tortfeasor in order to obtain defense and indemnification.

Even if Penn National defends and indemnifies Toll, Toll faces exposure to a judgment that exceeds Penn National's policy limits. Those limits, moreover, could be reduced or extinguished by other claims, subjecting Toll to potential exposure for a relatively small settlement or judgment.[1] Under these circumstances, to protect itself fully, Toll should pursue its claim against Delaware Heating. Toll's concerns might be alleviated if Penn National enters a separate, written agreement with Toll by which Penn National agrees to provide unconditional,

---

[1]     Please advise whether policy limits are impaired in any way and whether any other claims are pending under the policy. Even if no claims currently are pending, however, the possibility exists that other claims still may be made under the policy.

Linda E. Stewart
June 28, 2006
Page 2



uncapped defense and indemnity for this claim.  Short of such an agreement, however, Toll risks exposure by dismissing its claims against Delaware Heating.

Please provide the requested information and insurance policy as soon as possible, so Toll can make a fully informed response to your proposed acceptance of tender.

If you have any questions, please do not hesitate to contact us.

Very truly yours,

Frederic J. Giordano

FJG:krm

Harrisburg Claims Service Office
P.O. Box 3880
Harrisburg, PA 17105-3880
800.942.9715 Phone
717.230.8200 Phone
800.833.9422 Claims-Mgt Fax
717.221.6062 Claims-Mgt Fax

www.PennNationalInsurance.com

 PENN NATIONAL
INSURANCE

August 1, 2006

Mr. Frederic J. Giordano
McCarter & English, LLP
919 N Market Street, SL 1800
Wilmington, DE 19801

RE:    Robert Kempski, Plaintiff v. Toll Bros. Inc., Defendant – Toll Bros, Inc. Third
       Party Plaintiff v Delaware Heating And Air Conditioning Services, Inc. In The
       United States District Court In And For The District of Delaware

       C.A. No. – 06 -252-KAJ

       Insured:        Delaware Heating And Air Conditioning
       Claim No.:      02749592
       Plaintiff:      Robert P. Kempski
       Date of Loss:   8/25/05

Dear Mr. Giordano:

       Penn National Insurance previously advised your client in a letter dated June 20,
2006 that Penn National Insurance would provide a defense for Toll Bros., Inc., in a
lawsuit filed by Robert Kempski against Toll Bros., Inc. In The United States District
Court For the District of Delaware. Penn National's defense was conditioned on Toll
Bros., Inc. dismissing its Third Party Complaint against Delaware Heating And Air
Conditioning Services, Inc.

       This letter is to advise that after receiving your letter of June 28, 2006, Penn
National reviewed its position and without waiving any other restrictions, conditions, or
terms of the applicable insurance policy, Penn National Insurance will remove the
condition in our original Acceptance Letter that the Third-Party Complaint filed by Toll
Bros., Inc., against Delaware Heating And Air Conditioning be dismissed and Penn
National will proceed with the defense of Toll Bros., pursuant to the restrictions, terms,
conditions and provisions in the insurance policy issued by Penn National Insurance to
Delaware Heating And Air Conditioning, Inc., that was in effect at the time of the loss
that gives rise to the aforementioned lawsuit.

       Please do not hesitate to contact us in the event either you or your client has any
questions or comments regarding this matter.

Sincerely,

Linda L. Stewart
Claim Specialist

cc:    Louis J. Rizzo, Jr., Esquire



McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
tel 973.622.4444
fax 973.624.7070
www.mccarter.com

**FREDERIC J. GIORDANO**
Partner
973-639-6988 (Telephone)
973-297-3877 (Facsimile)
fgiordano@mccarter.com

ATTORNEYS AT LAW

August 2, 2006

**BY FACSIMILE AND FIRST CLASS MAIL**

Linda L. Stewart
Claims Specialist
Penn National Insurance
P.O. Box 3880
Harrisburg, PA 17105-3880

Re:  *Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning*
          *Services, Inc.*
     *Civil Action No.: 06-252-KAJ*
     *Named Insured: Delaware Heating and Air-Conditioning, Inc.*
     *Additional Insured:  Toll Bros., Inc.*
     *Your Claim No.:  02749592*

Dear Ms. Stewart:

     It was nice speaking with you earlier today.  As we discussed, we received yesterday by
facsimile your letter withdrawing the requirement that Toll Bros., Inc. ("Toll") dismiss its third-
party complaint against Delaware Heating and Air-Conditioning Services, Inc. ("Delaware
Heating") as a condition of Penn National's accepting Toll's defense.  This shall confirm that
Toll requests that McCarter & English continue representing Toll in this matter.  We note that no
attorney has yet appeared for Delaware Heating and suggest that Reger, Rizzo appear for that
entity instead.  Given the adversity between Toll and Delaware Heating, one firm cannot
represent both entities.

     We understand that you will consult with coverage counsel regarding Toll's request and
look forward to your response.  In the meantime, we ask that you advise Reger, Rizzo to refrain
from seeking transfer of the file pending resolution of the defense counsel issue.

     If you have any questions, please do not hesitate to contact us.

                                           Very truly yours,

                                           *Frederic J. Giordano*
                                           Frederic J. Giordano

FJG:krm

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102-4056
tel 973.622.4444
fax 973.624.7070
www.mccarter.com

**FREDERIC J. GIORDANO**

·Partner
973-639-6988 (Telephone)
973-297-3877 (Facsimile)
fgiordano@mccarter.com



**McCARTER ENGLISH**
ATTORNEYS AT LAW

August 2, 2006

**BY FACSIMILE AND FIRST CLASS MAIL**

Linda L. Stewart
Claims Specialist
Penn National Insurance
P.O. Box 3880
Harrisburg, PA 17105-3880

*Re: Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning
Services, Inc.*
*Civil Action No.: 06-252-KAJ*
*Named Insured: Delaware Heating and Air-Conditioning, Inc.*
*Additional Insured: Toll Bros., Inc.*
*Your Claim No.: 02749592*

Dear Ms. Stewart:

It was nice speaking with you again today. This shall confirm that you hope to speak to coverage counsel and get back to us regarding the continued retention of McCarter & English as defense counsel by next week.

This further shall confirm that Penn National has agreed to both defend and indemnify Toll Bros., Inc. against the captioned lawsuit, as initially set forth in your June 20, 2006 letter, and that the omission of a reference to indemnification in your August 1, 2006 letter was unintentional.

Thank you for your continued attention to this matter. If you have any questions, please do not hesitate to contact us.

Very truly yours,

Frederic J. Giordano

FJG:krm

ME1\5775681.1

Harrisburg Claims Service Office
P.O. Box 3880
Harrisburg, PA 17105-3880
800.942.9715 Phone
717.230.8200 Phone
800.833.9422 Claims-Mgt Fax
717.221.6062 Claims-Mgt Fax

www.PennNationalInsurance.com



PENN NATIONAL
INSURANCE

October 4, 2006

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND REGULAR U. S. MAIL

*ACCEPTANCE LETTER*

Mr. Fred J. Giordano
McCarter & English, LLP
919 N. Market Street, SL 1800
Wilmington, DE 19801

RE:    Robert P. Kempski, Plaintiff v. Toll Bros., Inc., Defendant – Toll Bros. Inc. Third
       Party Plaintiff v. Delaware Heating And Air Conditioning Services, Inc. In The
       US District Court In And For The District of Delaware C.A. No. 06-252-KAJ
       Insured:     Delaware Heating And Air Conditioning
       Claim No.:   02749592
       Plaintiff:   Robert P. Kempski
       Date of Loss: 8/25/05

Dear Mr. Giordano:

Penn National Insurance acknowledges receipt of the third party complaint on May 19,
2006, in which Toll Bros., Inc. requests defense and indemnification from our insured,
Delaware Heating & Air Conditioning Services, Inc. After many discussions in an effort
to come to an amicable resolution of any outstanding issues due to the complexity of
cross-claims in this litigation, we have decided to agree to pay defense costs for Toll
Brothers, Inc. to defend the interest of Toll Brothers, Inc. in the above-referenced
litigation matter. However, we will not pay for Toll Brothers, Inc.'s legal costs for
prosecuting the third party complaint action against Penn National's insured, Delaware
Heating & Air Conditioning.

As of this date, the information and/or documents in our possession concerning this
matter consist of the following: A joinder letter dated February 9, 2006 sent by Kristina
Small; a copy of the complaint filed against Toll Bros., Inc. captioned Robert Kempski v.
Toll Bros., Inc.; a copy of the Third Party Complaint captioned Toll Bros., Inc. v.
Delaware Heating & Air Conditioning; and a copy of the contract between Toll Bros., Inc.
and Delaware Heating & Air Conditioning.

Toll Brothers tender arises from a contract that required Delaware Heating & Air
Conditioning Services to indemnify and pay Toll Bros., Inc.'s defense costs arising from
losses that occur during the performance of Delaware Heating & Air Conditioning's work
under the contract documents, whether or not such claim, damage, loss or expense is

based in whole or in party upon any negligent act or omission of Toll's participation in the work or upon any statutory duty or obligation.

Penn National understands that this matter involves a claim by Robert Kempski against Toll Brothers, Inc., arising out of an accident that occurred at a job site located at Lot 87 of the Brandywine residential development that was under construction and where Delaware Heating & Air Conditioning was performing construction services pursuant to the Contract between Delaware Heating & Air Conditioning and Toll Brothers, Inc. At the time of the accident, Mr. Kempski was an employee of Delaware Heating & Air Conditioning. Mr. Kempski was installing duct work in the attic of the home that was under construction and fell when a board he was standing on gave way causing him to fall from the attic to the first floor level of the home. Mr. Kempski filed a lawsuit in the Superior Court For The State Of Delaware In and For New Castle County seeking judgment against Toll Brothers, Inc. for his damages.

Toll Brothers, Inc. is making a request for defense and indemnification under Delaware Heating & Air Conditioning Services' Commercial General Liability Policy issued by Penn National Insurance, pursuant to Policy No. AC9 0613137, for the Policy Period from March 14, 2005 through March 14, 2006. The Policy provides $1,000,000 liability coverage for "bodily injury" caused by an "occurrence". In view of the foregoing, Penn National Insurance will afford coverage pursuant to the terms and provisions of the subject policy.

Please be advised that Penn National Insurance reserves any and all of its rights under any of the provisions, definitions, conditions or exclusions contained in any insurance policy issued by Penn National Insurance to Delaware Heather & Air Conditioning Inc. Furthermore, upon the discovery of any other facts or issues relating to coverage of this matter, Penn National reserves its rights to modify or amend its coverage position and assert any defenses based upon any of the policy provisions, definitions, conditions or exclusions, whether or not specifically mentioned herein.

Please be advised that Lou Rizzo of the law firm of Reger, Rizzo, Kavulich & Darnall has been retained by Penn National Insurance to defend Toll Brothers, Inc.'s interests in this matter. Mr. Rizzo may be contacted at 1001 N. Jefferson St., Suite 202, Wilmington, DE 19801; telephone 302-652-3611; Fax 302-652-3620; E-Mail Address: lrizzo@rrkdlaw.com.

Please do not hesitate to contact us or Mr. Rizzo in the event either you or your client has any questions or comments regarding this matter.

Sincerely,
PENN NATIONAL INSURANCE

Linda L. Stewart
Claim Specialist

cc: Lou Rizzo
    Reger, Rizzo, Kavulich & Darnall
    1001 N. Jefferson Street, Suite 202
    Wilmington, DE 19801

Jonathan Parshall
Murphy, Spadaro & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07102-0652
973.622.4444
fax 973.624.7070
www.mccarter.com

**FREDERIC J. GIORDANO**

Partner
973-639-6988 (Telephone)
973-297-3877 (Facsimile)
fgiordano@mccarter.com



October 13, 2006

## BY FACSIMILE AND FIRST CLASS MAIL

Adam Parsons, Esq.
Linda Stewart
Penn National Insurance
P.O. Box 3880
Harrisburg, PA  17105-3880

> **Re:   *Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning***
> ***    Services, Inc.***
> ***    Civil Action No.:  06-252-KAJ***
> ***    Named Insured: Delaware Heating and Air Conditioning, Inc.***
> ***    Additional Insured:  Toll Bros., Inc.***
> ***    Your Claim No.:  02749592***

Dear Mr. Parsons and Ms. Stewart:

We write in response to Ms. Stewart's letter dated October 4, 2006, which we just received.  The acceptance Penn National offers is -- again -- different from the coverage that you advised by telephone on multiple occasions that Penn National would provide to Toll.

First, Penn National previously advised that it would accept both defense and indemnification of Toll (up to policy limits), but now states -- the title of Ms. Stewart's letter notwithstanding -- that it will provide only a defense subject to a reservation of rights.   Penn National also advised that McCarter and English would remain Toll's defense counsel, but again seeks to appoint Reger, Rizzo as Toll's defense counsel.  Reger, Rizzo, however, already has entered an appearance for Delaware Heating and Air Conditioning, Inc. ("DHAC").  Toll has filed a Third Party Complaint against DHAC.  Toll and DHAC, therefore, are directly adverse in this action and it is inappropriate for one firm to represent both entities.  We hope that Penn National's recent attempt to assign the Reger Rizzo firm as defense counsel was an oversight.

Toll, accordingly, requests that Penn National confirm in writing that it will defend and indemnify Toll against *Kempski* up to policy limits, and that Penn National approves McCarter and English's continued retention as Toll's counsel.  Toll also requests reimbursement of past and future defense costs.  Please advise where we may direct such invoices.

ME1\5900487.1

Adam Parsons, Esq.
Linda Stewart
October 13, 2006
Page 2

      We would appreciate your prompt response as Toll tendered this matter many months ago and it deserves a prompt resolution.

                    Very truly yours,

                    */s/ Frederic J. Giordano*

                    Frederic J. Giordano

FJG:krm

**FREDERIC J. GIORDANO**

Partner
973-639-6988 (Telephone)
973-297-3877 (Facsimile)
fgiordano@mccarter.com

November 2, 2006

## BY FACSIMILE AND FIRST CLASS MAIL

Linda Stewart
Penn National Insurance
P.O. Box 3880
Harrisburg, PA  17105-3880

*Re:  Kempski v. Toll Bros., Inc. v. Delaware Heating and Air Conditioning*
*Services, Inc.*
*Civil Action No.:  06-252-KAJ*
*Named Insured:  Delaware Heating and Air-Conditioning, Inc.*
*Additional Insured:  Toll Bros., Inc.*
*Your Claim No.:  02749592*

Dear Ms. Stewart:

I write further to our October 26, 2006 telephone conversation, in which you confirmed that Penn National Insurance Company will both defend and indemnify Toll, that Reger Rizzo will defend Delaware Heating and Air Conditioning, and that McCarter & English will continue to represent Toll. You advised that you would send a letter confirming the above, but we have not yet received your letter. If you have not sent the letter already, please direct it to my attention as soon as possible.

Thank you for your attention to this matter.

Very truly yours,

Frederic J. Giordano

FJG:krm

cc:    Adam Parsons, Esq.

bcc:   Kristine Maciolek Small, Esq. (by e-mail)
       Trisha DeMatos (by e-mail)

e-mail: PJP, MPK, ASD

MEI\5940308.1

Harrisburg Claims Service Office
P.O. Box 3880
Harrisburg, PA 17105-3880
800.942.9715 Phone
717.230.8200 Phone
800.833.9422 Claims-Mgt Fax
717.221.6062 Claims-Mgt Fax

www.PennNationalInsurance.com

 PENN NATIONAL
INSURANCE

November 8, 2006

CERTIFIED MAIL – RETURN RECEIPT REQUESTED
AND REGULAR U. S. MAIL

Mr. Fred J. Giordano
McCarter & English, LLP
919 N. Market Street, SL 1800
Wilmington, DE 19801

RE:  Robert P. Kempski, Plaintiff v. Toll Bros, Inc., Defendant – Toll Bros, Inc. Third
     Party Plaintiff v. Delaware Heating And Air Conditioning Services, Inc. In The
     US District Court In And For The District of Delaware C.A. No. 06-252-KAJ

          Insured:      Delaware Heating And Air Conditioning
          Claim No.:    02749592
          Plaintiff:    Robert P. Kempski
          Date of Loss: 8/25/05

Dear Mr. Giordano:

The purpose of this letter is to clarify Penn National Insurance's coverage position and
correct an error in the Acceptance Letter dated October 4, 2006. A copy of the October
4, th 2006 letter is attached for your reference.  The last paragraph of the October 4,
2006 letter should read that Lou Rizzo has been retained to protect the interest of
Delaware Heating And Air Conditioning and not Toll Bros., Inc.

You have also asked for clarification of Penn National Insurance's coverage position
regarding indemnification for Toll Bros., Inc. Penn National Insurance has agreed to
indemnify Toll Bros., Inc., but only for the negligence of Delaware Heating And Air
Conditioning. Penn National Insurance did not agree to indemnify Toll Bros., Inc. for Toll
Bros., Inc.'s sole negligence.

I hope that this letter resolves any lingering concerns you have with regards to Penn
National Insurance's coverage position in this matter.

Sincerely,

Linda L. Stewart
Claims Specialist

# EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT KEMPSKI, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 06-252 KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| TOLL BROS., INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| TOLL BROS., INC. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE HEATING AND AIR | ) | |
| CONDITIONING SERVICES, INC., and | ) | |
| JD FRAMING CONTRACTORS, INC. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## ANSWER TO COMPLAINT WITH AFFIRMATIVE DEFENSES AND CROSS CLAIM

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted.

5.    Admitted.

6.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    It is admitted that the contract contains indemnification language. The contract is

a written   document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

11.    It is admitted that the contract required EHAC to procure liability insurance. The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

12.    Admitted.

13.    Admitted.

14.    The allegations contained herein are directed toward a party other than the answering Defendant and no response is required.

15.    The allegations contained herein are directed toward a party other than the answering Defendant and no response is required.

16.    The allegations contained herein are directed toward a party other than the answering Defendant and no response is required.

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Admitted.

22.    Denied. After reasonable investigation, answering Third Party Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial. By way of further answer, the allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

23.    It is admitted that DHAC entered into a contract to perform HVAC work in the

House.  The remaining allegations contained herein are denied.

24.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

25.    Admitted.

26.    It is admitted that the contract contains indemnification language.  The contract is a written   document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

27.    Denied.  After reasonable investigation, answering Third Party Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial.

28.    The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

29.    The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

30.    The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

31.    The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

### COUNT I

32.    Answering Third Party Defendant incorporates paragraphs 1 through 31 above as is fully set forth herein.

33.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

34. Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

35. (a)-(j)  Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

36. Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

### COUNT II

37. Answering Third Party Defendant incorporates paragraphs 1 through 36 above as is fully set forth herein.

38-42. The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

### COUNT III

43. Answering Third Party Defendant incorporates paragraphs 1 through 42 above as is fully set forth herein.

44. Denied. After reasonable investigation, answering Third Party Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial.

45. Denied. After reasonable investigation, answering Third Party Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial.  By way of further answer, the allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

46. Denied. After reasonable investigation, answering Third Party Defendant is without

sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial. By way of further answer, the allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

47.     Denied. After reasonable investigation, answering Third Party Defendant is without sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained herein and same are deemed denied with strict proof thereof demanded at the time of trial. By way of further answer, the allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

### COUNT IV

48.     Answering Third Party Defendant incorporates paragraphs 1 through 47 above as is fully set forth herein.

49.-53. The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

### COUNT V

54.     Answering Third Party Defendant incorporates paragraphs 1 through 53 above as is fully set forth herein.

55.     Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

56.     Admitted.

57.     Admitted.

58.     The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

59.    The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

60.    The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

61.    The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

62.    The contract is a written a document which speaks for itself and Third Party Plaintiff's characterization thereof is specifically denied.

63.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

64.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

65.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

## COUNT VI

66.    Answering Third Party Defendant incorporates paragraphs 1 through 65 above as is fully set forth herein.

67-79. The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

## COUNT VII

80.    Answering Third Party Defendant incorporates paragraphs 1 through 79 above as is fully set forth herein.

81.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

82.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

83.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

84.    Denied. The allegations contained herein are denied as conclusions of law to which no responsive pleadings are required.

### COUNT VIII

85.    Answering Third Party Defendant incorporates paragraphs 1 through 84 above as is fully set forth herein.

86-89. The allegations contained herein are directed toward a party other than the answering Third Party Defendant and no response is required.

### FIRST AFFIRMATIVE DEFENSE

90.    Third Party Plaintiff's Complaint fails to state a claim  upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

91.    Plaintiffs' causes of action are barred in whole or in part by the applicable statue of limitations.

### AFFIRMATIVE DEFENSE

92.    Plaintiffs' causes of action may be barred in whole or in part by the execution of a general release.

### THIRD AFFIRMATIVE DEFENSE

93.    Plaintiffs' causes of action are barred in whole or in part by the assumption of a known risk and/or contributory negligence.

### FOURTH  AFFIRMATIVE DEFENSE

94.    Plaintiffs' causes of action are barred in whole or in part by the provisions of the Delaware Comparative Negligence Act.

### FIFTH  AFFIRMATIVE DEFENSE

95.    If Plaintiffs sustained the injuries as alleged in their Complaint, which is herein strictly denied, then they were caused by the acts or omissions of entities/individuals over which/whom answering Defendant had no control nor legal duty to control.

### SIXTH  AFFIRMATIVE DEFENSE

96.    At all times material hereto, answering Third Party Defendant acted with due care and proper care under the circumstances.

### SEVENTH AFFIRMATIVE DEFENSE

97.    Plaintiffs have failed to mitigate their damages.

### EIGHTH AFFIRMATIVE DEFENSE

98.    If Plaintiff sustained injuries as alleged in her Complaint, which is herein strictly denied, Plaintiff's injuries were caused by a fellow servant.

### NINETH AFFIRMATIVE DEFENSE

99.    Third Party Plaintiff's claims are precluded in whole or in part by the provisions of Delaware Worker's Compensation Statute.

### TENTH AFFIRMATIVE DEFENSE

100.    Third Party Plaintiff's claims are precluded in whole or in part by the provisions of 6 Del. C. § 2704.

WHEREFORE, Answering Third-Party Defendant Delaware Heating and Air Conditioning requests that judgment be entered it his favor and against all other parties.

### CROSS CLAIM AGAINST DEFENDANT/THIRD-PARTY PLAINTIFF

### JD FRAMING CONTRACTORS, INC

101.    Answering Third-Party Defendant incorporates paragraphs 1-100 above as if fully set forth herein.

102.    The Answering Third- Party Defendant denies that it is liable to the Third-Party Plaintiff in any respect. However, in the event that the answering Defendant is held liable to the

Plaintiff, then it cross-claims against the co-defendant, JD Framing Contractors, Inc., on the grounds that the conduct of Co-defendant, weas the primary cause of the damage sustained by the Plaintiff and that the answering Third-Party Defendant, if liable at all, is only secondarily liable. The answering Third-Party Defendant, Delaware Heating and Air Conditioning, therefore is entitled to indemnification from the Co-defendant.

103.    In the event that the answering Third-Party Defendant is held primarily liable to the Third-Party Plaintiff, then the wrongful acts of the Co-defendant, JD Framing Contractors, Inc., are contributing causes of the damages sustained by the Third-Party Plaintiff and the answering Third-Party Defendant is entitled to contribution in any amount which he may be required to pay to the Third-Party Plaintiff as a result of the Co-defendant, JD Framing Contractors, Inc.'s wrongful acts, based on the relative degrees of fault determined pursuant to the provisions of Delaware's Uniform Contribution Among Tortfeasor's Law, 10 Del. C. § 6308.

WHEREFORE, Answering Third-Party Defendant Delaware Heating and Air Conditioning requests that judgment be entered it his favor and against all other parties.

**REGER RIZZO KAVULICH & DARNALL LLP**
/s/Louis J. Rizzo, Jr., Esquire
Louis J. Rizzo, Jr., Esquire (DE ID# 3374)
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302) 652-3611
Attorney for Third-Party Defendant, Delaware
Heating and Air Conditioning

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ROBERT KEMPSKI, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.: 06-252 KAJ |
| | ) | |
| v. | ) | |
| | ) | |
| TOLL BROS., INC. | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| TOLL BROS., INC. | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE HEATING AND AIR | ) | |
| CONDITIONING SERVICES, INC., and | ) | |
| JD FRAMING CONTRACTORS, INC. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I, the undersigned, do hereby certify on this 10th day of October, 2006 that two true and correct copies of the foregoing Answer to Complaint with Affirmative Defenses have been served by ECF/PACER upon the following:

Joseph J. Rhoades, Esquire
1225 King Street, Suite 1200
P.O. Box 874
Wilmington, DE 19899-0874

Michael Kelly, Esquire
McCarter & English
919 North Market Street, Suite 1800
P.O. Box 111
Wilmington, DE 19899

Erica Finnegan, Esquire
Cross & Simon LLC
913 N. Market Street, 11th Floor
Wilmington, DE 19899-1380

**REGER RIZZO KAVULICH & DARNALL LLP**

_/s/Louis J. Rizzo, Jr., Esquire_

Louis J. Rizzo, Jr., Esquire (DE ID# 3374)
1001 Jefferson Plaza, Suite 202
Wilmington, DE 19801
(302)  652-3611
Attorney for Third-Party Defendant, Delaware
Heating and Air Conditioning

# EXHIBIT F

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

**H**
West Willow-Bay Court, LLC v. Robino-Bay Court
Plaza, LLC
Del.Ch.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware,New Castle County.
WEST WILLOW-BAY COURT, LLC, a Delaware
limited liability corporation, Plaintiff,
v.
ROBINO-BAY COURT PLAZA, LLC, a Delaware
limited liability corporation, and Robino-Bay Court
Pad, LLC, a Delaware limited liability corporation,
Defendants.
**C.A. No. 2742-VCN.**

Submitted: June 19, 2007.
Decided: Nov. 2, 2007.

Peter J. Walsh, Jr., Esquire and Jennifer A.
Chamagua, Esquire of Potter Anderson & Corroon
LLP, Wilmington, Delaware; Louis S. Wiener, Es-
quire of Sutherland Asbill & Brennan LLP, Wash-
ington, DC, Attorneys for Plaintiff.
Steven M. Yoder, Esquire, Peter B. Ladig, Esquire,
Scott G. Wilcox, Esquire, and Stephen B. Brauer-
man, Esquire of The Bayard Firm, P.A., Wilming-
ton, Delaware, Attorneys for Defendants.

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor.

**I. INTRODUCTION**

\*1 Judges are frequently called upon to read and
apply contracts. Their goal is to find the common,
shared intent of the contracting parties. They are in-
structed, however, not to consider extrinsic evid-
ence unless the contract is ambiguous-reasonably
susceptible of two (or more) plausible interpreta-

tions. In addition, extrinsic evidence may not be
used in determining whether the contract is ambigu-
ous. This case requires the application of those two
venerable principles. The contract at issue, hardly
the proverbial model of clarity, is not easy to read,
but it is not ambiguous. That conclusion ultimately
prevents the Court from considering the extrinsic
evidence that arguably would have led to a different
result. In short, this case tests how far a court
should go to avoid an outcome required by a fair
reading of the agreement, although one that may
not implement an intent shared by both parties.

This action arises out of a purchase agreement (the
"Purchase Agreement") between Plaintiff West
Willow-Bay Court, LLC ("West Willow") and De-
fendant Robino-Bay Court Plaza, LLC
("Robino-Bay Court"). The purpose of the Purchase
Agreement was to transfer a pad site (the
"Property"), currently owned by Defendant Robino-
Bay Court PAD, LLC,[FN1] at the Bay Court Plaza
Shopping Center (the "Shopping Center") in Dover,
Delaware to West Willow so that West Willow
could lease the Property to Wawa, Inc. ("Wawa")
for the development of a Wawa convenience store
with gasoline service (the "Proposed Wawa"). West
Willow asserts that Robino has failed to obtain a
third party consent to its proposed project required
under the Purchase Agreement, as amended (the
"Amended Purchase Agreement"), and asks for spe-
cific performance. The parties' chief disputes con-
cern the nature of Robino's obligation to secure the
third party consent under the Amended Purchase
Agreement and the suitability of specific perform-
ance as a remedy. They have filed cross-motions
for summary judgment.

FN1. For convenience, "Robino" is used at
times to refer to both Robino-Bay Court
and Robino-Pad.

**II. BACKGROUND**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

A. *The Shopping Center and the Value City Lease*

Robino-Bay Court acquired the Shopping Center in 1997.[FN2]Michael Stortini, a managing member of Robino-Bay Court and a twenty percent equity owner, led Robino's efforts in the acquisition.[FN3]At the time, the Shopping Center had approximately a half-dozen tenants, including the department store Value City.[FN4]As part of the acquisition, Robino-Bay Court assumed the leases then in effect, including Value City's lease.[FN5]

> FN2.*See* Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Deposition of Michael Stortini 12 (hereinafter "Stortini Dep.").

> FN3.*See id.* 7, 8, 12.

> FN4.*See id* 13.

> FN5.*Id.* 13-14.

Executed in 1976, Value City's lease (the "Value City Lease") addresses, among other things, future development in the Shopping Center.[FN6]Article XXIV provides:

> FN6.*See* Stortini Dep., Ex. 1, at Art. XXIV (the Value City Lease). When the lease was entered into in 1976, the premises housed a Wilmington Dry Goods department store.

[N]either Lessor, its principal officers nor its shareholders will by sale or lease of any parcel of the land acquired in connection with any contemplated development of the Exhibit A shopping center or now existing and acquired to any person, firm or corporation permit any construction other than as shown on Exhibit A on such parcel by Lessor or the purchaser or lessee thereof, or his agents, lessees or transferees, without the consent of the Lessee, not to be unreasonably withheld. Said restriction shall be subject to Exhibit A, attached hereto. Any permitted building shall be no more than one story in height and shall only have normal commercial signs.

*2 Thus, certain improvements in the Shopping Center were subject to Value City's prior consent, a consent that it could not unreasonably withhold. "Exhibit A" is an attachment depicting a proposed bank and liquor store at the front of the Shopping Center tract.[FN7]After the Value City Lease was executed, a liquor store was constructed on the proposed liquor store pad but has since been torn down. The Proposed Wawa would be erected where the liquor store was located. The Value City Lease, with extension options, expires on April 30, 2016.[FN8]

> FN7.*Id.* Ex. 1, at Ex. A. For convenience, this exhibit will be referred to hereinafter as "Exhibit A."

> FN8.*Id.,* at Third Amendment to Lease Agreement.

B. *The Plan to Develop Further the Shopping Center*

Seneca Properties ("Seneca") managed the Shopping Center for Robino in 2002.[FN9] Although Seneca was not directed to find potential buyers for property at the Shopping Center, Seneca's President, Marc Geffroy, mentioned to Thomas McKee at a trade show that a pad (the Property) was available at the Shopping Center.[FN10]McKee is the principal of West Willow Development LLC, which in turn owns West Willow, and is its sole employee, responsible for its real estate development activities.

> FN9. Stortini Dep. 24-25.

> FN10. Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Deposition of Thomas McKee 10-12 (hereinafter "McKee Dep."); *see* Stortini Dep. 24-25.

After inspecting the site, McKee told Geffroy that West Willow was interested in acquiring the Property because it might be a good location to relocate an existing Wawa convenience store, which did not have gas dispensing capabilities; a store located at the Shopping Center could have gasoline

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 3

FN11

> FN11. McKee Dep. 11-12.

As the result of preliminary discussions, West Willow, on September 10, 2003, sent Robino a letter of intent, outlining the terms under which it would purchase the Property.[FN12] The letter related that West Willow intended to transfer the Property to Wawa, by ground lease, for the construction of a Wawa store with gasoline service.[FN13] The letter did not create a binding obligation, but it did contemplate a later purchase and sale agreement. Stortini, in response, signed the letter on Robino's behalf.[FN14] Negotiations ensued, and the parties entered into the Purchase Agreement on February 11, 2004.[FN15]

> FN12. See McKee Dep. Ex. 1 (letter of intent); McKee Dep. 13-14.

> FN13. McKee Dep. 15-16.

> FN14. See McKee Dep. Ex. 1, at 6.

> FN15. See McKee Dep. 10; Stortini Dep. Ex. 3, at 20 (the Purchase Agreement). While negotiating with West Willow about the Property, Robino was also discussing the possibility of developing a Buffalo Wild Wings restaurant on the other pad site at the front of the Shopping Center with another party. Stortini Dep. 27.

C. The Purchase Agreement

Under the Purchase Agreement, Robino agreed to sell and West Willow agreed to purchase the Property for $575,000, provided that certain conditions were met, again with the understanding that West Willow intended to develop the property for use as a Wawa store with gasoline service.[FN16] West Willow was required to make a $25,000 deposit, as well as "procure[ ] ... all permits, licenses, variances, and approvals that Purchaser [West Willow] deems necessary or desirable to permit Purchaser to construct and operate" the Proposed Wawa.[FN17] In

turn, Robino was to secure the Property's subdivision from the Shopping Center and to obtain the rezoning that would permit construction of a gas station on the Property.[FN18]

> FN16. See Purchase Agreement.

> FN17. Id. at §§ 2, 7(b)(ii). Subsection 7(b)(ii) provides as follows:

>> For purposes hereof, the term "Purchaser Approvals" means and includes (A) the procurement of all permits, licenses, variances, and approvals that Purchaser deems necessary or desirable to permit Purchaser to construct and operate Purchaser's Retail Store, including, without limitation, any and all approvals pertaining to site plan approval, buildings, site work, occupancy, signs (including, without limitation, buildings signs and a pylon sign), curb cuts (including a curb cut on Route 113), driveways (including ingress and egress to public thoroughfares), wetlands and environmental matters and all DOT and local traffic permits and approvals, and (B) all building permits for Purchaser's Retail Store and other portions of the Project (including fuel islands and underground fuel tanks).

> FN18. Id. at § 7(b)(i). Subsection 7(b)(i) provides:

>> For purposes hereof, the term "Seller Approvals" means and includes: (A) the subdivision or resubdivision of the Property from the balance of the land currently owned by Seller in the manner depicted on Exhibit "A", as more particularly set forth in Section 11 below; and (B) the rezoning of the property to the SC-2 classification or such other zoning classification acceptable to Purchaser which permits as a matter of right the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 4

construction and operation of a convenience gas station at the Property.

In Section 11, the Purchase Agreement addresses the issue of subdivision more fully. Section 11, as later amended, is set out in its entirety below in Part II.E.2.

If either party failed to meet the conditions contained in the Purchase Agreement within the specified time limit, West Willow could either extend the time for performance by a total of 180 days or terminate the agreement and reclaim its deposit.FN19If West Willow elected to extend the agreement and the parties again failed to meet all the conditions, West Willow would have the option of either waiving the conditions or terminating the Purchase Agreement.

FN19.*See id.* at § 7(b)(vi).

*3 In effect, the Purchase Agreement, as originally executed, gave West Willow an option to buy the Property. Although Robino was obligated to use "due diligence and good faith efforts" to secure subdivision and rezoning, West Willow was free to terminate the Purchase Agreement if it could not obtain any "desirable" permit, license, variance or approval. The original agreement contained no express provision for third party consents and did not address the rights of Value City.FN20

FN20. Although the Purchase Agreement, as originally executed, did not include a term explicitly addressing third party consents, it did feature provisions that could arguably be read to encompass the Value City consent. For instance, the Purchase Agreement's Section 7, setting forth conditions precedent to closing, includes as a condition precedent the truth and accuracy of Robino's warranties and representations. *See* Purchase Agreement at § 7(d)(ii). Looking to Section 10, which sets forth those warranties and representations, at least two could be tenably read to touch

upon the Value City Lease's consent provision. First, subsection 10(n) requires Robino to represent that "[t]here are no agreements or understandings (whether written or oral) relating to the Property" except for certain listed (and not applicable) exceptions. Second, section 10(p) requires Robino to represent that it "has made no commitments to any ... third party ... to subject the Property to any restrictions."The Purchase Agreement provides that the consequence of failure of a condition precedent is the agreement's termination (and Robino's return of West Willow's deposit less $100).*See id.* at § 7 (e). These contractual provisions were not expressly revised by amendment of the Purchase Agreement.

**D. *The Wawa Lease***

West Willow entered into a land lease agreement with Wawa (the "Wawa Lease") on June 30, 2004.FN21The Wawa Lease originally provided that Wawa would construct a convenience store with gasoline service on the Property and thereafter begin paying rent to West Willow.FN22Subject to certain conditions, West Willow was responsible for obtaining "all zoning, construction and other land development approvals and permits, including, without limitation, a building permit, and all use approvals and permits ..., necessary for [Wawa] to construct, use and operate ... a retail food market and gasoline dispensing facility in accordance with [Wawa's] plans...."FN23 If West Willow failed to obtain the necessary permits and approvals by June 30, 2005, Wawa or West Willow could terminate the lease agreement. No mention was made of third party tenant consents in the Wawa Lease.

FN21.*See* McKee Dep. Ex. 3 (the Wawa Lease).

FN22.*Id.* at ¶¶ 5-6.

FN23.*Id.* at ¶ 6.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

E. *The Subdivision Approval Process and Amendment of the Purchase Agreement*

1. *The City's Conditional Approval*

After executing the Purchase Agreement, Robino and West Willow began working to obtain the approvals, submitting applications for site plan and subdivision approval to the City of Dover (the "City"). Robino submitted the plans for the Property at the same time it submitted plans for the adjacent Buffalo Wild Wings restaurant. By then, Robino had already entered into a ground lease agreement with Buffalo Wild Wings.

Although the City initially approved the site plan application in November 2004, and extended the final approval deadline until November 30, 2006, the subdivision approval process met with difficulties. The City informed the parties on October 26, 2004, that it would not approve Robino's application for subdivision in its original form. Instead, the City conditioned subdivision approval on Robino's granting a cross access easement in favor of the owners of adjacent parcels.[FN24]

> FN24.*See* Defs.' Opening Br. in Supp. Mot. for Summ. J., Affidavit of Stephen Brauerman Ex. 7 (hereinafter "Brauerman Aff.") (letter from the City's Planning Commission).

Because Robino estimated the easement's value to be some $1.5 million, it regarded the City's conditional approval as an effective denial of the subdivision plan.[FN25]Accordingly, Robino notified West Willow, by letter dated December 16, 2004, that it wished to terminate the Purchase Agreement.[FN26] West Willow responded on December 30, informing Robino that it was willing to cooperate in opposing the City's easement requirement, but in any event Robino did not have the right to terminate the Purchase Agreement.[FN27] That exchange prompted further discussions between Robino and West Willow. As the result of negotiations in early 2005, Robino agreed to grant the easement in exchange

for an increase in the purchase price from West Willow and a rent increase from the Buffalo Wild Wings restaurant.[FN28]At the same time, West Willow raised concerns about Value City's consent to the Proposed Wawa. Stortini, before the Second Amendment was executed, did not anticipate that securing Value City's consent would be a problem.[FN29]Thus, West Willow's concerns were addressed in the same negotiations that resolved the access easement question and resulted in an increased purchase price.

> FN25. Stortini Dep. 61; McKee Dep. Ex. 4 (letter from Robino's attorney).

> FN26. McKee Dep. Ex. 4.

> FN27.*See* Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Deposition of Douglas Hershman Ex. 1 (hereinafter "Hershman Dep.") (letter from West Willow's attor- ney).

> FN28.*See* Stortini Dep. 62-63.

> FN29.*See id.* 63-64 (''[I]f required, we could get [Value City's] consent, and if not required, [West Willow] could go ahead and build ....).

2. *The February Letter and the Second Amendment to the Purchase Agreement*

*4 By letter dated February 28, 2005, addressed to Stortini (the "February Letter"), West Willow set out the terms under which the parties had agreed to move forward with transferring the Property and obtaining subdivision approval.[FN30] The letter, though sent by McKee, contained language in large part provided by one of West Willow's attorneys.FN31In the February Letter, West Willow agreed to increase the purchase price to $725,000. In exchange, Robino would

> FN30.*See* Brauerman Aff. Ex. 10 (the February Letter).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

FN31. McKee Dep. 44-46; *see* Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Deposition of Mark Jackson 62-63 (hereinafter "Jackson Dep.").

[R]emain expressly responsible for using its best efforts to obtain, at its sole cost and expense, any and all consents and approvals from all third parties, including existing tenants and lenders, necessary or desirable for Purchaser's [West Willow's] acquisition of the Property and the development and intended use of the Property as a Wawa convenience store with gasoline service and such other amenities as Wawa desires. These consents and approvals include, but are not limited to, final subdivision and site plan approvals from the City of Dover; accordingly, Seller [Robino-Bay Court] shall grant such easements and/or cross-access agreements required by the city, county or state (including specifically, DelDOT) and promptly and fully satisfy, at its sole cost and expense, all other conditions precedent to the subdivision and site plan approval.[FN32]

FN32. Brauerman Aff. Ex. 10 at 1.

The February Letter was not to be binding; instead, a binding agreement would take effect only upon the execution of a formal amendment to the Purchase Agreement.[FN33]Stortini signed the February Letter on Robino's behalf and returned it to West Willow.

FN33.*Id.* at 1.

West Willow's attorneys eventually prepared a Second Amendment to the Purchase Agreement (the "Second Amendment")[FN34] and sent it to Robino for execution.[FN35]Acting for Robino, Stortini executed the Second Amendment on April 5, 2005, without consulting counsel, believing that it merely formalized the terms of the February Letter.[FN36]Specifically, Stortini expected that the Second Amendment would only obligate Robino to use "best efforts" to obtain Value City's consent, if obtaining Value City's consent was

Between Robino's receipt of the February Letter and the execution of the Second Amendment, the parties had not negotiated or discussed terms.[FN38]As executed, the Second Amendment reads, in pertinent part:

FN34. Brauerman Aff. Ex. 11 at ¶ 2(b) (hereinafter the "Second Amendment"). The First Amendment to the Purchase Agreement altered terms not related to the present controversy.

FN35. Jackson Dep. 72-73.

FN36.*See* Stortini Dep. 68-69, 71-72.

FN37. Stortini Dep. 70-71.

FN38. McKee Dep. 48; *see* Jackson Dep. 73.

Anything contained herein to the contrary notwithstanding, Seller shall remain expressly responsible for obtaining, at its sole cost and expense, any and all consents and approvals from all third parties necessary or desirable for Purchaser's acquisition of the Property and the development and use of the Property as a Wawa convenience store with gasoline service and such other amenities as Wawa desires. These consents and approvals include, but are not limited to, final subdivision and site plan approvals from the City of Dover as contemplated above. Accordingly, Seller specifically covenants and agrees to grant such easements and/or cross-access easements required by the city, county or state (including specifically, DELDOT) and to promptly and fully satisfy, at its sole cost and expense, all other conditions precedent to the subdivision and site plan approval.... Seller shall use due diligence and its best efforts to fully satisfy all of the requirements set forth in this paragraph as soon as possible.
*5 The Second Amendment further provides:

In the event Seller for any reason fails to deliver and procure any and all necessary approvals for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Purchaser's intended use of the Property as a Wawa convenience store with gasoline service as aforesaid and/or to fully and timely satisfy all conditions precedent thereto, Purchaser shall be entitled to exercise any of its rights at law, in equity or under this Agreement (including, without limitation, the right to specific performance and/or monetary damages), without regard to any contractual limitations.

When integrated into the Purchase Agreement, the Second Amendment amended Section 11 to read, in germane portion, as follows:

11. *Subdivision.*[FN39] [1] The parties acknowledge that the Shopping Center currently consists of a single lot recognized only by preliminary subdivision. [2] In this regard, following the expiration of the Inspection Period, *Seller shall, at its sole cost and expense, use due diligence and good faith efforts to cause the Shopping Center to be subdivided or resubdivided so that (i) the Property shall become a single and separately subdivided and recorded lot or parcel for all purposes and (ii) the Property shall have the configuration substantially as shown on the Site Plan attached hereto.*[3] All documents to be submitted by Seller to governmental authorities in connection with such subdivision effort after the Effective Date shall be subject to Purchaser's prior review and written approval....

FN39. The bracketed numbers are used for ease of reference to the various sentences of Section 11 as amended ("Amended Section 11"). Although Amended Section 11 carries the caption of "Subdivision," it is not limited to subdivision matters, and the Purchase Agreement contains a provision that captions are for "reference purposes" only. *See* Purchase Agreement § 27.

[4] Purchaser covenants to respond to any to any request for consent to any subdivision documents within ten (10) business days.... [5] In the event

Purchaser is unwilling to consent ... then either Purchaser or Seller may terminate this Agreement.... [6] Seller covenants that it shall not voluntarily pursue or advocate any subdivision ... which would impose conditions upon the Property which would require Purchaser to seek a variance to construct or operate the Project or would otherwise adversely affect ... Purchaser's ability to procure all Approvals or to construct or operate the project. [7] Seller shall notify Purchaser upon the date the subdivision of the Property has been finally completed.... [8] [FN40] *Anything contained herein to the contrary notwithstanding, Seller shall remain expressly responsible for obtaining, at its sole cost and expense, any and all consents and approvals from all third parties necessary or desirable for Purchaser's acquisition of the Property and th e development and use of the Property as a Wawa convenience store with gasoline service and such other amenities as Wawa desires.*[9] These consents and approvals include, but are not limited to, final subdivision and site plan approvals from the City of Dover as contemplated above. [10] Accordingly, Seller specifically covenants and agrees to grant such easements and/or cross-access easements required by the city, county or state (including specifically, DELDOT) and *to promptly and fully satisfy,* at its sole cost and expense, *all other conditions precedent to the subdivision and site plan approval.*[11] The foregoing obligations include, without limitation, the obligation (i) to cause to be instated the proceedings in the City of Dover for Minor Subdivision Plan approval ..., as well as the proceedings in the City of Dover for Site Plan Approval ..., [and] (ii) to fully satisfy all conditions imposed as outlined in the Development Advisory Committee Report.... [12] *Seller shall use due diligence and its best efforts to fully satisfy all of the requirements set forth in this paragraph as soon as possible.*

FN40. The Second Amendment deleted the final two sentences of the original Section 11 and substituted its text. Sentence 8 is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

the first sentence with its language supplied by the Second Amendment.

*6 [13] *In the event Seller for any reason fails to deliver and procure any and all necessary approvals for Purchaser's intended use* of the Property as a Wawa convenience store with gasoline service as aforesaid and/or to fully and timely satisfy all conditions precedent thereto, Purchaser shall be entitled to exercise any of its rights at law, in equity or under this Agreement (including, without limitation, the right to specific performance and/or money damages), without regard to any contractual limitation.[FN41]

> FN41.*See* Purchase Agreement (emphasis added); Second Amendment (emphasis added).

Significantly, the "best efforts," language of the February Letter, describing the nature of Robino's obligation to obtain third party consents, does not appear in the Second Amendment.

### 3. *Subdivision Approval*

With the Second Amendment in place, Robino executed an easement agreement satisfying the conditions the City had placed on subdivision approval in October 2005.[FN42]Although the City eventually approved the subdivision application, because the necessary approvals had not been obtained by summer 2005 as required by the original Wawa Lease, West Willow and Wawa had executed a First Amendment to the Wawa Lease.[FN43]The amendment gave West Willow an additional 180 days to secure the necessary permits and approvals.

> FN42. Brauerman Aff. Ex. 12 (the Access Easement Agreement); Stortini Dep. 60.

> FN43. Pl.'s Opening Br. in Supp. of Mot. for Summ. J., Deposition of Alexander Krowzow 22; (hereinafter "Krowzow Dep."); Krowzow Dep. Ex. 2 (First Amendment to Wawa Lease).

### F. *Value City*

#### 1. *West Willow's Concerns About Value City*

As noted above, early in the approval process, McKee learned from Geffroy that Value City might be able to object to the Proposed Wawa based on the terms of its lease with Robino-Bay Court.[FN44]In 2004, McKee discussed Value City's rights under the lease with both Geffroy and Robino's counsel overseeing the subdivision process. Geffroy, on behalf of Robino, wrote Value City's President, Edward Arndt, on September 20, 2004, requesting that Value City approve the Proposed Wawa.[FN45]Arndt responded, declining to give Value City's consent to the proposed sale of the Property and the Proposed Wawa. [FN46]

> FN44. McKee Dep. 28-29.

> FN45. Stortini Dep. Ex. 5.

> FN46.*Id.*

From 2004 to 2006, Stortini had numerous conversations with Geffroy about securing Value City's consent.[FN47]Geffroy wanted to get Value City's consent, but Stortini did not consider it necessary .[FN48]

> FN47. Stortini 46.

> FN48.*Id.*

After execution of the Second Amendment to the Purchase Agreement and the First Amendment to the Wawa Lease, West Willow began pressing Robino on the Value City consent.[FN49]In an email dated September 21, 2005, McKee told Tom Cekine, a Robino project manager, that West Willow was "running into a real time crunch with regard to its delivery requirements with Wawa."[FN50]

> FN49.*See, e.g.,* Stortini Dep. Ex. 11 (email ascertaining the status of Value City's consent).

> FN50.*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 9

On December 23, 2005, West Willow and Wawa executed a Second Amendment to the Wawa Lease, extending the permit and approvals period to June 30, 2006.[FN51] At the time, Wawa was not aware of West Willow and Robino's difficulties in securing Value City's consent or of what was preventing West Willow and Robino from closing on the Property. Instead, Wawa executed the Second Lease Amendment in order to give itself more time to secure municipal approvals.[FN52]

> FN51. Krowzow Dep. Ex. 3 (Second Amendment to Wawa Lease).

> FN52. Krowzow Dep. 32-34.

*7 In discussions in early 2006, Robino informed West Willow that it did not think Value City's consent was necessary.[FN53]In addition, Robino's attorneys were afraid that Value City might attempt to "take advantage of the situation." [FN54]Robino based its opinion that Value City's consent was unnecessary on two considerations. First, because the Value City Lease permitted the two stores in the parking lot of the Shopping Center, delineated in Exhibit A, and the Proposed Wawa was to be built on one of the sites set forth in Exhibit A (the proposed liquor store site), Robino believed Value City did not have a right to obj ect.[FN55]Second, a Buffalo Wild Wings restaurant had been constructed, opened, and operated without Value City's protest, on the site of the proposed bank shown in Exhibit A.[FN56]

> FN53. Stortini Dep. 78-79; see Hershman Dep. 31-33.

> FN54. Hershman Dep. 32.

> FN55. Hershman Dep. 27-31, 34-36; see Stortini Dep. 27-28. See also Exhibit A (depicting a proposed bank and liquor store on outer pads in the Shopping Center); text accompanying supra notes 7-8 (describing Exhibit A).

> FN56.See Stortini Dep. 27-28, 40; Hersh-

man Dep. 34.

Nonetheless, by May 10, 2006, West Willow had made clear that it believed Value City's consent was necessary. In an email sent that day, West Willow's attorney informed Robino's attorney that it interpreted the Value City Lease to require Value City's consent.[FN57]

> FN57.See Hershman Dep. Ex. 3.

Eventually, Robino and West Willow "agreed to disagree" over whether or not Value City's consent was necessary. Nevertheless, Robino's attorney agreed to seek it, although he was not aware that Geffroy had unsuccessfully approached Value City some two years earlier.[FN58]

> FN58.See Hershman Dep. 18-19, 31-33, 70-71. Robino had terminated its relationship with Seneca and Geffroy in 2004. Stortini Dep. 30-31.

West Willow and Wawa executed a Third Amendment to the Wawa Lease around June 30, 2006, which extended the permit period to December 31, 2006.[FN59]At this point, Wawa was aware that Value City's withheld consent was preventing Robino and West Willow from closing on the Property.

> FN59. Krowzow Dep. Ex. 4 (Third Amendment to Wawa Lease).

2. Negotiations with Value City

Robino asked for Value City's consent in a letter dated July 10, 2006.[FN60] Fearing that the proposed Wawa would reduce Value City's visibility, Arndt withheld consent in a letter dated July 13, 2006, but mentioned that Value City might be more amenable if Robino would renovate Value City's exterior storefront, provide it with lease renewal options and release a third party, a Value City affiliate, from liability under the lease.[FN61]Robino and Value City then engaged in another round of correspondence, Robino arguing that Value City was unreasonably

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 10

withholding its consent and Value City reiterating its previous position.

> FN60. Brauerman Aff. Ex. 14 (letter from Robino's attorney).

> FN61. Brauerman Aff. Ex. 15 (Arndt's response).

Because Robino found Value City's conditions unacceptable, it informed West Willow's attorney that it could not obtain Value City's consent. In reply, West Willow's attorney objected that Robino had failed to use its best efforts, stating, "[p]ursuant to the terms of the Second Amendment, Robino is specifically obligated to use its best efforts, which it has not done, to obtain any third party consent that West Willow deems desirable."[FN62]

> FN62. Brauerman Aff. Ex. 19 (West Willow's attorney's response).

After receiving West Willow's letter, Robino approached Value City again. Robino offered Value City $75,000 toward the construction of a new storefront façade, as well as to extend the Value City Lease for two additional five-year terms at $5.75 per square foot.[FN63] Robino also offered to release the third party affiliate.[FN64] Value City countered, proposing that Robino offer it a termination fee "in the millions" in exchange for terminating the lease.[FN65] After several negotiation sessions, Value City withdrew its counteroffers and on November 6, 2006, Robino informed West Willow by letter that it could not obtain Value City's consent.[FN66] West Willow did not respond.

> FN63. Brauerman Aff. Ex. 20 (email from Robino's attorney to Value City).

> FN64. Id.

> FN65. Brauerman Aff. Ex. 21 (reply email from Value City).

> FN66. Brauerman Aff. Ex. 22 (email from Robino's attorney to West Willow's attor-

ney).

*8 Value City reopened negotiations on November 7, 2006, offering to approve the Property's sale and the Proposed Wawa in exchange for a new façade, the release of the third party affiliate, and either one additional five year renewal option at $1.50 per square foot or two additional five year options, with a rental rate of $3.00 per square foot for the first option period and a rental rate of $4.00 per square foot for the second option period.[FN67]

> FN67. Brauerman Aff. Ex. 23 (email from Value City to Robino's attorney).

Robino responded by offering $100,000 toward the new storefront, agreeing to release the third party affiliate, and proposing two additional five year options of $5.00 per square foot for the first option period and $6.00 per square foot for the second option period.[FN68] The option rent rates, in Robino's opinion, were below even the then-current market rate.[FN69] By Robino's estimate, its offered concessions package had a present value of at least $650,000. Nevertheless, Value City discontinued negotiations again on November 14, 2006,[FN70] and Robino, therefore, has been unable to obtain its consent.

> FN68. Brauerman Aff. Ex. 24 (reply email from Robino's attorney to Value City).

> FN69. Id.

> FN70. Brauerman Aff. Ex. 25 (letter from Value City to Robino's attorney).

*3. Wawa's Unwillingness to Proceed Without Value City's Consent*

The permit period under the Third Amendment to the Wawa Lease expired on December 31, 2006. Although Wawa has drafted a Fourth Amendment, that document has not been executed.[FN71] Wawa has indicated that it will not close on the lease until Value City confirms that it will not object to the Proposed Wawa.[FN72]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

FN71.*See* Krowzow Dep. Ex. 45 (draft Fourth Amendment to Wawa Lease); Pl.'s Br. in Supp. of Mot. for Summ. J., Affidavit of Alexander Krowzow ¶¶ 5-6.

FN72. Krowzow Dep. 46.

### III. CONTENTIONS

West Willow asks that the Court declare (1) that Robino has breached the Amended Purchase Agreement by failing to obtain Value City's consent and by terminating its efforts to do so and (2) that West Willow is entitled to specific performance of Robino's obligation to secure Value City's consent.

### A. *The Nature of Robino's Obligation*

West Willow contends that the plain language of the Second Amendment, clear and unambiguous, imposes an unqualified obligation on Robino to obtain Value City's consent. It supports this argument by citing the Amended Purchase Agreement which provides that Robino "shall ... be expressly responsible for obtaining, at its sole cost and expense, any and all consents ... necessary or desirable for [West Willow's] acquisition of the Property and [its development and use] as a Wawa convenience store."West Willow emphasizes that under the language of the clause, Robino's obligation is not constrained by any "best efforts" language.

Conversely, Robino urges that the clear and unambiguous plain language of the Amended Purchase Agreement requires it only to use "best efforts" to obtain Value City's consent. In support, Robino contends that Sentence 2, unaltered by amendment and providing that the "Seller shall, at its sole cost and expense, use due diligence and good faith efforts" to secure subdivision approval, FN73 supports a best efforts standard. Additionally, Robino submits that Sentence 12 is not merely a timing provision but that it also qualifies Robino's obligation to obtain the consents and approvals discussed in Sentence 8, requiring Robino only to use its best efforts to secure Value City's consent.FN74

FN73. Purchase Agreement at § 11.

FN74. Sentence 12 states that "Seller shall use due diligence and its best efforts to fully satisfy all the requirements set forth in this paragraph as soon as possible."

*9 Finally, Robino argues in the alternative that if Amended Section 11 is found to be ambiguous, the extrinsic evidence supports a best efforts standard. West Willow answers that the extrinsic evidence supports an unconditional obligation.

### B. *Robino's Conformity with the Amended Purchase Agreement*

Robino maintains it has met its best efforts obligation under the Amended Section 11 by attempting to secure Value City's consent.FN75 West Willow, in turn, argues that the governing standard is unconditional, and that because Robino has failed to secure Value City's consent and is not taking any further action toward that end, Robino has breached the Amended Purchase Agreement.

FN75. Robino argues that its negotiations with Value City, culminating in an offer to provide concessions that Robino values at $650,000, constituted best efforts. The question of whether Robino exercised its best efforts has not been submitted for the Court's consideration.

### C. *The Suitability of Specific Performance as a Remedy*

Finally, if Robino is held to have breached the Amended Purchase Agreement, the parties dispute specific performance's appropriateness as a remedy. West Willow argues that specific performance is appropriate because the sale of real property is at issue. Robino replies that specific performance is inappropriate because West Willow has an adequate remedy at law; an order of specific performance would include a personal services component; and finally, crafting a specific performance order in this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 12

case would necessarily entail a great deal of the Court's supervision.

## IV. ANALYSIS

A. *Standard Applicable on Cross-Motions for Summary Judgment*

Court of Chancery Rule 56 governs motions for summary judgment.[FN76]Where, as here, the parties have filed cross-motions for summary judgment without presenting argument that an issue of material fact exists with regard to either motion, Court of Chancery Rule 56(h) d irects "the Court [to] deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[FN77]

> FN76.*O'Neill v. Town of Middletown*, 2007 WL 1114019, at *5 (Del. Ch. Mar. 29, 2007).

> FN77. Ct.  Ch.  R.  56(h); *see O'Neill* , 2 007 WL  1114019,  at  *5  n.  34  (noting  that Court of Chancery Rule 56(h)"treats cross-motions for summary judgment in the absence of identified factual issues as the practical equivalent of a stipulation for decision on the merits based on the record submitted ...").

B. *Some General Principles*

Determining the nature of Robino's obligation under the Purchase Agreement to obtain Value City's consent is the crux of this matter and an exercise in contract interpretation. The proper interpretation of a contract, although analytically a question of fact, is considered a question of law.[FN78]

> FN78.*Pellaton v. Bank of New York*, 592 A.2d at 473, 478 (Del.1999).

The goal of contract interpretation is to ascertain the shared intention of the parties.[FN79]Contracts must be construed as a whole.[FN80]Where contract language is "clear and unambiguous," the ordinary and usual meaning of the chosen words will generally establish the parties' intent.[FN81]The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities  that  have  engaged  in  arms-length  negotiations.[FN82]Only where contract language is ambiguous will a court consider extrinsic evidence in interpreting an agreement,[FN83] and a court will not disturb a bargain because, in retrospect, it appears to have been a poor one.[FN84]

> FN79.*E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985).

> FN80.*Nw. Nat'l Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.1996)."[T]he meaning  which  arises  from  a  particular  portion of an agreement cannot control the meaning of the entire agreement where such inference  runs  counter  to  the  agreement's overall  scheme  or  plan."*Shell Oil Co.,*  498 A.2d at 1113.

> FN81. Delaware adheres to the objective theory of contracts, under which it is presumed that contract language governs in the absence of ambiguity. *Progressive I nt'l Corp. v. E.I. du Pont de Nemours & Co.,* 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002). Under the objective theory of contract,  " 'intent does not invite a tour through [a party's] cranium, with [the party] as the guide.' " *Id.* (quoting E. ALLAN  FARNSWORTH,  CONTRACTS  § 3.6 (2d ed.2000)).

> FN82. It should be noted that both parties' are sophisticated entities and their agents are  sophisticated  businesspersons.  They both have had extensive experience in real estate development and both have had ample access to counsel. It is a basic principle of contract law that a person is bound

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

by the terms of a contract he signs, even if he has not read the agreement or is otherwise unaware of its terms. *See Graham v . State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 913 (Del.1989); *see also Pellaton,* 592 A.2d 473 (Del.1991) (enforcing contract terms despite the signing party's assertion that he did not read the document before signing). Thus, Robino's suggestion that Stortini executed the Second Amendment without having first scrutinized its terms is unavailing. Also, that Stortini executed the agreement without the advice of counsel is of little moment: there is no general requirement that contracts be executed under the guidance of counsel, especially when the signor is a sophisticated businessperson like Stortini.

FN83.*E.g., NAMA Holdings v. World Mkt. Ctr. Venture, LLC,* 2007 WL 2088851, at *6 (Del. Ch. July 20, 2007).

The Delaware Supreme Court has declared that if a contract "is *clear and unambiguous* on its face," a court may not consult extrinsic evidence in interpreting its provisions. *Pellaton,* 592 A.2d at 478 (emphasis added). In a similar vein, but employing slightly different words, this Court has stated,

When the language of a contract is *plain and unambiguous,* binding effect should be given to its evident meaning. Only where there are ambiguities may a court look to collateral circumstances; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.

*Majkowski v. Am. Imaging Mgmt. Servs., LLC,* 913 A.2d 572, 581 (Del. Ch.2006) (emphasis added). Hence, in determining whether to turn to extrinsic evidence, Delaware courts are to decide at the out-

set whether or not the contract language is "clear and unambiguous" or "plain and unambiguous." Although this language seems to suggest two inquiries-first, whether the language is "clear" or "plain," and second, whether the language is "unambiguous"-the terms of art "clear and unambiguous" and "plain and unambiguous" collapse into a single query centering on "ambiguity" alone. *See, e.g., Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 (Del.1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.,* 624 A.2d 1191, 1198 (Del.1993) ("If a writing is plain and clear on its face, i.e., its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent. However, if the words of the agreement can only be known through an appreciation of the context and circumstances in which they were used a court is not free to disregard extrinsic evidence of what the parties intended. *In that situation the language used by the parties is subject to different meanings and is, thus, ambiguous, or more precisely, not reflective of the parties shared intent.*" (internal citations and quotations omitted) (emphasis added)); *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195-96 (Del.1992) ("Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."); *Carlson v. Hallinan,* 925 A.2d 506, 527 (Del. Ch.2006) ("A court may only resort to extrinsic evidence to ascertain the meaning of the contract if it is ambiguous."); *Progress-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

*ive Int'l Corp.,* 2002 WL 1558382, at *7 ("[T]he language of a contract governs when no ambiguity exists."); E. ALLAN FARNSWORTH, CONTRACTS § 7.12, at 465 (4th ed.2004) (using "clear" and "ambiguous" as antonyms); SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §§ 30:4-30:7, at 37-92 (4th ed.1999) (discussing ambiguity alone as the criterion to be employed in determining whether or not it is proper for a court to consult extrinsic evidence).

Naturally, "[t]here may be occasions where it is appropriate for the trial court to consider some undisputed background facts to place the contractual provision in its historical setting without violating this principle."*Eagle Indus., Inc.,* 702 A.2d at 1233 n. 7. "But the trial court must be careful in entertaining background facts to avoid encroaching on the basic principles [concerning extrinsic evidence] set forth herein."*Id.* A fair reading of a contract requires an understanding of the context, but that factual background cannot be allowed to serve as a substitute for extrinsic evidence and thereby divert appropriate attention from the words employed by the parties.

FN84.*See, e.g., Fed. Sav. & Loan Ins. Corp. v. Grand Forks Bldg. & Loan Ass'n,* 85 F.Supp. 248, 252 (D.N.D.1949) ( "[The] Court has no authority to re-make or re-vamp an executed contract, nor to indulge in any artificial or unreal construction in order to relieve the defendant of the seeming burdens of its contract.").

C. *The Nature of Robino's Obligation Under the Amended Purchase Agreement*

**\*10** Because the pending dispute focuses on Sentence 8 of Amended Section 11, it is worth repeating:

> Anything contained herein to the contrary notwithstanding, Seller shall remain expressly responsible for obtaining, at its sole cost and expense, any and all consents and approvals from all third parties necessary or desirable for Purchaser's acquisition of the Property and the development and use of the Property as a Wawa convenience store with gasoline service and such other amenities as Wawa desires.

A review of the sentence's component parts will be helpful in reaching an understanding of the parties' intent.

At the outset, it should be noted that Sentence 8 is given special prominence within Amended Section 11. Its introductory clause, "[a]nything to the contrary notwithstanding," allows Sentence 8 to trump any other provision that might conflict with it. No other term within Amended Section 11 benefits from a comparable booster.

As for its substantive content, Sentence 8 directs Robino to obtain "consents and approvals from all third parties necessary or desirable."This language presents two threshold issues for determination: first, is Value City a third party within the scope of the Amended Purchase Agreement, and second, is its consent necessary or desirable? A third party is simply "[o]ne not a party to an agreement, a transaction, or an action but who may have rights therein."[FN85]Value City is clearly a third party by virtue of the consent clause in its lease with Robino-Bay Court.

FN85.BLACK'S LAW DICTIONARY 1479 (6th ed.1990).

Whether or not Value City's consent is necessary or desirable is a question only a shade less facile. The Value City Lease provides that Robino-Bay Court may not cause any construction in the Shopping Center as the result of a sale other than the construction of the proposed bank and liquor store de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

picted in Exhibit A without Value City's consent, which cannot be unreasonably withheld. In construing this provision for the purposes of this litigation,FN86 Value City's consent appears to be necessary. West Willow is not seeking to develop a liquor store on the proposed pad, nor is the Proposed Wawa likely to have the same (relatively minor) effect on visibility that a liquor store would have.FN87Moreover, Wawa apparently will not go forward without Value City's consent.FN88

> FN86. The Court, of course, supplies no definitive construction of the Value City Lease; instead, it offers only a plausible reading of that agreement to the extent necessary to frame the issues before it.

> FN87. The Court takes notice that unlike liquor stores, modern convenience stores with gasoline dispensing facilities usually have towering overhead shelters above their pumps. Value City's Arndt wrote that compared to the proposed bank and liquor store depicted on Exhibit A, "[t]he Wawa Project is much larger in scope."Brauerman Aff. Ex. 15.

> FN88. If these factors do not make Value City's consent necessary, they certainly make it desirable to eliminate the risk of litigation over the Proposed Wawa under the Value City Lease.

The question "remains" of how to view the phrase, "[Robino] shall remain expressly responsible for obtaining any and all consents and contracts from all third parties necessary or desirable ."FN89The critical word, of course, is "remain." "Remain" is frequently understood to mean "staying the way it was or continuing."It can also have a meaning of "to be something yet to be shown, done, or treated."FN90

> FN89. Perhaps more to the point, the question is whether use of the word "remain" renders the key provision of the Amended

Purchase Agreement ambiguous. "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings ."*O'Brien v. Progressive N. Ins. Co.,* 785 A.2d 281, 288 (Del.2001).

> FN90.WEBSTER'S THIRD INT'L DICTIONARY 1919 (3d ed.1993).

If the first meaning was intended, the sentence firmly and without a hint of textual ambiguity establishes that the obligation to obtain the Value City consent was Robino's responsibility before the Second Amendment and continues as its responsibility after that amendment. That interpretation, of course, may be at odds with the undisputed fact that Robino never (at least before the Second Amendment) had any expressly delineated duty to obtain Value City's consent.FN91By the time of the February Letter, the parties had agreed-albeit without any formal binding resolution-that Robino would use its best efforts to obtain Value City's consent. That, however, is of little help to Robino because the history of how the parties reached the current language constitutes extrinsic evidence which cannot be used to alter the meaning of otherwise clear and unambiguous language.

> FN91. A nother possible explanation is that the parties understood from the outset that Robino was to secure third party consents and approvals other than those identified in subsection 7(b)(ii).*See supra* note 20 (discussing the original Purchase Agreement's required warranties and representations). Although extrinsic evidence cannot be used to guide the interpretation of clear and unambiguous contract language (*see Shell Oil Co.,* 498 A.2d at 113; text accompanying *supra* notes 81-84), this position also finds some support in the deposition of the West Willow attorney who drafted the Second Amendment. Jackson Dep. 72-73. In his deposition, he noted that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Robino may have been required to get Value City's consent under the original Purchase Agreement's warranties and representations section, as well as the title requirements section. Jackson Dep. 50. Additionally, he stated that the Second Amendment was designed, in part, to eliminate ambiguity, *see* Jackson Dep. 68-69, which could be argued to include underscoring the parties' understanding from the beginning that Robino was to obtain consents. Finally, he implied that the original Section 11 might have encompassed the Value City consent as well. *See* Jackson Dep. 51-52. The deposition, however, also offers support for the contrary view: addressing the Second Amendment, West Willow's attorney stated that it was intended to obligate Robino to do something more than what was originally intended. *See id.* at 65.

*11 Even if the history-showing that Robino had no prior binding obligation to obtain the consent-is used, the alternative definition of "remain" serves the necessary purpose by instructing that the job of obtaining the consent is something yet to be done by Robino, another unambiguous reading and only a slightly strained interpretation of the words.[FN92] That two separate meanings for remain can be found applicable does not make the sentence ambiguous because the ultimate result remains the same: that is, that Robino has the obligation to secure Value City's consent.

> FN92. Of course, as the Court recognizes, *supra* notes 20 (discussing the textual argument that the Purchase Agreement's required representations and warranties encompassed the Value City Lease consent clause) and 91 (discussing in passing the extrinsic evidence concerning the opinion of West Willow's attorney), there is an argument that Robino was obligated to obtain Value City's consent under the original

Purchase Agreement. It could further be asserted that if Robino was always required to obtain Value City's consent as a condition precedent to closing pursuant to the required warranties and representations, and Amended Section 11's Sentence 13 reserves all available remedies only if Robino fails to obtain necessary "approvals," that failure to obtain a required "consent" under Amended Section 11 would only invoke the original Purchase Agreement's remedy for failure to meet all conditions precedent: termination of the Purchase Agreement. The Court ultimately finds this reasoning unpersuasive because it depends on a distinction between "approvals" and "consents," terms that the Purchase Agreement itself shows the parties have used interchangeably at times. For instance, Section 11 of the original Purchase Agreement provides that "[a]ll documents to be submitted by [Robino] to governmental authorities ... shall be subject to [*West Willow's* ] prior review and *written approval.*" Purchase Agreement, at § 11 (emphasis added). Addressing those same contemplated written approvals, the very next sentence provides, "*[West Willow] covenants to respond to any request for consent* (4)27"*See id.* Thus, the fact that remedies are expressly reserved for breaches relating to "approvals" without mentioning "consents" is not of great significance.

Moreover, contrary to Robino's position, Sentence 8 is not qualified by any "best efforts," "reasonable efforts," or "good faith efforts" language.[FN93] As the *Restatement (Second) of Contracts* teaches:

> FN93. Although Sentence 8 spells out Robino's obligation clearly in regard to securing Value City's consent, in the main, Amended Section 11 is certainly not a fine example of precise contract drafting. For

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

example, a more difficult question of contract interpretation, one that is not before the Court, is what Robino's obligation was in regard to securing subdivision approval. Sentence 2 requires Robino to use "best efforts," while Sentence 8 provides, "Anything contained herein to the contrary notwithstanding, Seller shall remain expressly responsible for obtaining ... [all] approvals...." This language, particularly given the "anything to the contrary notwithstanding" clause, would arguably vitiate the express best efforts language of Sentence 2. No comparable tension within Amended Section 11 exists with respect to third party consents because only Sentence 12 deals explicitly with that topic.

Contract liability is strict liability. It is an accepted maxim that *pacta sunt servanda*, contracts are to be kept. The obligor is therefore liable in damages for breach of contract even if he is without fault and even if circumstances have made the contract more burdensome or less desirable than he had anticipated....*The obligor who does not wish to undertake so extensive an obligation may contract for a lesser one by using one of a variety of common clauses: he may agree only to use his "best efforts"; he may restrict his obligation to his output or requirements; he may reserve a right to cancel the contract; he may use a flexible pricing arrangement such as a "cost plus" term; he may insert a force majeure clause; or he may limit his damages for breach.*[FN94]

> FN94.RESTATEMENT (SECOND) OF CONTRACTS ch. 11 introductory cmt. (emphasis added).

Because Sentence 8 is not limited by any "best efforts" language, Robino agreed, without qualification, to secure Value City's consent to the Proposed Wawa.

Robino's alternative construction is unpersuasive. Robino looks to Sentence 2, unchanged by the

Second Amendment, but it does not establish an umbrella "best efforts" standard for the remainder of Section 11. Stating that "Seller shall ... use due diligence and good faith efforts to cause the Shopping Center *to be subdivided,*" Sentence 2's qualified obligation is limited to subdivision approval and has no bearing on Robino's obligation to obtain Value City's consent.

Similarly, the Second Amendment's use of the word "remain" in Sentence 8 does not merely reconfirm the "due diligence and good faith efforts" standard that was preserved from the original Section 11 in Sentence 2 as Robino suggests. Construing "remain" in this fashion would strain the Second Amendment's text, because, as discussed above, the "due diligence and good faith efforts" standard applies only to subdivision approval, while the Second Amendment, by way of the new Sentence 8, imposes a new, express obligation on Robino: to obtain necessary or desirable consents from third parties.[FN95]

> FN95. Robino does not sponsor a plausible alternative meaning for "remain." Instead, its argument ultimately reduces down to a contention that Sentence 8 does not make any sense because of its verb. If "remain" is read in the sense of "staying the way it was," Sentence 8 in Robino's view makes no sense, because it could not stay responsible for an obligation (third party consents) which it never had explicitly before the Second Amendment. Adopting that view, one not without some appeal, especially in light of the extrinsic evidence, *see infra* note 98, would lead the Court to read the section out of the agreement. Where the words can be read to describe a contractual duty in an unambiguous-even if somewhat awkward-fashion, the Court's function is not to substitute its subjective view of what the parties might have intended but, instead, it is to give meaning to the words used by the parties.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Robino's assertion that Sentence 12 is more than a timing provision, qualifying Robino's obligation to obtain the requisite consents and approvals, similarly fails. Read naturally, the sentence (stating "Seller shall use due diligence and its best efforts to fully satisfy all of the requirements set forth in this paragraph as soon as possible") can only be read as a timing provision. No deadline is set; Robino must use its "best efforts" to meet its obligation "as soon as possible." This interpretation, does not, as Robino contends, render Sentence 10's "promptly and fully" language repetitive or mere surplusage. Delaware courts do prefer to interpret contracts to give effect to each term rather than to construe them in a way that renders some terms repetitive or mere surplusage.[FN96] Nonetheless, a simple reading of Sentence 10, stating "[Seller] ... agrees to grant such easements and/or cross-access agreements required by the [city, county and state government] ... and to promptly and fully satisfy ... all other conditions precedent to *the subdivision and site plan approval*," reveals that this timing provision addresses only the government approvals (and possibly private parties' actions necessary to satisfy the various regulatory requirements), while Sentence 8 addresses "all of the requirements set forth in [Section 11's first paragraph]," including the third party consents.[FN97]

FN96.*See, e.g., O'Brien,* 785 A.2d at 287 ("Delaware Courts have consistently held than an interpretation that gives effect to each term of an agreement is preferable to any interpretation that would result in a conclusion that some terms are uselessly repetitive.").

FN97. Another argument-one not squarely presented by Robino-that might be seen as aiding Robino proceeds as follows. Sentence 8 merely reinforces that it is Robino who must obtain the third party consents. Sentence 8 does not set any performance standard, such as, for example, an unqualified duty or best efforts. Elsewhere, in Amended Section 11, a standard-best efforts-is prescribed for certain tasks, but no standard is established for the Sentence 8 responsibilities. Thus, there is a void in the Amended Purchase Agreement that constitutes an ambiguity and may be filled by reference to extrinsic evidence. That argument fails, however, because the standard of performance in a contract-in the absence of any qualification-is understood for what it is: a binding and unqualified obligation-one which, the Court has concluded, was imposed upon Robino by the Amended Purchase Agreement for those matters within the scope of Sentence 8.

*12 The Amended Purchase Agreement is clear and unambiguous in regard to Robino's obligation to secure third party consents; therefore, the Court declines to consider extrinsic evidence and holds that the plain meaning of Section 11 imposes on Robino the otherwise unqualified duty to secure Value City's consent to the Proposed Wawa .[FN98]

FN98. The extrinsic evidence, if it could be considered, would favor Robino primarily because the February Letter (containing terms that were not negotiated thereafter) anticipates only Robino's best efforts to secure Value City's consent. Indeed, that understanding was reflected in a demand letter written by West Willow's counsel which reminded Robino that it was "specifically obligated [by the terms of the Second Amendment] to use its best efforts, which it has not done, to obtain any third party consent ..." Brauerman Aff. Ex. 19 (letter from West Willow's attorney to Robino's attorney). Most (if not all) of the additional compensation paid to Robino under the Second Amendment can fairly be allocated to the cost of providing the easement to adjacent owners. Thus, Robino received little, if any, compensation for taking on the risk of obtaining Value City's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consent. On the other hand, Robino may not have appreciated the risk and may not have sought additional payment because Stortini thought that obtaining Value City's consent would not be difficult. *See* Stortini Dep. 57, 63-64. Also, Sentence 8 was first composed for the Second Amendment. As such, it must be taken as reflecting the parties' latest and most focused effort to define the terms of their contractual relationship. Finally, the best efforts language of the February Letter was not carried forward to the Second Amendment; its deletion suggests that the less burdensome standard would not define the nature of Robino's duties.

## D. *A Few Words About "Absurdity"*

Robino's contention that such a construction is hyper-technical and would work an absurd result, an argument occupying the interstices between the text and extrinsic evidence, deserves comment. At root, Robino argues that holding it entered into an agreement guaranteeing the consent of a third party beyond its control, whatever the cost, works an absurd result, an agreement that would be commercially disadvantageous to Robino and, hence, one unreasonable for Robino to enter into. Although not without some appeal, this argument is ultimately unpersuasive. A wide gulf exists between construing an ambiguous contract as commanding an absurd result and simply enforcing the language of a revised contract that appears to be a poor bargain based upon a close and careful reading of its terms.

"[T]here is ... a strong American tradition of freedom of contract, and that tradition is especially strong in our State, which prides itself on having commercial laws that are efficient."[FN99]Freedom of contract enables parties to enter into all sorts of agreements, advantageous and disadvantageous. Where, as here, the parties have voluntarily ordered their relationship through a binding contract, "Delaware law is strongly inclined to respect their agreement...."[FN100]

FN99.*Abry P'ners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1059-60 (Del. Ch.2006) (footnotes omitted).

FN100.*Libeua v. Fox,* 880 A.2d 1049, 1056 (Del. Ch.2005), *aff'd in pertinent part,*892 A.2d 1068 (Del.2006); *accord Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 172 (Del. Ch.2005) (recognizing the "fundamental principle that parties should have the freedom to contract and that their contracts should not easily be invalidated"); *Texas Instruments Inc. v. Tandy Corp .,* 1992 WL 200604, at *5 (Del. Ch. Aug. 13, 1992) (acknowledging a "powerful presumption in favor of freedom of contract"); *State v.. Tabasso Homes, Inc.,* 28 A.2d 248, 252 (Del.Gen.Sess.1942) ("[T]he right to contract is one of the great, inalienable rights accorded to every free citizen.... [F]reedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist.").*See also Fleming v. U.S. Postal Serv. A MF O'Hare,* 27 F.3d 259, 261 (7th Cir .1994) (Posner, J.) (noting that "a premise of a free-market system is that both sides of the market, buyers as well as sellers, tend to gain from freedom of contract"). The *Libeua* Court went on to note that a court will only interfere with the parties' bargain "upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than the freedom of contract. Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."*Libeua,* 880 A.2d. at 1056-57 (footnotes omitted).

In this vein, a court will not read a reasonableness

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
(Cite as: Not Reported in A.2d, 2007 WL 3317551)

Page 20

or "best efforts" requirement into a contract entered into by sophisticated parties,[FN101] nor will one strain to find ambiguities in order to reach that result, even to abjure imposing an exacting obligation on a party. A party is not discharged from the binding language of a contract simply because its obligation under that language turns out to be difficult or burdensome.[FN102]Robino agreed, without any qualification, to secure Value City's consent, and it cannot look to the Court for relief from that obligation. "[I]t is not for some judge to substitute his subjective view of what makes sense for the terms accepted by the parties."[FN103]

FN101.See Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co., 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) ("A court should not read a reasonableness requirement into a contract entered into by two sophisticated parties. It is imperative that contracting parties know that a court will enforce a contract's clear terms and will not judicially alter their bargain, that courts do not tramp/trump the freedom of contract lightly.") (quotations and footnotes omitted).See also supra note 84.

FN102.See Safe Harbor Fishing Club v. Safe Harbor Realty Co., 107 A.2d 635, 638 (Del. Ch.1953) ("Courts cannot alter contracts merely because they work a hardship. A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect, because it turns out to be difficult or burdensome to per- form.").

FN103.Matria Healthcare, Inc. v. Coral SR LLC, 2007 WL 763303, at *1 (Del. Ch. Mar. 1, 2007). Robino invokes Horizon Personal Commc'n, Inc. v. Sprint Co., 2006 WL 2337592 (Del. Ch. Aug. 4, 2006), in which the Court, applying Kansas law, observed that it would not rigidly construe the terms of a contract so as to "make[ ] performance impossible and pro-

duce [ ] an absurd result."Id. at *21. The result here is not absurd if one accepts Stortini's view, later proven to be mistaken, that obtaining Value City's consent would not be a problem. Additionally, Robino may have anticipated that, because Value City's consent could not be "unreasonably withheld" under the Value City Lease, it would not be difficult to obtain.

E. The Suitability of Specific Performance

With the conclusion that Robino is contractually obligated to secure Value City's consent under the Amended Purchase Agreement, the Court turns to whether specific performance of that obligation, as urged by West Willow, is appropriate.

Specific performance is an equitable remedy designed to protect a party's expectations under a contract by compelling the other party to perform its agreed upon obligation.[FN104]Specific performance is an extraordinary remedy, appropriate where assessing money damages would be impracticable or would fail to do complete justice.[FN105]As West Willow points out, specific performance is particularly appropriate for enforcing contracts for the sale of real property.[FN106]The party seeking specific performance must show that there is no adequate remedy at law.[FN107]

FN104.See Certainteed Corp. v. Celotex Corp., 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005).

FN105.Collins v. Am. Int'l Group, Inc., 1998 WL 227889, at *6 (Del. Ch. Apr. 29, 1998).

FN106.See, e.g., Lee Builders v. Wells, 95 A.2d 692, 693 (Del. Ch.1953) ("[I]n the case of an agreement for the sale of land, courts will assume that money damages do not constitute an adequate remedy for the breach of such a contract and take jurisdic-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion without the necessity of an actual showing that such is the case.... It is almost a matter of course that a court of equity will enforce specific performance of contracts concerning land, for all land is assumed to have a peculiar value to those who contract as to it, so that damages for breach of the contract is not an adequate remedy.") (quotation and citation omitted), *rev'd on other grounds,* 99 A.2d 620 (Del.1953).

FN107. *Minnesota Invco of RSA # 7, Inc. v. Midwest Wireless Holdings LLC,* 903 A.2d 786, 793 (Del. Ch.2006).

**\*13** A party is never absolutely entitled to specific performance; the remedy is a matter of grace and not of right, and its appropriateness rests in the sound discretion of the court.[FN108] In general, equity will not grant specific performance of a contract if it cannot "effectively supervise and carry out the enforcement of the order."[FN109] Moreover, the balance of the equities must favor granting specific performance.[FN110]

FN108. *See Safe Harbor Fishing Club,* 107 A.2d at 638. *See also Morabito v. Harris,* 2002 WL 550117, at \*3 (Del. Ch. Mar. 26, 2002) ("[T]here is no 'entitlement' to specific performance, even when a contract breach involving unique goods is admitted.").

FN109. *Bryson v. J.T.B., Inc.,* 1977 WL 23826, at \*7 (Del. Ch. Aug. 15, 1977); *see Bali v. Christiana Care Health Servs., Inc.,* 1999 WL 413303, at \*3 (Del. Ch. June 16, 1999); *see also N. Delaware Indus. Dev. Corp. v. E.W. Bliss Co.,* 245 A.2d 431, 434 (Del. Ch.1968) ( "[P]erformance of a contract for personal services, even of a unique nature, will not be affirmatively and directly enforced. This is so, because, ... the difficulties involved in compelling performance are such as to make an order

for specific performance impractical."). The difficulty in enforcing and supervising a specific performance remedy is particularly acute when the contract to be enforced involves personal services.

FN110. *Morabito,* 2002 WL 550117, at \*2.

Ultimately, granting specific performance is inappropriate in this context because the Court could not effectively and fairly ensure or compel Robino's compliance. An order of specific performance would require Robino to secure Value City's consent. Whether or not Value City consents to the sale and the Proposed Wawa is, although subject to Robino's influence, out of its control. The Value City Lease provides that Value City's consent may not be "unreasonably withheld," a term that, at least arguably, may mean that if Value City's concerns over reduced visibility are indeed reasonable, Value City may be entitled to withhold consent no matter what concessions are offered by Robino. In short, because Robino cannot be compelled to force an independent third party to act, especially under circumstances where the third party may have no duty to act, specific performance is inappropriate.[FN111] Perhaps, more to the point, the Court's authority to protect Robino from Value City's taking unfair advantage of its bargaining position is limited. Accordingly, West Willow is not entitled to an award of specific performance.

FN111. In fact, West Willow appears to have all but conceded the specific performance issue in its answering brief. *See* Pl.'s Answering Br. in Supp. of Mot. for Summ. J. 17 ("As a practical matter, however, specific performance need not be ordered.... [T]he Court should not hesitate to declare a breach and allow the parties to proceed toward determining the appropriate damages."). The Court also questions whether a remedy requiring it to closely monitor or supervise Robino's effort to negotiate with Value City regarding its consent would be 1practicable. *Cf. Bali,* 1999 WL 413303, at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 2007 WL 3317551)**

Page 22

*3

## V. CONCLUSION

For the reasons set forth above, (1) West Willow is entitled to a declaration that Robino has breached the Purchase Agreement, as amended, by not obtaining Value City's consent, and (2) specific performance is not a suitable remedy. [FN112]

> FN112. Additional proceedings to determine West Willow's damages will be necessary.

Counsel are to confer and to submit an implementing order within ten days.

Del.Ch.,2007.
West Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC
Not Reported in A.2d, 2007 WL 3317551 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT G

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 1992 WL 200604)**

▷
Texas Instruments Inc. v. Tandy Corp.
Del.Ch.,1992.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.
TEXAS INSTRUMENTS INCORPORATED, a
Delaware corporation, Plaintiff,
v.
TANDY CORPORATION, a Delaware corporation,
Defendant.
**Civ. A. No. 12166.**

Submitted: June 29, 1992.
Decided: Aug. 13, 1992.

Jesse A. Finkelstein of Richards, Layton & Finger,
Wilmington (Barry R. Satine, and Susan L. Gorman
of Jones, Day, Reavis & Pogue, New York City,
Jay C. Johnson of Texas Instruments Incorporated,
Dallas, Tex. of counsel), for plaintiff Texas Instruments Incorporated.
Donald F. Parsons, Jr. of Morris, Nichols, Arsht &
Tunnell, Wilmington, (Albert J. Hillman, Roger L.
Cook, A. James Isbester, and David L. Bilsker of
Townsend and Townsend, San Francisco, Cal., of
counsel), for defendant Tandy Corp.

*MEMORANDUM OPINION*

ALLEN, Chancellor
*1 Litigation of the Amended Complaint has been
stayed in most respects, pending conclusion of an
earlier filed case between the same parties in the
United States District Court for the Northern District of California. *See Texas Instruments Incorporated v. Tandy Corporation,* Del.Ch., C.A. 12166
(May 1992). Litigation of Count II of the Amended
Complaint, however, has not been stayed. That
Count purports to allege a breach of the license
agreement by which Tandy Corporation acquired

rights to practice the art covered by a large number
of patents granted to Texas Instruments. The gist of
Count II is that Tandy breached the license agreement by instituting the federal action which seeks,
among other relief, a declaration of the invalidity of
a number of Texas Instrument's patents. Texas Instruments seeks here a judicial determination that it
now has the legal right to terminate the license
agreement as a result of that action.

Pending is Tandy's motion to dismiss Count II of
the Amended Complaint. It asserts two grounds in
support of that motion. First, it says that recognition of a state law breach of contract action predicated upon the mere filing of suit in the federal district court is inconsistent with public policy as reflected in the well-known case of *Lear v. Adkins,*
395 U.S. 653 (1969) and is forbidden under the Supremacy Clause of our federal Constitution.
Second, Tandy asserts that, federal law aside, the license agreement cannot be construed to create a
contractual obligation to refrain from instituting
such suit. Indeed, defendant claims that the contract
expressly preserves a right to do so.

For the reasons summarized below, I conclude that
a contract provision of the type that plaintiff claims
confers on it the right to terminate the license
agreement is unenforceable as a matter of federal
law. The motion to dismiss Count II will therefore
be granted.

3

The license agreement does not include an express
stipulation that the patentee will have the option to
terminate the license in the event that the licensee
institutes a judicial proceeding seeking an adjudication of patent invalidity. Texas Instruments argues
that such a provision is implicit in the license
agreement, while Tandy urges it is nonexistent.
While it seems commonsensical that if the parties
had intended to create a provision of this sort, they
would have included express language setting it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)
(Cite as: Not Reported in A.2d, 1992 WL 200604)

forth. I cannot conclude on this motion to dismiss that under no state of facts consistent with the Amended Complaint could one conclude that such a stipulation was an implicit part of the agreement reached. Thus, I am required to address the more general question presented by Tandy's federal law argument.

I turn then to the Supremacy Clause argument. In doing so, I assume for purposes of analysis that the parties have agreed in their license agreement that the filing of suit seeking a declaration of the invalidity of any of the patents covered by the license is an act of default entitling the patentee to rescind or terminate the license.

*2 This aspect of the motion presents the question whether such a provision in a patent licensing contract is void as against public policy. To formulate an opinion on that question requires a review of the Supreme Court's opinion in *Lear v. Adkins*, 395 U.S. 653 (1969) as well as a review of the practical consequences of a provision of this type. I start with the practical purpose and function of a contract clause permitting termination of the license upon the filing of suit by the licensee.

As a general matter, there can be no question, I suppose, that such a provision will to some extent deter licensees from instituting judicial review of patent validity. This is obviously so because an alleged infringer of a patent is better off having a licensee than not. The license offers certain protection. First, it provides a legal right to use the patented device or process. Thus, even if a license fails in his attack on the patent he will not be subject to an injunction against his use of the subject matter of the patent.FN1 Second, the license precludes a finding of wilful infringement with its prospect of enhanced damages.FN2 Third, the license defines the reasonable royalty to which the patentee is entitled and thus defines and limits the monetary damages to which the user of a valid patent is likely to be subject. Thus, in a number of ways that may be important, an alleged user of a patent is advantaged in initiating litigation by having a license underling the

patent he attacks. These advantages may be economically significant and there is nothing in the nature of things that forecloses one who may wish to challenge the validity of a patent (or to challenge his own infringement of it) from entering into a license agreement in order to achieve them.

The existence of a right to withdraw these advantages by canceling the license in the event of a judicial challenge will therefore act as a disincentive to greater or lesser extent to the institution of such a challenge.

From the point of view of the patentee the existence of a license agreement with one who is challenging the validity of his patent may have positive and negative implications. On the negative side, since the license offers some protection to the licensee in the event of the licensee's losing the litigation, it makes litigation marginally more likely. A patentee does not want the validity of his patent challenged for two good reasons. First, the challenge represents a threat to the validity, and thus the value, of the patent monopoly. Second, and probably less importantly, such a suit will require the expenditure of time and money to defend. Thus, since a judicial challenge is unhelpful and expensive, a patentee will rationally want to discourage it. A patent license makes litigation (in the post *Lear* era) somewhat more likely; a provision allowing unilateral cancellation in the event of suit reduces that prospect somewhat.

But the existence of a license during a judicial contest over patent validity (or infringement) will also have positive implications for the patentee. It will, so long as it subsists, assure him of the receipt currently of royalty payments in an amount that he deemed acceptable when he negotiated the license.FN3 This, at least in some instances, will be a right of material value.

*3 The existence of a licensing contract with a provision giving the patentee the option to terminate the license if suit is filed would be the optimum position for patentees. It would put the licensee at risk

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)
(Cite as: Not Reported in A.2d, 1992 WL 200604)

of losing the license-bestowed protections if he should sue, while leaving the patentee free (if and when it transpires that the disincentives effect was insufficient to preclude suit) to elect to continue the license.[FN4] Thus, a provision of this type is economically rational on the part of patentees. Indeed since patents constitute legally enforced monopolies, (*i.e.,* all other things held equal, patentees have greater bargaining power) if such provisions were legally valid one would expect them to be common, if not customary.

What is most significant in this analysis, however, is the conclusion that the only function clauses of the type assumed have is to act as a disincentive to institute suit seeking a judicial review of patent validity. I conclude that clauses of this type are, for that reason, invalid and unenforceable as a matter of federal law. *Lear v. Adkins* is the precedent that compels that conclusion.

In *Lear v. Adkins,* the Supreme Court reviewed the relationship between state contract law and the federal law of patents and of restraints on trade. The central holding of *Lear* was to overturn *Automatic Radio Manufacturing Co. v. Hazeltine Research, Inc.,* 339 U.S. 827 (1950). That case had held that one who had accepted benefits under a patent license was thereafter estopped to challenge the validity of that patent. The foundation for the *Hazeltine Research* holding was provided by equitable concepts with deep roots in the law of licenses. The Supreme Court in *Lear,* however, was driven by a different vision than one focusing upon fairness between particular parties. The Court sought a rule that would foster and protect what it saw as the elemental commitment of our legal system to active markets free from unreasonable restraints.

A patent, of course, is the paradigm of a restraint on free trade. It is a state-enforced monopoly. When it is validly issued that restraint is, of course, reasonable as a matter of law. It represents a legislative inducement to invention and innovation. But if a patent is incorrectly issued, it represents not a fair exchange for the disclosure of invention but simply

an unjustified clog on commerce. In that event, *Lear* teaches that there is a strong federal interest in seeing such a mistake corrected by an adjudication of patent invalidity. Since patent licensees were seen by the Court as among the most likely of prospects to perform this helpful function, the Supreme Court held that "the public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain"(395 U.S. at 670) required that licensees be free to sue to establish patent invalidity. "We think it plain," the Court said, "that the technical requirements of contract doctrine must give way before the demands of the public interest...." *Id.*

**\*4** The central holding of *Lear* is not directly applicable to this case. Tandy is already exercising the right that *Lear* recognized in its California litigation. The Court's reasoning in *Lear* is, nevertheless, significant to the question of the enforceability of the assumed termination provision that is sought to be litigated here. In *Lear* the Supreme Court went beyond its central holding dealing with the possible *preclusion* of suit by a licensee to address a license contract issue affecting the *incentive* of licensees to sue for invalidity.

The license in issue in *Lear* provided that the licensee would pay royalties until such time as "the patent ... is held invalid." *Lear,* 395 U.S. at 673. "Thus," the Supreme Court said, "it may be suggested that although Lear must be allowed to raise the question of patent validity in the present lawsuit, it must also be required to comply with its contract and continue to pay royalties until its claim is finally vindicated in the courts." *Id.*

In what might be thought to be an extreme position, the Supreme Court rejected this position:

The parties contract, however, is no more controlling on this issue than is the State's doctrine of estoppel, which is also rooted in contract principles. The decisive question is whether overriding federal policies would be significantly frustrated if licensees could be required to continue to pay royal-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)
(Cite as: Not Reported in A.2d, 1992 WL 200604)

ties during the time they are challenging patent validity in the courts.

*Id.* The Court saw the threat of such frustration:
Enforcing this contractual provision would give the licensor an additional economic incentive to devise every conceivable dilatory tactic in an effort to postpone the day of final judicial reckoning. We can perceive no reason to encourage dilatory court tactics in this way. Moreover, the cost of prosecuting slow-moving trial proceedings and defending an inevitable appeal might well deter many licensees from attempting to prove patent invalidity in the courts.

Lastly, enforcing this contractual provision would undermine the strong federal policy favoring the full and free use of ideas in the public domain. For all these reasons, we hold that Lear must be permitted to avoid the payment of all royalties accruing after Adkins' 1960 patent issued if Lear can prove patent invalidity.

395 U.S. 673-74. Thus, the federal policy necessitating the destruction of the doctrine of license estoppel was deemed by the Supreme Court to go so far as to require the conferring upon a licensee of a privilege to suspend its valid contract obligation to pay royalties by the act of filing suit challenging the validity of the patent. *See Painton & Company v. Bourns, Inc.,* 442 F.2d 216, 226 (1971) (Friendly, J.); Lipscomb's *Walker on Patents* § 20:57 (3d ed.1987).

Subsequent courts have, of course, recognized the authoritative character of this holding, but they have sensibly read it narrowly. Most significantly, the Court of Appeals for the Federal Circuit has held that while *Lear* recognized a right to suspend royalty payments, it did not hold that exercise of that right could not itself constitute a breach of the license entitling the licensor to terminate the license. In *Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991 (1985), the court of appeals reversed a district court order permitting a licensee-plaintiff to make

royalty payments into an escrow fund pending the outcome of the litigation. The court quoted a 1977 holding of the Court of Appeals for the Second Circuit in support of that result:

*5 We believe that the reasoning succinctly stated by the Second Circuit in *Warner-Jenkinson Co. v. Allied Chemical Corp.,* 567 F.2d 184, 193 USPQ 753 (2d Cir.1977) and followed by the Eighth Circuit in *Nebraska Engineering Corp. v. Shivvers,* 557 F.2d 1257, 195 USPQ 227 (8th Cir.1977) is in keeping with the holding of and policy statements in *Lear:*

We believe that *if the plaintiffs wish to continue to invoke the protections of their licensing agreements, they should be required to continue paying their royalties* to the defendant. Ultimately, all royalties paid after the filing of the complaint *may* have to be returned to the plaintiffs.... At present, *plaintiffs already have the option of withholding royalties and thereby breaching the licensing agreement;* of course, they would then run the risk of an injunction if they should lose on the merits. It would not be fair for the plaintiffs to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties. Patents are presumed to be valid, 35 U.S.C. § 282; until invalidity is proven, the patentee should ordinarily be permitted to enjoy the fruits of his invention. The principal effect of an escrow arrangement would be to put undeserved pressure on the defendant.

*Warner-Jenkinson,* 567 F.2d at 188, 193 USPQ at 753.

*Cordis Corp. v. Medtronic, Inc.,* 780 F.2d 991, 995 (Fed.Cir.1985) (emphasis added).

While *Cordis* holds that breach of a valid contractual obligation (there the duty to make royalty payments) may provide a valid [FN5] state law basis for contract termination during the pendency of litigation claiming patent invalidity. *Cordis* does not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 5
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)
**(Cite as: Not Reported in A.2d, 1992 WL 200604)**

hold that a provision authorizing termination *in the event of suit, without more,* is itself a valid provision. Unlike the provision for the payment of royalties involved in *Cordis* or *Warner-Jenkinson,* the inevitable effect of a clause of the type here involved is principally and perhaps only-to discourage suit. But in this area, it is very much the policy of the law to permit and indeed to facilitate suits testing the validity of the grant of a patent monopoly. This policy is resounding in the *Lear* opinion and its roots run deep in our law. *See, e.g., Pope Manufacturing Co. v. Gormully,* 144 U.S. 224, 234 (1892) (patent license provision prohibiting licensee from challenging validity of patents held not specifically enforceable in equity).

In attempting to distill and apply the federal law to this claim, I am compelled to conclude that a contract provision affording to a patentee the option of terminating a patent license, in the event that the licensee seeks an adjudication of patent invalidity, is invalid as against public policy. I do so with a certain hesitancy because of the powerful presumption in favor of freedom of contract. But I note that this is a context in which a monopolist is one of the contracting parties. More directly relevant, however, is the conclusion I reach that the opinion in *Lear v. Adkins* is consistent with no other result.

**\*6** The motion to dismiss Count II will therefore be granted.

FN1. 35 U.S.C. § 283 (1984).

FN2. 35 U.S.C. § 284 (1984).

FN3. In saying this, I accept as correct the view of the Court of Appeals for the Federal Circuit as well as that of the Second Circuit, that while *Lear* recognized a right to suspend royalty payments the exercise of such right will give rise itself to a right to terminate the license. *See infra* at pp. 8-9.

FN4. A t that point the licensee has, under the *Lear* case, an election as well to sus-

pend royalty payments, *see infra* at p. 7.

FN5. *I.e.,* not inconsistent with federal law.
Del.Ch.,1992.
Texas Instruments Inc. v. Tandy Corp.
Not Reported in A.2d, 1992 WL 200604 (Del.Ch.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)
(Cite as: Not Reported in A.2d, 2007 WL 3112466)

Page 1

**H**

Handler Corp. v. State Drywall Co., Inc.
Del.Super.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,New Castle County.
HANDLER CORPORATION, a Delaware corpora-
tion, Handler Development, Inc., a Delaware cor-
poration and Penn National Insurance Company,
Plaintiffs,
v.
STATE DRYWALL CO., INC., a Delaware corpor-
ation, and Harleysville Insurance Company, a
Pennsylvania corporation, Defendants.
**No. 05C-06-012 MMJ.**

Sept. 27, 2007.

Upon Cross Motions for Summary Judgment.

Louis J. Rizzo, Jr., Esquire, Reger Rizzo Kavulich
& Darnall, LLP, Wilmington, Delaware, Attorney
for Plaintiffs.
Stephen P. Casarino, Esquire, Casarino, Christman
& Shalk, Wilmington, Delaware, Attorney for De-
fendants.

*MEMORANDUM OPINION*

MARY M. JOHNSTON, J.

### PROCEDURAL CONTEXT

**\*1** Leandro Tlapechco ("Tlapechco") filed a com-
plaint on September 5, 2002 against Handler Devel-
opment Inc. and Handler Corporation ("Handler")
and other defendants.[FN1] Tlapechco alleged injur-
ies sustained in a fall at a residential construction
project at the Legends of Frog Hollow in
Middletown, Delaware ("Legends") on May 18,
2002. At the time of the fall, Tlapechco was em-
ployed by the painting contractor, Esperanza Paint-

ing ("Esperanza"). The two causes of action against
Handler were for negligently hiring the construc-
tion supervisor, and for negligence in providing
protective railings on the second floor from where
Tlapechco fell. Defendant State Drywall Company,
Inc. ("Drywall") was the drywalling subcontractor
on the project. Drywall subcontracted the drywall
hanging work to Vallejo Drywall ("Vallejo"). Dry-
wall did not perform the drywall installation.

FN1. *Tlapechco v. Handler*, C.A. No.
02C-09-046 MMJ (Del.Super.)

On March 15, 2005, Handler filed a Motion for
Summary Judgment on the grounds that Handler, as
general contractor at Legends, did not maintain act-
ive control over or voluntarily assume safety re-
sponsibilities for Tlapechco's work. Handler's Mo-
tion for Summary Judgment was denied.

During trial, judgment was entered in favor of Dry-
wall. The Court ruled that Tlapechco had no claim
against Drywall for vicarious liability because Dry-
wall and Vallejo were independent contractors. The
only remaining claim against Drywall was Hand-
ler's contractual claim, which is the subject matter
of this litigation. All contractual claims of Handler
against Drywall were bifurcated from the
Tlapechco trial by agreement of the parties and by
order of the Court, to be decided as part of the in-
stant Declaratory Judgment action.

The personal injury case proceeded to trial on Au-
gust 22, 2005. Handler moved for directed verdict
at the close of plaintiff's case, and again at the end
of trial. The Court denied both motions. The jury
found that Tlapechco was 40% negligent and that
Handler was 60% negligent, and awarded
Tlapechco $3,450,000. The total award of
$5,750,000 was reduced by 40% comparative negli-
gence. The jury found in favor of Handler on the
direct claim of negligent hiring.

Handler appealed to the Delaware Supreme Court,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)
(Cite as: Not Reported in A.2d, 2007 WL 3112466)

Page 2

seeking review of the Court's rulings on summary judgment and several motions in limine. Tlapechco filed a cross appeal on the Court's award of summary judgment on the issue of general contractor liability. The Delaware Supreme Court reversed the Superior Court's decision on summary judgment and the case was remanded for a new trial. Tlapechco and Handler were able to settle the lawsuit prior to the second trial.

Based on indemnity and insurance agreements with subcontractors, Handler filed a Complaint for Declaratory Judgment against Esperanza and Drywall on June 1, 2005. Esperanza has conceded that Handler was an additional insured under their insurance policies. Handler dismissed the claim against Esperanza after Esperanza tendered its full policy limits to Handler.

**\*2** Plaintiffs have filed an Amended Complaint for Declaratory Judgment asking the Court to declare that they are entitled to insurance coverage under the policy of insurance written by Harleysville Mutual Insurance Company for Drywall. Plaintiffs seek a declaration that Handler Corporation is an additional insured under the Harleysville policy, and that Harleysville was primary and they are entitled to reimbursement of defense costs. This is defendants' motion for summary judgment claiming entitlement to judgment as a matter of law.

### SUMMARY JUDGMENT STANDARD

This Court will grant summary judgment only when no material issues of fact exist. The moving party bears the burden of establishing the non-existence of material issues of fact.[FN2]Once the moving party meets its burden, the burden shifts to the non-moving party to establish the existence of material issues of fact.[FN3]Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact

for trial.[FN4]If, after discovery, the non-moving party cannot make a sufficient showing of the existence of an essential element of the case, summary judgment must be granted.[FN5]A court deciding a summary judgment motion must identify disputed factual issues whose resolution is necessary to decide the case, but the court must not decide those issues.[FN6]The Court must evaluate the facts in the light most favorable to the non-moving party.[FN7] Summary judgment will not be granted under circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.[FN8]

FN2.*Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

FN3.*Id.* at 681.

FN4.Super. Ct. Civ. R. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

FN5.*Celotex Corp.,* 477 U.S. at 322-23;*Burkhart v. Davies,* 602 A.2d 56, 59 (Del.1991), *cert. denied,*504 U.S. 912 (1992).

FN6.*Merrill v. Crothall-American, Inc.,* 606 A.2d 96, 99 (Del.1992).

FN7.*Id.*

FN8.*Ebersole v. Lowengrub,* 180 A.2d 467, 468-69 (Del.1962).

### DISCUSSION

The cross motions for summary judgment present two basic issues. First, does defendant Harleysville Insurance Company ("Harleysville") have a duty to provide a defense to plaintiff Handler Development, Inc. ("Handler") in connection with *Tlapechco v. Handler,* C.A. No. 02C-09-046 (Del.Super.)? Second, is Handler entitled to indem-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)
(Cite as: Not Reported in A.2d, 2007 WL 3112466)

Page 3

nification under the insurance policy issued by defendant Harleysville Insurance Company to defendant Drywall Company, Inc. ("Drywall")?

### *Contractual Indemnification*

The Subcontract Agreement between Handler and Drywall provides:

1. Subcontractor shall be considered an independent contractor and not an employee or agent of the Company. Subcontractor shall be solely liable for any loss or damage caused by Subcontractor, its subcontractors, or the agents or employees of either.

2. Subcontractor at all times shall fully indemnify, protect and hold harmless the Company, its agents and employees from and against all loss, damage or expense, including attorney's fees, as to all claims, damages or liabilities resulting from accident, negligence, including the Company's negligence, or any other cause whatever caused by Subcontractor or its subcontractors or any of them during the performance of this Agreement, and any contract for extra supplementary work. In any and all claims against the Company or any of its agents or employees by any employee of the Subcontractor or any of its subcontractors, the indemnification obligation under this Paragraph shall not be limited in any way by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts. The Company shall not in any manner be liable or responsible for any loss or damage to the Subcontract Work or any part thereof, or to any of the materials or other things supplied by Subcontractor or any of its subcontractor by reason of any casualty or by reason of any act, default or omission of the Company or any third party, except to the extent of the Company's recovery therefore under the Company's Builders' Risk Insurance Policy.

**\*3** The second paragraph appears to contain a provision requiring indemnification for Handler's own negligence. This exculpatory clause is void.[FN9] A construction contract cannot indemnify a party against that party's own conduct. Therefore, the language in the second paragraph of clause XIX, "including the Company's negligence," and "of the Company," must be invalidated.

> FN9. *Del. C.* § 2704(a).

However, there is no need to nullify the remainder of the Indemnification section.[FN10] The Agreement contains a severability clause: "If any provision of this Agreement is, or shall at any time be, contrary to law, then such provision shall not be applicable. In such event, all other provisions of this Agreement shall continue in effect."[FN11]

> FN10. *Chrysler v. Merrell,* 796 A.2d 648, [ ] (Del.2002). 6

> FN11. Subcontract Agreement XXIV. Miscellaneous.

The Subcontract Agreement explicitly provides that Drywall is required to indemnify Handler for vicarious liability. Drywall has no duty to provide indemnification for Handler's own negligence.

### *Primary or Excess Coverage*

The Penn National Insurance Company insurance policy ("Penn Policy") provides that the coverage is primary, with certain exceptions. The relevant exception provides that the insurance is excess over "[a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement."

The Additional Insured Endorsement in the Harleysville Policy states: "Any coverage provided hereunder shall be excess over other valid and collectible insurance available to the additional insured

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)
(Cite as: Not Reported in A.2d, 2007 WL 3112466)

Page 4

whether that other insurance is primary, excess, contingent or provided on any other basis."

Arguably, these provisions are competing excess coverage clauses. The initial determination is whether Handler was added as an "additional insured," under the terms of the Penn Policy.

The Subcontract Agreement requires Drywall to purchase comprehensive general liability insurance coverage.[FN12]In construing an insurance policy, the Court must consider the parties' intentions.[FN13]The Agreement states that the insurance obtained by Drywall "fully covers and indemnifies" Handler. The indemnification clause contemplates that Drywall "shall be solely liable for any loss or damage caused by [Drywall], its subcontractors, or the agents of employees or either."The Court finds that the parties intended that Drywall purchase insurance to cover and indemnify Handler.

> FN12. Subcontract Agreement XI. Insurance.

> FN13.*Continental Casualty Co. v. Alexis I Dupont School District,* 317 A.2d 101, 105 (Del.1974).

The Additional Insured Endorsement attached to the Harleysville Policy does not specifically name Handler as an additional insured. The Endorsement defines an "additional insured" as "any general contractor, subcontractor or owner whom [Drywall is] required to add as an additional insured on this policy under a written or oral construction contract or agreement where a certificate of insurance showing that person or organization as an additional insured has been issued and received by 'us' prior to the date of loss."

**\*4** The Court finds that the Subcontract Agreement is a written construction contract requiring Drywall to add Handler, the general contractor, as an additional insured. Drywall was contractually obligated to take whatever steps were necessary to insure

Handler under the Harleysville Policy.[FN14]Because the Subcontract Agreement requires that Drywall obtain insurance covering Handler; Drywall purchased the Harleysville policy; and the Additional Insured Endorsement specifically contemplates that the general contractor will be covered; Handler is an additional insured as intended by the parties and contemplated under the Additional Insured Endorsement attached to the Harleysville Policy.

> FN14.*See Daimler Chrysler Corp. v. Penn National Ins. Co.,* 2003 Del. Super LEXIS 128, *11.

The Penn Policy provides that its insurance is primary except when there is "[a]ny other ***primary*** insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement."(Emphasis added). The next question is whether the Harleysville Policy is primary or excess. If the Harleysville Policy is primary, the Penn Policy is excess. If Harleysville is an excess policy, the Penn Policy is primary coverage.

The Harleysville Policy Additional Insured Endorsement explicitly provides: "Any coverage provided hereunder shall be excess over other valid and collectible insurance available to the additional insured whether that other insurance is primary, excess, contingent or provided on any other basis."This language is unambiguous. Regardless of Drywall's contractual obligation to indemnify Handler, the Harleysville Policy simply does not provide primary coverage for additional insureds.[FN15]

> FN15. It appears that Drywall breached its contractual insurance and indemnification obligations to Handler in two ways. First, Drywall agreed to be "solely liable for any loss or damage" it caused. Because the Harleysville Policy is excess insurance for additional insureds, the Harleysville Policy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)
(Cite as: Not Reported in A.2d, 2007 WL 3112466)

does not provide full insurance coverage for Handler's vicarious liability. Second, Drywall failed to issue and transmit to Harleysville a certificate of insurance showing that Handler was an additional insured. However, in light of the finding that the Harleysville Policy is excess coverage, the Court need not resolve whether the procedural defect of Drywall's failure to send a certificate of insurance invalidates Handler's status as an additional insured.

Therefore, there are no circumstances in which the Harleysville Policy can be deemed primary. The Court finds that the Harleysville Policy is excess and the Penn Policy is primary, in the absence of any other primary insurance.

### Duty to Defend

The Harleysville Policy states that "[w]hen this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or 'suit' that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers." As the excess carrier, Harleysville had no duty to defend.

In light of this ruling, the Court need not determine when the duty to defend arose, or when the duty terminated.

### CONCLUSION

Drywall is contractually required to indemnify Handler for vicarious liability. Drywall has no duty to provide indemnification for Handler's own negligence. The Court finds that Handler is an additional insured as intended by the parties and contemplated under the Additional Insured Endorsement attached to the Harleysville Policy. However, the Harleysville Policy does not provide primary coverage for additional insureds. As the excess carrier, Harleysville Insurance Company did not have a duty to

provide a defense or to indemnify Handler.

*5 THEREFORE, Plaintiffs' Motion for Summary Judgment is hereby denied as to entitlement to a defense under the Harleysville policies, and granted as to Drywall's contractual indemnification obligation. Defendants' Motion for Summary Judgment is hereby granted in that Harleysville has no duty to defend Handler, and denied in that Drywall has a contractual obligation to indemnify Handler.

IT IS SO ORDERED.

Del.Super.,2007.
Handler Corp. v. State Drywall Co., Inc.
Not Reported in A.2d, 2007 WL 3112466 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2003 WL 21733013)**

Page 1

**C**
Davis v. R.C. Peoples, Inc.
Del.Super.,2003.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Brian K. DAVIS and Sharon M. Davis, Plaintiffs,
v.
R.C. PEOPLES, INC., a foreign corp., Defendant/
Third-Party Plaintiff,
v.
HERITAGE INTERIORS, INC., Third-Party De-
fendant.
**No. Civ.A. 01C-11-147JRS.**

Submitted May 7, 2003.
Decided July 25, 2003.

Upon Consideration of Third-PartyDefendant Herit-
age Interiors, Inc.'s Motion for Summary Judgment.
Granted in Part. Denied in Part.

Arthur M. Krawitz, Doroshow, Pasquale, Krawitz,
Siegel & Bhaya, Wilmington, Delaware, for
Plaintiffs.
Louis J. Rizzo, Reger & Rizzo, Wilmington,
Delaware, for Defendant/Third-Party Plaintiff.
Kenneth M. Doss, Casarino, Christman & Shalk,
Wilmington, Delaware, for Third-Party Defendant.

MEMORANDUM OPINION

SLIGHTS, J.

I. INTRODUCTION

*1 In this case, the Court must determine whether a
party to a construction contract may claim an im-
plied right to indemnification when it has failed to
secure such protection in its contract documents.
The case arises from a personal injury accident on a
construction site at Wilmington College's New

Castle County campus. The plaintiff, Brian K. Dav-
is ("Davis"), was injured while in the course of his
employment with third-party defendant, Heritage
Interiors, Inc. ("Heritage"). The general contractor
for this construction project was defendant, third-
party plaintiff, R.C. Peoples, Inc. ("R.C.Peoples").
The contract between Heritage and R.C. Peoples is
silent with respect to indemnification.

Davis has sued R.C. Peoples alleging, *inter alia,*
that it negligently failed to maintain a safe work en-
vironment. R.C. Peoples has brought a third-party
claim against Heritage for contribution and indem-
nification. Heritage has moved for summary judg-
ment on the grounds that it is immune from claims
for contribution under Delaware's workers' com-
pensation statute,[FN1] and that no indemnification
obligation may be imposed as a matter of law. The
contribution claim clearly is not viable and has
already been dismissed by the Court. The claim for
indemnification, however, involves a more com-
plicated analysis. After studying the relevant case
authority, the Court is satisfied that, under certain
factual scenarios, a claim for implied indemnity
may be viable. Because Heritage has focused its
presentation on the legal viability of the implied in-
demnity claim, it has not supported its motion with
a factual record which would allow the Court to de-
termine if such a scenario is present in this case.
Accordingly, the motion for summary judgment
with respect to implied indemnity must be
DENIED. Since the parties agree that there is no
express provision for indemnity in place here, the
motion for summary judgment is GRANTED with
respect to R.C. Peoples' claim for indemnity based
upon its contract with Heritage.

FN1.DEL CODE ANN. tit. 19, § 2304
(1995).

II. FACTS

In the summer of 1999, R.C. Peoples was the gener-
al contractor on a construction project at Wilming-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
(Cite as: Not Reported in A.2d, 2003 WL 21733013)

Page 2

ton College ("the Project"). On July 26, 1999, Heritage submitted a bid to R.C. Peoples to perform framing, drywall and related services on the Project. The bid outlined the work to be done and the associated cost but did not state specifically the manner in which the work would be performed. Nor did it address such customary issues as insurance coverage and indemnification. Apparently, the parties had worked together on other projects and were satisfied that such contractual formalities were not necessary on this Project.[FN2]Instead, the details of the parties' relationship with respect to this Project were discussed orally among the principals prior to and during Heritage's performance. It is undisputed that the topic of indemnification was not discussed.

> FN2. Interestingly, the record reveals that the parties had entered into indemnification agreements on other projects. The record is clear, however, that such agreements were limited in scope to the projects to which they related. There was no "blanket" indemnification agreement in place between the parties at the time of the events giving rise to this lawsuit.

On February 1, 2000, Davis slipped and fell on an ice-covered stairway at the construction site while carrying tools from one floor of the work area to another. He sought his exclusive remedy of workers' compensation from his employer, Heritage, and filed a claim for personal injuries against R.C. Peoples. R.C. Peoples, in turn, filed a third-party claim against Heritage for contribution and indemnification.

*2 At the conclusion of oral argument, the Court granted Heritage's motion for summary judgment with respect to R.C. People's third-party claim for contribution.[FN3]All that remains for consideration, then, is the third-party claim for indemnification. Fact discovery is closed and the motion is ripe for decision.

> FN3.See Precision Air, Inc. v. Standard

*Chlorine of Del., Inc.,* 654 A.2d 403, 407 (Del.1995)("Because the employer cannot be held liable as a joint tortfeasor, it is not obligated to provide contribution to the third party.").

### III. DISCUSSION

#### A. Summary Judgment Standard

When considering a motion for summary judgment, the Court's function is to examine the record and determine whether genuine issues of fact exist.[FN4]If, after viewing the record in a light most favorable to the non-moving party, the Court finds that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law, then summary judgment will be granted.[FN5]Summary judgment will not be granted, however, if the record indicates that a material fact remains in dispute, or if judgment as a matter of law is not appropriate.[FN6]

> FN4.*Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* 312 A.2d 322, 325 (Del.Super.Ct.1973).

> FN5.*Id.*

> FN6.*Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

#### B. Implied Indemnification

The parties agree that the contract documents between Heritage and R.C. Peoples do not address the issue of indemnification. The parties did not discuss indemnification orally, and did not otherwise address the topic in their communications about the Project. Express indemnification, therefore, is not an issue in this case.

R.C. Peoples contends that even in the absence of an express commitment to indemnify, Heritage may be liable for indemnification on the basis of its breach of an implied promise to perform its work

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
(Cite as: Not Reported in A.2d, 2003 WL 21733013)

Page 3

on the project in "a workmen like manner."[FN7] According to R.C. Peoples, this breach, standing alone, creates the right of indemnification even when the parties do not expressly contemplate indemnification.[FN8] Heritage responds by arguing that R.C. Peoples must establish some acceptance of the obligation of indemnification by Heritage-in writing, orally or otherwise-in order to prevail on its claim of implied indemnification.

> FN7. (D.I.48)

> FN8. R.C. Peoples has not argued that it enjoyed a "special relationship" with Heritage from which an obligation to indemnify may be implied. *See SW (Delaware), Inc. v. American Consumers Indus., Inc.,* 450 A.2d 887, 889 (Del.1982)(indemnification obligation may arise when a "special relationship" exists between the parties of a nature that such an obligation should be implied).

The majority of jurisdictions do not recognize an implied right to indemnification.[FN9] Delaware, however, appears to side with the minority. For instance, in *Diamond State Tel. Co. v. University of Delaware,*[FN10] the court held that a contractor may be liable on a theory of implied indemnity when he breaches "an obligation to perform his work with due care."[FN11] The court identified three specific factual scenarios where the employer may be liable to a third party for implied indemnity, notwithstanding workers' compensation exclusivity, when the employer's conduct places the third party in a position where it is exposed to liability to the employee.[FN12] These include instances where the employer creates a dangerous condition on the third party's premises which causes injury to the employee, instances where the employer knowingly permits the employee to work under dangerous conditions which may have been caused or created by the third party, and instances where the employer activates a latent dangerous condition caused or created by the third party which, in turn, causes injury to the employee.[FN13] After describing the scenarios,

the court concluded: "From the foregoing, it is obvious that whether or not there exists liability to indemnify a third party depends entirely upon the factual circumstances surrounding the incident."[FN14]

> FN9. 7 LARSON, WORKERS' COMPENSATIONLAW, § 121.07[1] (2002)("we find a sharp divergence of opinion between the small minority of jurisdictions holding that, when the relation between the parties is based on contract, an obligation of care with accompanying indemnity obligation can be implied that survives the exclusivity defense, and the majority that reject the implied indemnity doctrine").

> FN10.269 A.2d 52 (Del.1970).

> FN11.*Id.* at 57.

> FN12.*Id.* at 57-58.

> FN13.*Id.*

> FN14.*Id.*

**3** Since deciding *Diamond State,* our Supreme Court in other decisions has embraced the notion that an obligation to indemnify may be implied from the circumstances of the case.[FN15] Heritage acknowledges that Delaware courts have declined to recognize worker's compensation exclusivity when an implied obligation of indemnity is present. But, according to Heritage, our Supreme Court further refined the right of implied indemnity in *Precision Air, Inc. v. Standard Chlorine of Del., Inc.,*FN16 and a critical component of the claim, as recognized in *Precision Air,* is missing here. In *Precision Air,* the court held:

> FN15.*See, e.g., SW (Del.), Inc.,* 450 A.2d at 889-90;*Howard, Needles, Tammen & Bergendoff v. Steers, Perini & Pomeroy,* 312 A.2d 621, 623 (Del.1973).

> FN16.654 A.2d 403 (Del.1995).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
(Cite as: Not Reported in A.2d, 2003 WL 21733013)

An employer, even though it has paid workmen's compensation benefits to an injured employee, can be held contractually liable to a third party where a contract between the employer and third party contains provisions requiring the employer to: (i) perform work in a workman-like manner; and (ii) indemnify the third-party indemnitee for any claims arising from the employer-indemnitor's own negligence. (citation omitted)(emphasis in original).

Where both of the above-mentioned provisions are provided for by an express or implied contract, 'a third party has a right to maintain an action against a negligent employer who may be held liable for indemnity if the employer has breached and independent duty owed a third party, or if in the circumstances there is a basis for finding an implied promise of indemnity.'(citations omitted)(emphasis supplied).[FN17]

FN17.*Id.* at 407.

Heritage contends that *Precision Air* now makes clear that the third party must establish that the employer promised both to perform in a workman-like manner and to indemnify for any claims arising from the employer's negligence before the court may impose upon the employer an implied obligation to indemnify. Heritage argues that, according to *Precision Air*, these criteria apply to both express and implied indemnification claims. In this case, R.C. Peoples has conceded that Heritage never promised to indemnify R.C. Peoples for any loss which may have occurred on the Project (regardless of whose fault may have caused the loss). Indeed, the issue of indemnification was never discussed. Moreover, the record is devoid of any evidence that Heritage, either orally or in writing, ever expressed its commitment to perform its services on the Project in a workman-like manner.

At first glance, *Diamond State* and *Precision Air* appear to be at odds.*Diamond State* holds that an indemnity obligation may be implied under the cir-

cumstances of a given case depending upon the conduct of the employer/putative indemnitor; *Precision Air* appears to suggest that an indemnity obligation may be implied only when the employer/indemnitor acknowledges in some way an obligation to perform in a workman-like manner and to indemnify. On further inspection, however, the Court is unable to conclude that *Precision Air* intended to overrule or limit the right to implied indemnity recognized in *Diamond State.*

*4 At the outset, it bears emphasis that *Precision Air* involved an express indemnification provision that was negotiated into a written contract between the employer and the third-party indemnitee. There was no need in to imply an indemnity obligation; it arose from the parties' express contract. Thus, when the court discussed the "provisions" which are required to create "contractual[ ] liab[ility]," it would appear that it was discussing these provisions in the context of an express, written contract.[FN18]Indeed, to speak of "provisions" of an implied contract would be inconsistent with the concept of implied contract.[FN19]Since there are no words to comprise the "provisions" [FN20] of an implied contract, *ipso facto,* there are no provisions of an implied contract.[FN21]

FN18.*Id.*

FN19.*See Capital Management Co. v. Brown,* 813 A.2d 1094, 1098 (Del.2003)("[A]n implied contract is one inferred from the conduct of the parties, though not expressed in words. The parties' intent and mutual assent to an implied-in-fact contract is proven through conduct rather than words.") (citations omitted).

FN20. "Provision" is defined as: "A clause in a statute, contract or other legal instrument."BLACK'S LAW DICTIONARY 1240 (7th ed.1999).

FN21. The Court acknowledges the language in *Precision Air.*"Where both of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
(Cite as: Not Reported in A.2d, 2003 WL 21733013)

Page 5

above-referenced provisions are provided for by an express or implied contract...."*Precision Air,* 654 A.2d at 407 (emphasis supplied). This reference to "provisions" of an implied contract is not explained. It is possible that it was inadvertent given that it was made in the context of a discussion of cases where the claim for implied indemnity arose by virtue of the relationship between the parties or the conduct of the employer. *See American Consumers,* 450 A.2d at 889-90; *Diamond State,* 269 A.2d at 55.

In cases where the claim to indemnity is based upon a theory of implied indemnification, the Court is not willing to read *Precision Air* to require the putative indemnitee to establish that its contractual arrangement with the employer/indemnitor contained a "provision requiring the employer to [ ] perform in a workman-like manner and [ ] indemnify the third-party-indemnitee for any claims arising from the employer's [ ] own negligence."[FN22] When the circumstances warrant, the obligation to perform in a workman-like manner and to indemnify may be implied in the relationship, as a matter of law or fact, even in the absence of contractual "provisions." [FN23]

> FN22.*Precision Air,* 654 A.2d at 407.

> FN23.*See Bye v. George McCaulley & Son, Co.,* 76 A 621, 622 (Del.Super.Ct.1908)(when a contractor "holds himself out as a competent contractor to perform labor of a certain kind, the law presumes that he possesses the requisite skill to perform such labor in a proper manner and implies as part of his contract that the work shall be done in a skillful and workmen like manner"); *Diamond State,* 269 A.2d at 58 ("employer may be liable in indemnity for breach of his implied agreement of workmanlike performance").

The Court's interpretation of *Precision Air* recog-

nizes that there is a meaningful distinction between a claim of indemnity based upon an express agreement and a claim of indemnity implied from the conduct of the parties. In the case of express indemnification, the parties are free to negotiate the scope of the indemnity and the circumstances under which it will arise. Indeed, the law recognizes that, under certain circumstances, the parties may agree that one party to a contract will bear the risk of all losses (an indemnity obligation) regardless of which party may be at fault for the loss.[FN24] On the other hand, when the indemnity obligation is implied, the obligation will be limited to the extent of the fault attributed to the indemnitor.[FN25] In recognition of this distinction, *Precision Air* concentrated its analysis on the express "provision" of the parties contract in order to ascertain the scope of the indemnitor's obligation.[FN26] This exercise is not necessary when the indemnification obligation is implied.

> FN24.*See State v. Interstate Amiesite Corp.,* 297 A.2d 41, 44 (Del.1972)(party may contract for indemnification for all acts of negligence, including its own negligence, if the contract so providing is "crystal clear and unequivocal.").

> FN25.*See Precision Air,* 654 A.2d at 410.

> FN26.*Id.* at 407-08.

Finally, the Court must take note of the fact that *Precision Air* cites *Diamond State* with approval.FN27 Of particular relevance to this analysis is the absence of any expression of intent to overrule or limit *Diamond State'* s recognition of an implied indemnity obligation which may arise from "the factual circumstances surrounding the incident."[FN28] And, significantly, Heritage has offered no rational basis for the Court to read that intent into *Precision Air* or to take it upon itself to limit *Diamond State.* Accordingly, the Court concludes that R.C. Peoples may prosecute a claim for implied indemnification against Heritage assuming it can produce evidence that will fit into one of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)
**(Cite as: Not Reported in A.2d, 2003 WL 21733013)**

Page 6

three scenarios recognized in *Diamond State,* or some other scenario which would implicate the burden-sharing considerations that buoy the implied indemnity concept.[FN29]

     FN27.*Id.* at 407.

     FN28.*Diamond State,* 269 A.2d at 58.

     FN29.*Id.* at 57-58.*See also* 7 LARSON, WORKER'S COMPENSATION LAW, § 121.07[2] (2000)("It is difficult to see why there should be any conceptual obstacle to saying that when the employer negligently creates a dangerous condition in performing a service for the third party, the employer should indemnify the third party even if the third party was negligent to the extent of failing to discover the danger").

**\*5** There remains a matter of procedure not addressed by the parties. R.C. Peoples' third party complaint alleges that Heritage's indemnity obligation arises from the "terms and conditions of the subcontractor agreement between [the parties]."FN30 The pleading makes no reference to implied indemnity. The parties have agreed that there is no express contractual obligation to indemnify applicable to Heritage's work on the Project. Accordingly, summary judgment with respect to the express indemnification claim is appropriate. The Court will allow R.C. Peoples to amend its third party complaint in conformity with the evidence developed in discovery to plead a claim for implied indemnity.[FN31]The Court will also allow Heritage to renew its motion for summary judgment in the event it determines that the undisputed facts would not support a claim for implied indemnity as recognized in *Diamond State.*[FN32]

     FN30. (D.I.5, ¶ 7)

     FN31.*See* Del.Super. Civ. R. 15(b). The amended third-party complaint shall be filed within twenty (20) days of this Opinion and Order.

     FN32. In the motion *sub judice,* Heritage focused its presentation on whether an implied indemnity claim would be viable in light of R.C. Peoples' admission that it had no "contract for indemnity [with Heritage], 'written, oral or otherwise." ' (D.I.38) Now that the Court has determined that the indemnity obligation can be implied from the "factual circumstances surrounding the incident," it remains to be seen whether the "factual circumstances surrounding [this] incident" will support the claim. As the Court has not been supplied with any of the specifics of this incident, it cannot evaluate the *bona fides* of the implied indemnity claim on this record.

### IV. CONCLUSION

Based on the foregoing, Heritage's motion for summary judgment is GRANTED in part and DENIED in part. The Court already has granted summary judgment to Heritage with respect to R.C. Peoples' claim for contribution. Because the undisputed facts reveal that the parties did not expressly agree to any indemnification commitments, summary judgment must be granted with respect to R.C. Peoples' claim for indemnification based upon an express contract. The claim for implied indemnity, although not currently plead, is legally viable and will be permitted to survive this motion. If Heritage determines that the claim is not supported factually, it may renew its motion for summary judgment on that ground.

IT IS SO ORDERED.

Del.Super.,2003.
Davis v. R.C. Peoples, Inc.
Not Reported in A.2d, 2003 WL 21733013 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT KEMPSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: 06-252 *** |
| v. | ) | |
| | ) | |
| TOLL BROS., INC., *et al.* | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TOLL BROS., INC., | ) | |
| | ) | |
| Third-Party | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE HEATING AND AIR | ) | |
| CONDITIONING SERVICES, INC., | ) | |
| | ) | |
| | ) | |
| Third-Party | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Michael P. Kelly, hereby certify that on April 28, 2008 I caused a copy of the foregoing **Defendant/Third-Party Plaintiff Toll Bros., Inc.'s Answering Brief in Opposition to Delaware Heating and Air Conditioning Services, Inc.'s Motion for Summary Judgment** to be served electronically on the following counsel of record:

Joseph J. Rhoades, Esquire
Allen Dale Bowers, II, Esquire
Law Office of Joseph J. Rhoades
1225 King Street, St. 1200
P. O. Box 874
Wilmington, DE  19899

Louis J. Rizzo, Jr., Esquire
Reger, Rizzo, Kavulich, & Darnall, LLP
1001 Jefferson Plaza, St. 202
Wilmington, DE  19801

Daniel P. Bennett, Esquire
Mintzer, Sarowitz, Zeris, Ledva & Meyers, LLP
1220 N. Market St., Suite 300
Wilmington, DE  19801


By:     /s/ Michael P. Kelly
        Michael P. Kelly (DE# 2295)